1  STEVE W. BERMAN (*pro hac vice* pending)
   *steve@hbsslaw.com*
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 8th Avenue, Suite 3300
3  Seattle, WA  98101
   Telephone:  (206) 623-7292
4
   ELAINE T. BYSZEWSKI (SBN 222304)
5  *elaine@hbsslaw.com*
   HAGENS BERMAN SOBOL SHAPIRO LLP
6  301 North Lake Avenue, Suite 203
   Pasadena, CA  91101
7  Telephone:  (213) 330-7150

8  [Additional Counsel Listed on Signature Page]

9  *Attorneys for Plaintiff Alice Mayall, as parent and*
   *Guardian of minor H.C., on behalf of H.C. and all*
10 *Others similarly situated.*

11

12                    **UNITED STATES DISTRICT COURT**

13                 **CENTRAL DISTRICT OF CALIFORNIA**

14                        **SOUTHERN DIVISION**

15

16 ALICE MAYALL, as parent and          No.
   guardian of minor H.C., on behalf of
17 H.C. and all others similarly situated,   **CLASS ACTION COMPLAINT**

18
                              Plaintiff,
19

20      v.                                 DEMAND FOR JURY TRIAL

21
   USA WATER POLO, INC.
22                          Defendant.

23

24

25

26

27

28

010481-11  753991 V1

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ...................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................. 6

III.    PARTIES ................................................................................................... 7

        A.    Plaintiff ............................................................................................ 7

        B.    Defendant ....................................................................................... 11

IV.     FACTUAL BACKGROUND .................................................................. 13

        A.    A Primer on Concussions ............................................................... 13

              1.    Introduction ....................................................................... 13

              2.    Occurrence ......................................................................... 14

              3.    Two Forces ......................................................................... 14

              4.    Subconcussive Hits ............................................................ 15

              5.    Pathological Changes ......................................................... 16

              6.    Metabolic Changes ............................................................ 17

              7.    Symptoms ........................................................................... 18

              8.    Why Water Polo Players – Particularly Youth
                    Players – Are Vulnerable .................................................. 18

              9.    On the Sidelines ................................................................. 20

        B.    Consensus Best Practices for the Treatment of
              Concussion for the Period 2002-Present ....................................... 21

              1.    Vienna Protocol ................................................................. 21

              2.    2004 National Athletic Trainers' Association
                    Position Statement: Management of Sport-Related
                    Concussion .......................................................................... 25

3.   2006 American College of Sports Medicine
     Concussion Consensus Statement. ................................................ 27

4.   NFL 2007 Return to Play.............................................................. 29

5.   The 2008 Zurich Protocol. ........................................................... 30

6.   In 2009, Even the "NFL Adopts Stricter Statement
     on Return to Play Following Concussions." ................................. 36

7.   In 2011, the NFL Implemented a Standardized
     Concussion Assessment Protocol. ................................................ 38

8.   American College of Sports Medicine's
     Concussion (Mild Traumatic Brain Injury) and the
     Team Physician: A Consensus Statement – 2011
     Update. ......................................................................................... 39

9.   2013 American Academy of Neurology Update. ......................... 43

10.  2013 Zurich II Protocol. .............................................................. 45

C.   Reported Concussion Injuries and Incidence of
     Concussion in Water Polo ............................................................ 51

1.   Canadian Women's Water Polo Team's
     "Concussion Epidemic" ............................................................... 52

2.   Karoline "Kari" Krumpholz ........................................................ 53

D.   USA Water Polo Has Failed to Provide Adequate
     Concussion Management ............................................................... 54

1.   USA Water Polo Has Knowledge of Consensus
     Best Practices. .............................................................................. 54

2.   USA Water Polo Has Failed to Adopt *Any*
     Consensus Guidelines Promulgated by the
     International Conferences on Concussion in Sport. ..................... 55

     a.   USA Water Polo Fails to Require a Stepwise
          Return-to-Play Protocol Which Prohibits
          Same Day Return to Play. ................................................ 58

       b.     USA Water Polo Fails to Require Formal
Baseline and/or Post-Injury Neurocognitive
Testing of Players. .............................................................. 62

       c.     USA Water Polo Fails to Require that
Players' Concussions Be Managed Onsite
by Medical Personnel with Specific
Expertise in Concussion Diagnosis,
Treatment, and Management. ............................................ 63

       d.     USA Water Polo Fails to Adopt Consensus
Best Practices for Management of Children
and Adolescents with Concussion. ................................... 64

    E.     USA Water Polo Has Failed to Adopt Proper Rules
Allowing For Play to Be Stopped to Substitute An
Injured Player ........................................................................... 65

V.     CLASS ACTION ALLEGATIONS ...................................................... 67

VI.    CLAIMS ALLEGED ........................................................................... 69

COUNT I NEGLIGENCE (On Behalf of the Class) .................................... 69

COUNT II BREACH OF VOLUNTARY UNDERTAKING (On
    Behalf of the Class) .......................................................................... 71

COUNT III MEDICAL MONITORING (On Behalf of the Class) ............. 73

COUNT IV GROSS NEGLIGENCE (On Behalf of Minor H.C.) ............. 75

REQUEST FOR RELIEF .............................................................................. 77

JURY DEMAND ........................................................................................... 78

Plaintiff Alice Mayall ("Ms. Mayall"), as parent of minor H.C. ("H.C."),[1] on behalf of H.C. and all others similarly situated, brings this class action complaint against Defendant USA Water Polo, Inc. ("USA Water Polo"), and complains and alleges upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I.    INTRODUCTION

1.     USA Water Polo is the governing body for the sport of water polo in the United States and regulates every aspect of water polo, including rules regarding player safety and health. Using this authority, USA Water Polo requires all players and participants to follow the policies, rules, and regulations it has enacted. Accordingly, USA Water Polo is the authority on the issue of player safety and has a common law duty to provide players with rules, information, and best practices that protect them as much as possible from short-term and long-term health risks.

2.     USA Water Polo has the power to enact and enforce policies and rules that would prevent or minimize injuries. This case arises from the failure of USA Water Polo to take steps to recognize, manage and appropriately treat head injuries and concussions. USA Water Polo's failure to implement even a scant amount of concussion management care for its participants represents an extreme departure from the ordinary standard of care.

3.     For many families water polo and other aquatic sports are seen as terrific alternatives to football and other sports with high concussion rates. However, concussions can, and do, occur in water polo.

4.     Water polo is a rough and physical game, tracing its origins to an aquatic form of rugby, and is extremely demanding on both the body and mind. Water polo is

_____

[1] As required by Federal Rule of Civil Procedure 5.2, minors are referred to herein only by their initials.

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 1 -

the only true "contact" aquatic sport and is a mixture of swimming, throwing and martial arts. As a result, water polo is extremely taxing on the body because it demands all out bursts of energy. In addition, players compete in close proximity to one another, engage in physical contact, and can throw the ball at velocities reaching 60-70 km/h. As a result, head and facial injuries are common either through direct contact or contact with the ball.[2]

5.      The direct contact of the players and high velocity with which the ball travels often carries sufficient force to fracture or cause severe facial or head injuries.[3] For example, common situations in which head injuries may occur include when a player is hit with an elbow or hit in the head by a direct shot with the ball.[4]

6.      When head injuries such as concussions do occur in water polo, there are special considerations at play because the game is played while the players are treading water. Even for minor injuries, the correct precautions must be taken. As noted in a recent study: "[W]ater polo is unique because the physician or the coach must rely on other players to bring the injured athletes to the pool side for evaluation."[5]

7.      Concussions have significant ramifications for young athletes. For example, 11% of children who suffer a concussion still have symptoms three months later.[6] Persistent post-concussion symptoms can be devastating. According to the

---

[2] *Injuries in Water Polo*, available at: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2080536/ (last accessed Jan. 15, 2015).

[3] *Id.*

[4] *Care of the Young Athlete Patient Education* Handouts, *Water* Polo, available at: http://www.pomonapeds.com/linked/water_polo.pdf (last accessed Jan. 15, 2015).

[5] *Id.*

[6] Barlow KM, Crawford S, Stevenson A, et al. Epidemiology of Postconcussion Syndrome in Pediatric Mild Traumatic Brain Injury. Pediatrics 2010;126(2):e374 e381.

Ontario Neurotrauma Foundation, persistent symptoms disrupt daily living and participation in school and activities.[7] Children/adolescents may:

- Miss weeks or even months out of the school year, affecting marks and risking their promotion to the next grade;

- Have attention and memory deficits, making schoolwork a challenge and requiring special accommodations to maintain required academic levels;

- Become clumsy and accident prone, where once they were strong athletes; and

- Become socially withdrawn to cope with headaches and mood changes, on top of the social isolation caused by resigning from athletic teams.

8.     There is substantial evidence that young people may be more susceptible to damage resulting from repetitive concussive and sub-concussive brain trauma. Studies in boxing, hockey, and football reveal that the earlier one is exposed to greater brain trauma, the greater their risk of long-term problems.

- A study of boxers found that for those with less education, psychomotor speed scores declined significantly with increasing years of fighting.[8]

- A study of college football players found a significant relationship between the number of years played and a smaller hippocampus, an area of the brain essential for creating new memories.[9]

---

[7] Zemek, Roger, et al. Guidelines for Diagnosing and Managing Pediatric Concussion. Ontario Neurotrauma Foundation 2014.

[8] Banks, SJ, Obuchowski, N, Bernick, C. The Protective Effect of Education on Cognition in Professional Fighters. Archives of Clinical Neuropsychology 29 (2014) 54-59.

[9] Singh R, Meier TB, Bellgowan PS. Relationship of collegiate football experience and concussion with hippocampal volume and cognitive outcomes. JAMA. 2014 May 14;311(18):1883-8. doi: 10.1001/jama.2014.3313.

- In younger children, the long-term effects of brain trauma can become apparent years after injury, as normal developmental milestones are disrupted.[10]

9.    Younger players are typically not provided professional medical supervision, either during practices or at matches. About half of all high schools have access to an athletic trainer, but very few have an athletic trainer present on the sidelines or on call to help identify concussions during play.

- A national study of over 100 high schools showed that schools with athletic trainers may identify up to 8 times as many concussions.[11]

- A study of ice hockey teams found that by placing a doctor in the stands to look for concussions, they were able to identify 7 times more concussions than with an athletic trainer alone.[12]

10.    As the national governing body for water polo in the United States, USA Water Polo enforces the playing rules adopted by the Federation Internationale de Natation ("FINA") which oversees international competition in five aquatic sports: swimming, diving, synchronized swimming, water polo, and open water swimming. FINA enacts the rules which are then adopted and enforced by USA Water Polo.

11.    USA Water Polo has the power to enact, enforce, or modify[13] these rules that would properly protect participants from concussions that are preventable, as well as properly protect participants who suffer concussions from returning to play until

---

[10] Daneshvar DH, Riley DO, Nowinski CJ, McKee AC, Stern RA, Cantu RC. Long-term consequences: effects on normal development profile after concussion. Physical medicine and rehabilitation clinics of North America 2011;22:683-700, ix.

[11] LaBella C, et al. "A comparative analysis of injury rates and patterns among girls' soccer and basketball players at schools with and without athletic trainers from 2006/07-2008/09" *AAP* 2012.

[12] Echlin PS, Johnson AM, Riverin S, et al. A prospective study of concussion education in 2 junior ice hockey teams: implications for sports concussion education. Neurosurg Focus 2010;29:E6.

[13] *See e.g.*, http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2013-14/misc_non_event/2013NewRulesPOE.pdf (stating that some FINA playing rules "may be modified…" by USA Water Polo) (last accessed January 8, 2015).

CLASS ACTION COMPLAINT                              - 4 -
Case No.:
010481-11  753991 V1

they have progressed through a widely accepted stepwise, graded exertional return-to-play protocol and are symptom free for at least 24 hours.

12.    USA Water Polo has a duty to protect its players and states on its website that it "is committed to creating a healthy and safe environment for all of our participants."[14] USA Water Polo requests that each athlete, coach, and referee read and agree to a Code of Conduct upon joining or renewing their membership with USA Water Polo. While the "Code of Conduct" contains a provision prohibiting athletes, coaches, and referees from "encouraging an athlete to return to play pre-maturely following a serious injury (e.g., a concussion) and without the clearance of a medical professional," USA Water Polo does not have any rules or policies regarding concussions, including mandatory best practices for concussion management such as mandatory baseline testing, strictly enforced return to play rules, and proper medical evaluation and clearance before returning to play.

13.    Since at least 2004, if not sooner, there has been an international consensus on how to diagnose and treat concussed players. Best practices for concussion management include baseline testing, strictly enforced return to play rules, and proper medical evaluation.

14.    Despite USA Water Polo's pronouncements to the contrary, it has not taken appropriate actions in regards to protecting the safety of players at any level and has engaged in a pattern of gross negligence and inaction with respect to concussions and concussion-related maladies suffered by players.

15.    Plaintiff, on behalf of minor H.C. and a proposed class of all current or former water polo players who, from 2002 to the present, competed for a team governed by USA Water Polo, seeks injunctive relief requiring (1) the enactment and enforcement of proper concussion-management practices and return-to-play guidelines; and (2) proper substitution rules that allow for medical evaluation. Plaintiff

---

[14] http://www.usawaterpolo.org/resources/safe-sport.html.

CLASS ACTION COMPLAINT
Case No.:                                                  - 5 -
010481-11  753991 V1

further seeks equitable relief in the form of medical monitoring for the purpose of diagnosis of long-term injury and disease resulting from concussions as a result of USA Water Polo's negligence and concealment of information.

16.     Plaintiff, on behalf of minor H.C, individually has suffered damages and will in the future suffer damages caused by the gross negligence of the Defendant. Minor H.C. has suffered and continues to suffer from an assortment of problems associated with injuries, including but not limited to post-concussion syndrome, as well as such symptoms as headaches, loss of memory, academic impairment, excessive sleepiness, anxiety, cognitive dysfunction, limitations in physical activities, social isolation, and loss of the pleasures of life, among other things. As a result, Plaintiff, on behalf of minor H.C., seeks an individual award of compensatory damages, punitive damages, pain and suffering, and any other relief to which she is entitled.

## II.     JURISDICTION AND VENUE

17.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than Defendant's states of citizenship.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391(c) as Defendant is deemed to reside in this judicial district because it is subject to personal jurisdiction here, a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction, and Defendant conducts substantial business in this jurisdiction.

19.     Defendant is subject to personal jurisdiction in this District. Defendant is incorporated and based in California and thus has the requisite minimum contacts with California so as to be subject to both types of personal jurisdiction – general jurisdiction and specific jurisdiction. Defendant's actions and omissions have caused

harm in California to California residents, including minors, and will continue to do so unless enjoined, thus establishing specific personal jurisdiction. Moreover, Defendant has had substantial, continuous, and systematic other contacts with California, thus establishing general jurisdiction.

### III.    PARTIES

**A.    Plaintiff**

20.    Plaintiff Alice Mayall ("Ms. Mayall"), as parent of minor H.C. ("H.C."), is suing Defendant on behalf of H.C. and the Class. Ms. Mayall and H.C. are residents of Livermore, California. H.C. was born in 1998 and is currently 16 years old.

21.    H.C. has played water polo for the LARPD Lazers Water Polo Club, "a USA Water Polo registered club that encourages high standards of play and good sportsmanship."[15] The LARPD Lazers is one of approximately 500 USA Water Polo member clubs and must abide by the rules and policies of USA Water Polo. The LARPD Lazers, like USA Water Polo, has not instituted any rules with respect to concussion management, return-to-play guidelines.

22.    Before beginning to play for the Lazers, H.C. was a healthy, high-achieving, straight "A" honors student and multi-sport athlete. In addition to water polo, H.C. also played soccer.

23.    Prior to playing for the Lazers, H.C. was not administered a baseline test nor did H.C. or Ms. Mayall received any information from the Lazers or USA Water Polo on how to recognize or report head injuries. H.C. and Ms. Mayall did not receive any information from the Lazers or USA Water Polo concerning techniques or preventative measures to avoid head injuries.

24.    H.C. began playing for the Lazers in December 2013. From February 14-16, 2014, H.C. attended the annual "WinterFest" tournament organized and managed by USA Water Polo at Los Alamitos Joint Forces Training Base in Los Alamitos,

---

[15] http://lazerswaterpolo.weebly.com/.

CLASS ACTION COMPLAINT
Case No.:                                                    - 7 -
010481-11  753991 V1

California and played 5 games over the course of 3 consecutive days.[16] The tournament hosted both boys and girls teams and age groups ranging from 10 to 18 years old.[17] Despite the susceptibility of youth athletes to concussions, USA Water Polo did not provide any athletic trainers or medical personnel for the tournament or require that any athletic trainers or medical personnel be present at the tournament.

25.     On February 15, 2014, while playing goalie in a tournament for the Lazers, H.C. was hit hard in the face by a shot which led to a concussion. The game was not stopped by the referee or the coach. Rather, H.C. swam to the side of the goal and spoke with her coach while her team was on offense. H.C.'s coach (lacking any concussion management training, qualifications, and education from USA Water Polo) asked her a couple of questions. Dazed and unaware of the severity of her injury, H.C. told her coach that she wanted to return to play despite suffering a concussion. She was not taken out of the game. No one from the team or USA Water Polo provided her with any treatment nor was any athletic trainer or medical personnel present to provide treatment.

26.     During subsequent tournament games played on February 15, 2014, H.C. took additional hits to the head, exacerbating the initial injury. Again, the hits were observed by H.C.'s coach and the referee, the game was not stopped, and she was not evaluated by the team nor was any medical personnel present to provide treatment. No sideline assessment was performed nor was H.C. removed from the games.

27.     H.C. returned home from the tournament on February 16, 2014. On February 17, H.C. started to experience headaches, sleepiness and fatigue. As a result, H.C. was unable to attend school.

28.     For approximately two weeks following the tournament, H.C.'s symptoms continued, including: excessive sleeping, dizziness, inability to tolerate

---

[16] https://webpoint.usawaterpolo.com/wp15/Events2/ViewEvt.wp?EventID=7989 (last accessed January 16, 2015).

[17] *Id.*

CLASS ACTION COMPLAINT                          - 8 -
Case No.:
010481-11  753991 V1

movement, extreme sensitivity to light, headaches, decreased appetite, nausea, and inability to do any school work.

29.   Concerned with H.C.'s symptoms and their failure to resolve, Ms. Mayall took H.C. to the doctor and H.C. was diagnosed with post-concussion syndrome on March 4, 2014. H.C.'s symptoms persisted in the following weeks, including continued fatigue, excessive sleeping, headaches, decreased cognitive function, and an inability to focus.

30.   On March 12, 2014, H.C.'s doctor recommended that she consult with a neurologist due to her persisting post-concussion symptoms. Following a consultation with a neurologist, H.C. again received confirmation that her symptoms were completely consistent with concussion. As a result of her persisting symptoms, H.C. continued to miss school, activities, and other social functions while continuing to struggle with symptoms relating to her injury.

31.   H.C. never returned to school. Rather, in April, H.C. started on a home-and-hospital instructional program through the school district which continued through the end of the school year in June. Although previously an excellent student, H.C.'s productivity in completing academic work at home was greatly diminished. H.C's neuropsychologist in August noted that H.C. was sleeping excessively, experiencing persistent headaches, demonstrated a deficit in her ability to hold information in her mind or complete tasks, and was functioning in a low-average range in memory and controlled attention.

32.   Approximately a year after her injury, H.C. continues to experience daily headaches, sleeps excessively, and takes strong medication to combat her symptoms. H.C. has finally returned to school but has only completed a single academic course. She is currently on a reduced school day and takes 3 classes instead of the typical 5 – only 2 of which consist of traditional academic course work.

33.     During her time as a water polo player, USA Water Polo did not enforce or enact any policies, regulations, or rules requiring that teams educate coaches or athletes on what symptoms may be signs of a concussion. Because H.C. did not "black out" or was not "knocked out," she did not recognize her injury as a concussion. H.C. did not learn that concussions could occur without a "blackout" or "knockout experience" until she saw a doctor.

34.     Specifically, with respect to H.C., *inter alia*, USA Water Polo failed to implement system-wide concussion recognition and "return-to-play" guidelines for athletes who have sustained concussions. As a result, H.C. was returned to play while still recovering from prior concussion injuries. USA Water Polo failed to adequately educate and adopt rules requiring the education of coaches, staff, and athletes about the symptoms and long-term consequences of concussions if not properly treated, as well as the proper treatment protocol for head injuries. Moreover, USA Water Polo failed to implement system-wide guidelines for screening and detecting head injuries that would have detected the concussions H.C. received and thus prevented her playing until she had fully recovered.

35.     As a result of her injuries, H.C. has had to take time off from school, has suffered from a reduced academic performance, an inability to participate in social functions, and has incurred out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which H.C. has been diagnosed.

36.     H.C. is also at increased risk of latent brain injuries caused by repeated head impacts or the accumulation of subconcussive hits, particularly as a minor, and therefore is in need of medical monitoring. Further, on behalf of her minor daughter and the Class, Ms. Mayall seeks class-wide injunctive or equitable relief in the form of changes to USA Water Polo rules and practices with respect to concussion management and return-to-play guidelines in order to meet consensus best practices as detailed below.

**B.**     **Defendant**

37.     USA Water Polo is the "national governing body for the sport of water polo in the United States."[18] As such, USA Water Polo shall:

> "[B]e autonomous in the governance of the sport of water polo by independently determining and controlling all matters central to such governance, by not delegating any of that determination or control, and by being free from outside restraint."[19]

38.     USA Water Polo describes itself as:

> "[A] non-profit organization recognized by the United States Olympic Committee (USOC) and the Federation Internationale de Natation (FINA) as the National Governing Body for the sport of Water Polo in the United States. USA Water Polo oversees our Olympic water polo program, including senior, junior, youth and cadet national teams, as well as 20 different championship events annually, including the Junior Olympics, the US Open of Water Polo, and the Masters National Championships. With nearly 40,000 members, USA Water Polo is also the sanctioning authority for more than 500 Member Clubs and more than 400 tournaments conducted nationwide each year. USA Water Polo has a rich tradition of success at every level including World Championship, World Cup, World League and Pan Am Gold Medals, and most recently, Olympic Gold for our women's program. USA Water Polo is committed to the development and promotion of the sport throughout the US and to providing the best possible experience for all participants. It fosters grass-roots expansion of the sport, providing a national system of affiliated clubs and leagues, certified coaches and officials, educational materials, and background screenings, as well as developing programmatic materials and undertaking initiatives to generate greater awareness of the sport."[20]

---

[18] *See* Bylaws of USA Water Polo, Inc., Section 4.1, available at: http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWPByLaws.pdf (last accessed Jan. 16, 2015).

[19] *Id.* at Section 4.1(b).

[20] http://www.usawaterpolo.org/mission/mission-overview.html (last accessed Jan. 16, 2015).

CLASS ACTION COMPLAINT
Case No.:
010481-11 753991 V1                    - 11 -

39.     USA Water Polo's "Statement of Ethics Value" establishes a duty owed to players, members, and the public:

> Public trust in the performance of USA Water Polo, Inc. (USAWP) is the bedrock of our legitimacy. Donors, volunteers support our organization because they believe in our mission and they trust us to carry it forward, to be a faithful steward of our resources and to uphold rigorous and exemplary standards of conduct.
>
> USAWP is committed to earning this trust every day and in every possible way, including a willingness to go beyond legal requirements where appropriate to embrace the spirit of the law as well. It is up to everyone in our organization to carry out our mission with integrity, honesty, fairness, transparency, and a strong sense of respect for our membership and our public.[21]

40.     All USA Water Polo members are bound by the provisions of the USA Water Polo bylaws, rules of conduct, and any other membership requirements that the Board of Directors think are necessary and appropriate.

41.     USA Water Polo has its principal place of business in Huntington Beach, California and is located at 2124 Main Street, Suite 240, Huntington Beach, CA 92648.

42.     USA Water Polo is subject to specific and general personal jurisdiction in this District. As described herein, USA Water Polo exerts tremendous influence over all aspects of water polo, heavily regulates water polo, and organizes and manages tournaments and events tournaments in the United States at all levels. USA Water Polo has sought and received permission from the California Secretary of State ("S.O.S.") to do business in California, and the S.O.S.'s website shows that USA Water Polo has been authorized to conduct business in California since at least as early as 1996.

---

[21] http://www.usawaterpolo.org/resources/ethics-statement.html (last accessed Jan. 15, 2015).

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 12 -

43.     USA Water Polo holds its Board of Director meetings in California and consistently stages and promotes water polo events such as tournaments and events throughout California and this District.

44.     USA Water Polo, through its acts and omissions as set forth herein, has damaged Plaintiff and Class Members.

## IV.     FACTUAL BACKGROUND

**A.     A Primer on Concussions**

**1.     Introduction.**

45.     The word concussion derives from the Latin *concutere* for "to shake violently." Concussions are just that – a shaking of the brain inside the skull that changes the alertness of the injured person. That change can be relatively mild ("She was slightly dazed.") or profound ("She was unconscious."). Both situations fall within the definition of concussion. Concussions are often classified as a form of mild traumatic brain injury.

46.     According to the Centers for Disease Control and Prevention, almost four million sports-and recreation-related concussions are recognized every year, with many times that number occurring but going unrecognized.[22,23] For young people ages 15 to 24 years, sports are the second leading cause of traumatic brain injury, only behind motor vehicle crashes.[2] According to research by the NEW YORK TIMES, at least 50 youth football players (high school or younger) from 20 different states have died or sustained serious head injuries on the field since 1997.[24] One study estimates that the likelihood of

---

[22] http://www.cdc.gov (homepage on the internet) Concussion in Sports. Centers for Disease Control and Prevention. Atlanta GA; Concussion in Sports 2013 (updated July 22, 2013). Available from http://www.cdc.goviconcussion/sports/ (accessed February 28, 2014).

[23] Langlois, JA, W Rutland-Brown, MMWald. The epidemiology and impact of traumatic brain injury; a brief overview. J Head Trauma Rehabil. 2006;21:375-378.

[24] Schwarz, A, Silence on Concussions Raises Risks of Injury. NEW YORK TIMES, September 15, 2007.

an athlete in a contact sport experiencing a recognized concussion is as high as 20 percent each season.[25]

### 2. Occurrence.

47.    Concussions happen to all types of athletes – young and old, boys and girls, and in every conceivable sport. Concussions in sports occur when an athlete is slammed and makes sudden and forceful contact. That contact can be with the ground, court, or pool deck. It also can be with a batted ball, a thrown ball, a kicked ball, a goalpost (football), the boards (hockey), the scorer's table (basketball), and of course another player.

48.    Concussions can and frequently do occur without any contact with the head. Rather, the player's body receives a jolt that causes his shoulders and head to change speed or direction violently. This motion results in a "whiplash effect." Inside the skull, the brain shifts in the cerebrospinal fluid and bangs against the inside of the skull. Even falling from five or six feet and landing upright, if unexpected and therefore jarring, can send a shock through the spine and shake the head with a force that may cause a concussion. Concussions that are the most damaging to the brain tend to be the ones that involve a direct blow to the head, however.

49.    With a blow to the front of the head, the brain pushes forward until it crashes into the skull, reverses, and bumps against the back of the skull. This action produces an initial *coup*, then a *contrecoup* injury.

### 3. Two Forces.

50.    Concussions are caused by two types of forces in the form of accelerations, linear and rotational. *Linear acceleration* is akin to the straight-on force of a car smashing into a tree. At the moment of impact, the driver's head snaps violently. The collision causes direct brain injury, of course. That damage is worse than it would otherwise be because the inside of the skull is rough, not smooth.

---

[25] Gerberich, SG, JD Priest, JR Boen, et al. Concussion incidences and severity in secondary school varsity football players. Am J Public Health; 1983; 73:1370-1375.

CLASS ACTION COMPLAINT                              - 14 -
Case No.:
010481-11  753991 V1

Contact between the brain tissue and bony surface can be irritating, sometimes bruising or even tearing brain tissue.

51.     The second type of force is *rotational acceleration*. Think of a football player running from sideline to sideline and a head-hunting defensive player appearing out of nowhere to make a crunching tackle from the side. The force of the collision violently whips the ball carrier's head to one side. If it's jolting enough, the brain comes into contact with the skull. The cerebrospinal fluid in which the brain floats protects the brain and dampens the impact. However, if the force is large enough, an injury occurs. Driven into the skull by rotational accelerations, the brain can stretch and shear. Blood vessels and brain tissue exposed to this trauma may tear.

52.     The effects of rotational accelerations can be much worse than those from linear accelerations. Concern about this type of force caused the NFL to outlaw blind-side or "defenseless player" helmet-to-helmet hits. On virtually every hit to the head, both the linear and rotational accelerations are present. Among researchers and other experts, it's believed that rotational forces are more injurious.[26]

### 4.     Subconcussive Hits.

53.     Subconcussive hits, or impacts that do not produce any clinical concussion symptoms, may also adversely affect cerebral function. Evidence that subconcussive hits may adversely affect cerebral function has been reflected in documented changes in cerebral function (*i.e.*, visual working memory declines), and altered dorsolateral prefrontal cortex activation as assessed by functional magnetic resonance imaging in high school football athletes in the absence of clinical signs of concussion. In lay terms, one study on high school football players found that players who received normal football brain trauma and did not report any concussion symptoms still had functional MRI changes that mimicked concussed players.

---

[26] Cantu, RC. Biomechanics of head injury. In: Cantu, RC ed. Neurologic Athletic Head and Spine Injuries. W. B. Saunders Co, Philadelphia PA.

CLASS ACTION COMPLAINT                            - 15 -
Case No.:
010481-11 753991 V1

54.     Similarly, in a study of college football players released in 2013, researchers found that the more hits to the head a player absorbed, the higher the blood levels of a particular brain protein, S100B, that is known to leak into the bloodstream after a head injury. Even though none of the football players in the study suffered a concussion during the season, four of them showed signs of an autoimmune response, the presence of S100B antibodies in the players' blood. The players with the highest number of hits also showed abnormal diffusion tensor imaging findings on MRI DTI studies.

55.     Some studies have suggested that concussions or a combination of concussions and sub-concussive head impacts may lead to conditions such as chronic traumatic encephalopathy, mild cognitive impairment, and/or depression.

**5.     Pathological Changes.**

56.     Pathological changes to the brain's structure – tears and other injuries – are difficult to see on routine imaging. They are often invisible on head CT scans and routine magnetic resonance imaging (MRI), the imaging tests upon which physicians most often rely. For that reason, misconceptions exist about the damage that occurs to the brain from a concussion. Through the years, even medical professionals have questioned whether or not the structure of the brain was different after a concussion than before.

57.     At the Center for the Study of Traumatic Encephalopathy (CSTE) at Boston University, the brains of more than two hundred deceased professional and amateur athletes have been studied. Several of these athletes died within days of a concussion. Several of their deaths were suicides. These brains were examined by Dr. Ann McKee, a world-renowned neuropathologist.

58.     Her findings revealed that the brains had multiple microscopic changes such as widespread diffuse axonal swelling and other abnormalities that would have been missed if they had been tested by conventional imaging when they were living.

Some of the changes were limited to one region of the brain. In other cases, the pathology was wide-spread over several areas from the cortex and brain stem down to the spinal cord. All the injuries were microscopic but real.

**6. Metabolic Changes.**

59.     Concussions also trigger a complicated chain of chemical and metabolic reactions, which are known as the *neurometabolic cascade* of concussion. These biochemical processes confuse the brain, throwing off its ability to regulate, to transmit signals, and to send messages that control how we think and what we remember.

60.     From being pushed and pulled violently, the brain goes into an overactive state triggering a massive release of chemicals called *neurotransmitters.* These are the chemicals needed for one neuron to communicate with the next and the next. In this situation, the cells begin communicating in a disorderly way, blasting out impulses to all neurons at the same time so that the system becomes overloaded. At this point the brain loses its ability to regulate certain chemical balances. Potassium ions, which are typically contained within brain cells, flood out. Calcium ions, which are on the outside, rush inside the cells. The brain's chemical batting order is turned upside down, and returning things to normal is a very difficult process. To pump the ions back to the right places, the brain needs energy. But the chemical imbalances resulting from the concussion hinder that process, slowing or preventing the metabolic processes. At a time when the brain needs energy to set itself straight, its ability to make energy is greatly impaired.

61.     David Hovda, a well-regarded research scientist at UCLA, has studied these chemical imbalances in laboratory rats. Dr. Hovda's research points out that while cell chemistry in rats is disrupted for a short time after a concussion, it takes longer to return to normal.[27] That reversal may occur over weeks, even months.

---

[27] Giza CC, Hovda DA. The neurometabolic cascade of concussion. J Athl Train 2001;36:228-235.

Assuming that our brains function exactly as the brains of rats is quite a leap – and likely inaccurate. Still, it is worth thinking about these findings and what they reveal about concussed athletes.

**7.     Symptoms.**

62.     All concussions are accompanied by symptoms which fall into four major categories:

| | |
|---|---|
| **Somatic:** | Headaches, nausea, vomiting, balance and/or visual problems, dizzy spells and issues such as sensitivity to light and noise. |
| **Emotional:** | Sadness to the point of depression (even suicide), nervousness, and irritability. |
| **Sleep disturbance:** | Sleeping more or less than usual and trouble falling asleep. |
| **Cognitive:** | Difficulty concentrating, troubles with memory, feeling mentally slow or as if in a fog that will not lift. |

63.     Symptoms are clues. They reveal many things – the severity of the injury and the pace of recovery, for example. The number and combination of symptoms also can pinpoint areas of the brain affected by a concussion. Those cases in which the symptoms are focal, *i.e.*, the insult is to one brain area, tend to have fewer symptoms of shorter duration. When trauma is diffuse, *i.e.*, spread across several brain regions, the patient has more symptoms that persist longer.

**8.     Why Water Polo Players – Particularly Youth Players – Are Vulnerable.**

64.     Considerable research supports the proposition that a child's brain takes longer to recover from concussion or the accumulation of subconcussive hits than an adult's brain. Most of these studies deal with the high school athletes, limiting the conclusions we can draw about younger kids. Yet what is known points to children being at risk for significant post-traumatic issues.

CLASS ACTION COMPLAINT                                    - 18 -
Case No.:
010481-11  753991 V1

65.     Not surprisingly, the comparison of the two major age groups centers on key developmental differences between adults and children. Several of these differences need emphasizing, all bearing directly on the brain's response to trauma.

66.     The first aspect concerns *myelin*, the insulating cover of axons that make up the fiber tracts in the brain. Think of a copper wire inside the wall of a house and of the plastic rubber coating around the wire. The coating insulates, protects, and strengthens that wire. The fiber tracts in adult brains have a coating of myelin that acts in the same way, protecting the fibers from injury or insult. If sufficiently severe, brain trauma still can occur, of course, but myelination helps protect from minimal trauma. Children's brains have less myelin, so the neuronal pathways are more easily damaged.

67.     A second consideration is that of *relative head size.* A child's brain and head are disproportionately large compared to the rest of the body, especially through the first five to eight years of life. This anatomical relationship continues through about the age of 14, by which time a child's skull has grown to be about 90 percent as large as an adult-size one. While this fact seems trivial, it is important to a discussion of concussions and concussion risk. The disproportionately larger head size and weight, coupled with a child's weaker neck, mean that the child can't brace for a hit the way that an adult does. Rotational forces are greater for a child, proportional to the severity of the hit. The hit itself may not generate the same force because of the speed of the collision and the weights of the (junior) players involved, but what is transferred to the head may be as great or greater. It is all about neck strength.

68.     A third consideration is the effect of *cumulative trauma* through a person's life. Total brain trauma is the worry regarding child athletes. If one starts accumulating injuries early in life, chances are that there will be more through one's life experience. No one knows precisely what the effects of that long-term repetitive

trauma might be. No head trauma is good head trauma. If knocking around the brain can be avoided, then avoid it.

### 9. On the Sidelines.

69.     On the sidelines, the job of the physician or athletic trainer is to decide whether or not a player can continue in the game. The coach shares that responsibility, but is often saddled with other responsibilities that make it difficult for the coach to make a suitable evaluation. If he or she has any concerns about a particular player, the athlete should be pulled from the game. For the experienced doctor, the evaluation is a matter of looking into the eyes of the player and asking a series of questions. In this situation, the examiner is looking for clues that the individual knows what's going on around them; inappropriate answers to simple questions raise concerns.

70.     Questions that may be used are the following: What was the play you were injured on? What was the color of the jerseys of the opposing team? (This question is asked without letting the player turn around to look.) What quarter is it? What's the score? These questions reveal whether or not the athlete is alert to what was happening at the time of the injury. Of course, there is always the simplest question of all: Do you remember what happened? Followed by, tell me what you recall.

71.     If they pass this initial assessment, the examiner moves on to other cognitive tests. One is to give them six digits which they are asked to repeat, then to repeat them backwards. A simple balance test: can the player stand firm with their feet together, in heel-to-toe tandem position, and on one foot, eyes open and then closed; with hands on hips, eyes open and then closed?

72.     The age of the athlete is important to take into account in performing this assessment. While not a big difference exists in evaluating an adult and a young athlete, say down to nine or ten years old, this is not the case with very young children. More explanation is necessary and more care with language is needed with

younger children. Both the examiner and child being examined must be clear about the meaning of the words. For example, a young child probably won't know about being "dinged" and would be confused by a term such as "feeling in a fog" since both terms are slang terms used for head trauma. Some will know "dazed" and some won't. The key is to communicate on a level that is understood by the athlete, whatever the age.

**B.    Consensus Best Practices for the Treatment of Concussion for the Period 2002-Present**

**1.    Vienna Protocol.**

73.    As of 2002, consensus had been reached in the medical and scientific community for the cornerstones of the management and treatment of concussions.

74.    The "Summary and Agreement Statement of the First International Conference on Concussion and Sport, Vienna 2001" ("International Consensus Statement" or "Vienna Protocol") was published in early 2002 simultaneously in the *Clinical Journal of Sports Medicine*, *Physician and Sports Medicine* and *British Journal of Sports Medicine*.[28] The expert group who compiled the International Consensus Statement, known as the "Concussion in Sport Group," was comprised of a panel of world experts and was organized by the International Ice Hockey Federation, the Federation Internationale de Football Association Medical Assessment and Research Center (*i.e.*, FIFA), and the International Olympic Committee Medical Commission (IOC). The International Consensus Statement was intended to be, and accepted as, "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions." It was also intended to "be widely applicable to sport related concussion" and "developed for use by doctors, therapists, health professionals, coaches, and other peopled involved in the care of injured athletes, whether at the recreational, elite, or professional level." The Concussion in

---

[28] M. Aubry, et al., *Summary and Agreement Statement of the First International Conference on Concussion in Sport, Vienna 2001*, 36 BRIT. J. SPORTS MED. 6 (2002) ("Vienna Protocol").

CLASS ACTION COMPLAINT                                   - 21 -
Case No.:
010481-11  753991 V1

Sport Group subsequently met in Prague (2004),[29] Zurich (2008),[30] and Zurich (2012), and published updated Consensus Statements. The International Consensus Statement set forth a revised definition of concussion, a standard concussion-management protocol, and discussed the issues of prevention, education, and future directions for the injury.

75.     The first International Symposium on Concussion in Sport was held in Vienna, Austria ("Vienna Conference") in 2001. The goal was to provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries. The result of the conference was the publication of a consensus statement that was "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions" ("Vienna Protocol"). The publication was intended to "be widely applicable to sport related concussion" and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of injured athletes, whether at the recreational, elite, or professional level."

76.     The Vienna Protocol recommended specific return-to-play guidelines. The Vienna Protocol stated:

> When a player shows ANY symptoms or signs of a concussion:
>
> (1)     The player should not be allowed to return to play in the current game or practice.
>
> (2)     The player should not be left alone; and regular monitoring for deterioration is essential.
>
> (3)     The player should be medically evaluated after the injury.

---

[29] P. McCrory, et al., *Summary and Agreement Statement of the 2nd International Conference in Concussion in Sport, Prague 2004*, 39 BRIT. J. SPORTS MED. 196 (2005) ("Prague Protocol").

[30] P. McCrory, et al., *Consensus Statement on Concussion in Sport: The 3rd International Conference on Concussion in Sport held in Zurich*, 43 BRIT. J. SPORTS MED., i76, i78 (2009) ("Zurich Protocol").

> Return to play must follow a medically supervised stepwise process.

> A player should never return to play while symptomatic.
> 'When in doubt, sit them out!'

77. The Vienna Protocol also recommended a return-to-play stepwise process as follows:

> It was the consensus of the CISG that a structured and supervised concussion rehabilitation protocol is conducive to optimal injury recovery and safe and successful return to play. The rehabilitation principles were common to all identified programmes and are outlined below. Important principles state that the athlete be completely asymptomatic and have normal neurological and cognitive evaluations before the start of the rehabilitation programme. Therefore, the more prolonged the symptom duration, the longer the athlete will have sat out. The athlete will then proceed stepwise with gradual incremental increases in exercise duration and intensity, and pause or backtrack with any recurrence of concussive symptoms. It is appreciated that, although each step may take a minimum of one day, depending on the duration of symptoms, proceeding through each step may take longer in individual circumstances.

78. The Vienna Protocol provided that return to play after a concussion follows a stepwise process:

> (1)   No activity, complete rest. Once asymptomatic, proceed to level.

> (2)   Light aerobic exercise such as walking or stationary cycling.

> (3)   Sport specific training – for example, skating in hockey, running in soccer.

> (4)   Non-contact training drills.

> (5)   Full contact training after medical clearance.

> (6)   Game play.

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 23 -

1
2
3
4

> With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. If any symptoms occur after concussion, the patient should drop back to the previous asymptomatic level and try to progress again after 24 hours.

5
6
7
8
9
10

79.    In regards to sideline evaluation, the Vienna Protocol noted that "sideline evaluation includes clinical evaluation of signs and symptoms, ideally using a standardized scale of post-concussion symptoms for comparison purposes, and acute injury testing as described below under neuropsychological testing." The Vienna Protocol recommended tests such as the Maddock's questions and the Standardized Assessment of Concussion (SAC) as effective in concussion diagnosis and also stated:

11
12
13
14
15
16
17
18
19

> Sideline evaluation including neurological assessment and mental status testing is an essential component in the protocol. These evaluations are ideally developed in language translations for international sporting groups … In the acute assessment of concussive injury – that is, concussion diagnosis – brief neuropsychological test batteries that assess attention and memory function have been shown to be practical and effective. Such tests include the Maddock's questions and the Standardised Assessment of Concussion (SAC). It is worth noting that standard orientation questions – for example, time, place, person – have been shown to be unreliable in the sporting situation compared with memory assessment.

20
21
22
23
24

> It is recognised, however, that abbreviated testing paradigms are designed for rapid evaluation of concussion on the sidelines and are not meant to replace comprehensive neuropsychological testing, which is sensitive enough to detect subtle deficits that may exist beyond the acute episode.

25
26
27
28

80.    In regards to baseline testing and neuropsychological testing, the Vienna Protocol provided that "[o]verriding principles common to all neuropsychological test batteries is the need for and benefit of baseline pre-injury testing and serial follow up." It noted that the application of neuropsychological testing "has shown to be of value

and continues to contribute significant information in concussion evaluation … It has been shown that cognitive recovery may precede or follow resolution of clinical symptoms, suggesting that the assessment of cognitive function should be an important component in any return to play protocol." Further, "the consensus of the CISG was that neuropsychological testing is one of the cornerstones of concussion evaluation and contributes significantly to both understanding of the injury and management of the individual. Organised sport federations have access to and should attempt to employ such testing as appropriate. To maximise the clinical utility of such neuropsychological assessment, baseline testing is recommended."

81.     Finally, the Vienna Protocol acknowledged education of athletes, colleagues, those working with athletes and the general public as a "mainstay of progress in this field." The Vienna Protocol also recommended the "consideration of rule changes" and noted that "rule enforcement is a critical aspect of such approaches and referees play an important role."

### 2.     2004 National Athletic Trainers' Association Position Statement: Management of Sport-Related Concussion.

82.     A second consensus document on concussion management was issued in 2004 when the National Athletic Trainers Association ("NATA") published a position statement regarding concussion management.[31] NATA provided extensive recommendations including that "decisions about an athlete's return to practice should never be based solely on the use of any one test." It also recommended a "cautious clinical judgment" which "takes into account all evaluation options."

83.     Specifically, the NATA Position Statement stated:

> Return to participation after severe or repetitive concussive injury should be considered only if the athlete is completely symptom free and has a normal neurologic examination,

---

[31] K.M. Guskiewicz, et al., *National Athletic Trainers' Association Position Statement: Management of Sport-Related Concussion*, 39 J. ATHLETIC TRAINING 280 (2004) ("NATA 2004 Statement").

CLASS ACTION COMPLAINT                    - 25 -
Case No.:
010481-11  753991 V1

normal neuropsychological and postural-stability examinations, and, if obtained, normal neuroimaging studies (i.e., MRI with gradient echo). It may not be practical or even possible to use all these assessments in all athletes or young children, but a cautious clinical judgment should take into account all evaluation options. Each injured athlete should be considered individually, with consideration for factors including age, level of participation, nature of the sport (high risk versus low risk), and concussion history. Standardized neuropsychological testing, which typically assesses orientation, immediate and delayed memory recall, and concentration may assist the ATC and physician in determining when to disqualify an athlete from further participation. Balance testing may provide additional information to assist the clinician in the decision-making process of whether to disqualify an individual after a concussion. When to disqualify the athlete is one of the most important decisions facing the ATC and team physician when dealing with an athlete suffering from a concussion. This includes not only when to disqualify for a single practice or event but also when to disqualify for the season or for a career.

84.    It further stated:

The decision to disqualify an individual from further participation on the day of the concussive episode is based on the sideline evaluation, the symptoms the athlete is experiencing, the severity of the apparent symptoms, and the patient's past history. The literature is clear: any episode involving LOC or persistent symptoms related to concussion (headache, dizziness, amnesia, and so on), regardless of how mild and transient, warrants disqualification for the remainder of that day's activities.

85.    The NATA Position Statement similarly recommended baseline testing; the use of objective concussion assessment tools; a combination of screening tools for the sideline; and implementation of a neuropsychological testing program with evaluations by persons appropriately trained in the test administration and scoring (ideally by a neuropsychologist).

### 3. 2006 American College of Sports Medicine Concussion Consensus Statement.

86.     The American College of Sports Medicine's "Concussion (Mild Traumatic Brain Injury) and the Team Physician: A Consensus Statement" provided that a detailed/systematic plan for the team physician to follow in the evaluation of an individual for concussion on the sideline should be developed; noted that post injury neuropsychological data is more useful if compared to a baseline; a team physician should perform serial neurological assessments as an essential function; that it is desirable that the education of the athlete and others about concussion; and that helmets do not prevent, and may actually increase, the incidence of concussion.[32]

87.     Regarding same-day RTP, the consensus statement provided:

[i]t is *essential* the team physician understand:

- There is agreement that athletes with significant, persistent or worsening signs and symptoms (e.g., abnormal neurological examination, ongoing RGA or PTA, prolonged LOC) should not RTP.

- For other athletes with concussion, significant controversy exists for a same-day RTP decision and no conclusive evidence-based data are available. Areas of controversy include:

- Returning an athlete with any symptoms to play.

- Returning an athlete with fully resolved symptoms to play.

- Certain symptoms, even if resolved, are contraindications to same-day RTP (e.g., any LOC, PTA, and RGA).

- The duration and severity of symptoms are the determining factors of RTP.

---

[32] American College of Sports Medicine, *Concussion (Mild Traumatic Brain Injury) and the Team Physician: A Consensus Statement*, MED. SCI. SPORTS & EXERCISE, 395, 396 (2006).

CLASS ACTION COMPLAINT
Case No.:
010481-11 753991 V1

- 27 -

- It is the safest course of action to hold an athlete out.

88.    Regarding post-game-day RTP, the consensus statement provided:

[i]t is *essential* the team physician understand:

- Determine the athlete is asymptomatic at rest before resuming any exertional activity.

- Amnesia may be permanent.

- Utilize progressive aerobic and resistance exercise challenge tests before full RTP.

- Consider factors which may affect RTP, including:

- Severity of the current injury

- Previous concussions (number, severity, proximity)

- Significant injury in response to a minor blow

- Age (developing brain may react differently to trauma than mature brain)

- Sport

- Learning disabilities

- Understand contraindications for return to sport (e.g., abnormal neurological examination, signs or symptoms with exertion, significant abnormalities on cognitive testing or imaging studies).

- Controversy exists for postgame RTP decisions.

It is *desirable* the team physician:

- Coordinate a team to implement progressive aerobic and resistance exercise challenge tests before full RTP.

- Recognize challenging cognitive effort may exacerbate symptoms of concussion and retard recovery.

- Discuss status of athlete with parents, caregivers, teachers, certified athletic trainers and coaching staff within disclosure regulations.

- Consider neuropsychological testing.

(Emphasis in original.)

### 4.    NFL 2007 Return to Play.

89.    The NFL is now known to have hidden for at least a decade its knowledge of concussion injuries so it is hardly a paradigm of concussion management.

90.    The first return-to-play/concussion standards in the NFL were adopted in 2007. While the adoption by the NFL of the policy was late and incomplete, it reflected an important change that should have caused Defendant to adopt rules also.

91.    The NFL policy stated that a player should not be allowed to return in the same game if a player lost consciousness and also required mandatory baseline testing.[33]

92.    The 2007 policy placed an emphasis on taking a conservative approach to managing concussions including "giving full consideration to a player's medical history, including his history of concussions and recovery from any previous concussions, and taking the necessary time to conduct a thorough neurological examination, including mental status at rest and post-exertion before making a decision on returning a player to practice or play."

93.    The 2007 policy also mandated baseline testing:[34]

---

[33] Press Release, *NFL Outlines Standards for Concussion Management* (May 22, 2007), *available at* http://www.nflevolution.com/wordpress/wp-content/uploads/2012/08/concussion_standards-508.pdf; NCAA10044661-62.

CLASS ACTION COMPLAINT
Case No.:
010481-11 753991 V1

- 29 -

1
2
3
4
5
6
7
8

Neuropsychological baseline testing will be required for all NFL players beginning this season, using a standardized test to establish an individual functional baseline. Neuropsychological testing is one tool a physician can use to assist in the management of MTBI. It cannot be used by itself to make clinical decisions. For players removed from games due to concussions, repeat testing will be done during the season to track recovery and to help decide when they can return to play. These players also will be re-tested against their baseline performance the following season at training camp.

9       94.     Finally, the NFL took some steps to educate players in a 2007
10  "concussion pamphlet":[35]

11
12
13
14
15
16
17
18
19

(1) The player should be completely asymptomatic and have normal neurological test results, including mental status testing at rest and after physical exertion before returning to play; (2) Symptoms to be taken into account include confusion, problems with immediate recall, disorientation to time, place and person, anterograde and retrograde amnesia, fatigue, and blurred vision; (3) if an NFL player sustains a loss of consciousness, as determined by the team medical staff, he should not return to the same game or practice; (4) NFL team physicians and athletic trainers will continue to exercise their medical judgment and expertise in treating concussions, including considering any history of concussion in a player.

20      **5.      The 2008 Zurich Protocol.**

21      95.     The 3rd International Conference on Concussion in Sport was held in
22  Zurich in November 2008, resulting in an update of the Vienna and Prague Protocols
23  ("Zurich Protocol").[36] Once again, the Zurich Protocol reaffirmed the need for a

24
25
26
27
28

[34] Press Release, *NFL Outlines Standards for Concussion Management* (May 22, 2007), *available at* http://www.nflevolution.com/wordpress/wp-content/uploads/2012/08/concussion_standards-508.pdf.

[35] *See* Press Release, *NFL Outlines For Players Steps Taken to Address Concussions* (Aug. 14, 2007), *available at* http://www.nfl.com/news/story/09000d5d8017cc67/article/nfl-outlines-for-players-steps-taken-to-address-concussions.

[36] Zurich Protocol, at i78.

CLASS ACTION COMPLAINT
Case No.:
010481-11 753991 V1

- 30 -

graduated stepwise return-to-play process after a concussion with a 24-hour wait period between each step. The Zurich Protocol mirrors the Prague Protocol in many respects. However, the Zurich Protocol abandoned the simple versus complex terminology developed in Prague and also identified "concussion modifiers" which may affect the recovery and outcome of return-to-play progress. In addition, the Zurich Protocol more specifically enumerated a process for sideline evaluation and developed another standardized concussion assessment tool (SCAT2) for use in concussion evaluation.

96.     In regards to return to play, the Zurich Protocol noted:

> The cornerstone of concussion management is physical and cognitive rest until symptoms resolve and then a graded programme of exertion prior to medical clearance and return to play. The recovery and outcome of this injury may be modified by a number of factors that may require more sophisticated management strategies. These are outlined in the section on modifiers below. As described above, the majority of injuries will recover spontaneously over several days. In these situations, it is expected that an athlete will proceed progressively through a stepwise return to play strategy. During this period of recovery while symptomatic, following an injury, it is important to emphasise to the athlete that physical and cognitive rest is required. Activities that require concentration and attention (e.g., scholastic work, videogames, text messaging, etc) may exacerbate symptoms and possibly delay recovery. In such cases, apart from limiting relevant physical and cognitive activities (and other risk-taking opportunities for re-injury) while symptomatic, no further intervention is required during the period of recovery and the athlete typically resumes sport without further problem.

97.     The Protocol further stated:

> Return to play protocol following a concussion follows a stepwise process … With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. Generally each step

should take 24 hours so that an athlete would take approximately one week to proceed through the full rehabilitation protocol once they are asymptomatic at rest and with provocative exercise. If any postconcussion symptoms occur while in the stepwise programme, the patient should drop back to the previous asymptomatic level and try to progress again after a further 24-hour period of rest has passed."

98.     The Protocol included the following chart:

Graduated Return-to-Play Protocol:

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 1. No activity | Complete physical and cognitive rest | Recovery |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum predicted heart rate | Increase heart rate |
| | No resistance training | |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |
| 4. Non-contact training drills | Progression to more complex training drills, eg passing drills in football and ice hockey | Exercise, coordination, and cognitive load |
| | May start progressive resistance training) | |
| 5. Full contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

99.     The Zurich Protocol provided: "An important consideration in RTP is that concussed athletes should not only be symptom-free but also should not be taking any pharmacological agents/medications that may mask or modify the symptoms of concussion."

100.    In regards to "Same day RTP," the Protocol stated:

With adult athletes, in some settings, where there are team physicians experienced in concussion management and sufficient resources (e.g., access to neuropsychologists, consultants, neuroimaging, etc) as well as access to immediate (i.e., sideline) neurocognitive assessment, return to play management may be more rapid. The RTP strategy must still follow the same basic management principles namely full clinical and cognitive recovery before consideration of return to play. This approach is supported by

published guidelines, such as the American Academy of Neurology, US Team Physician Consensus Statement, and US National Athletic Trainers Association Position Statement. This issue was extensively discussed by the consensus panelists and it was acknowledged that there is evidence that some professional American football players are able to RTP more quickly, with even same day RTP supported by National Football League studies without a risk of recurrence or sequelae. *There are data however, demonstrating that at the collegiate and high school level, athletes allowed to RTP on the same day may demonstrate NP deficits post-injury that may not be evident on the sidelines and are more likely to have delayed onset of symptoms.* It should be emphasised however, that the young (<18) elite athlete should be treated more conservatively even though the resources may be the same as for an older professional athlete.

(Emphasis added.)

101.   The Protocol also noted that the panel agreed that a range of "modifying factors" may effect concussion management: "[A] range of 'modifying' factors may influence the investigation and management of concussion and in some cases, may predict the potential for prolonged or persistent symptoms." *Id.* at i79.

Concussion modifiers:

| Factors | Modifier |
|---------|----------|
| Symptoms | Number |
| | Duration (>10 days) |
| | Severity |
| Signs | Prolonged loss of consciousness (>1 min), amnesia |
| Sequelae | Concussive convulsions |
| Temporal | Frequency—repeated concussions over time |
| | Timing—injuries close together in time |
| | "Recency"—recent concussion or traumatic brain injury |
| Threshold | Repeated concussions occurring with progressively less impact force or slower recovery after each successive concussion |
| Age | Child and adolescent (<18 years old) |
| Co- and pre-morbidities | Migraine, depression or other mental health disorders, attention deficit hyperactivity disorder, learning disabilities, sleep disorders |
| Medication | Psychoactive drugs, anticoagulants |
| Behaviour | Dangerous style of play |
| Sport | High risk activity, contact and collision sport, high sporting level |

102.   The Zurich Protocol also re-emphasized the importance of neuropsychological and comparative baseline testing but noted that it should not be used as a stand-alone tool or form the sole basis of management decisions but rather as an aid to the clinical decision making process. In addition, the Zurich Protocol noted that "neurospychologists are in the best position to interpret NP tests by virtue of their background and training … However, there may be situations where neuropsychologists are not available and other medical professional may perform or interpret NP screening tests." The Zurich Protocol recommended that all high-risk sports have formal baseline neuropsychological screening, stating "[a]lthough formal baseline NP screening may be beyond the resources of many sports or individuals, it is recommended that in all organised high risk sports consideration be given to having this cognitive evaluation regardless of the age or level of performance." Finally, the Zurich Protocol noted that: "in the absence of NP and other testing, a more conservative return to play approach may be appropriate."

103.   The Zurich Protocol also expanded upon the sideline evaluation of concussion and formulated the SCAT2. The Zurich Protocol specifically stated:

When a player shows *any* features of a concussion:

    a.    The player should be medically evaluated onsite using standard emergency management principles and particular attention should be given to excluding a cervical spine injury.

    b.    The appropriate disposition of the player must be determined by the treating healthcare provider in a timely manner. If no healthcare provider is available, the player should be safely removed from practice or play and urgent referral to a physician arranged.

    c.    Once the first aid issues are addressed, then an assessment of the concussive injury should be made using the SCAT2 or other similar tool.

    d.    The player should not be left alone following the injury and serial monitoring for deterioration is essential over the initial few hours following injury.

    e.    A player with diagnosed concussion should not be allowed to return to play on the day of injury. Occasionally in adult athletes, there may be return to play on the same day as the injury.

*    \*    \**

Sideline evaluation of cognitive function is an essential component in the assessment of this injury. Brief neuropsychological test batteries that assess attention and memory function have been shown to be practical and effective. Such tests include the Maddocks questions and the Standardized Assessment of Concussion (SAC). It is worth noting that standard orientation questions (eg, time, place, person) have been shown to be unreliable in the sporting situation when compared with memory assessment. It is recognised, however, that abbreviated testing paradigms are designed for rapid concussion screening on the sidelines and are not meant to replace comprehensive neuropsychological

> testing which is sensitive to detect subtle deficits that may
> exist beyond the acute episode; nor should they be used as a
> stand-alone tool for the ongoing management of sports
> concussions. It should also be recognised that the appearance
> of symptoms might be delayed several hours following a
> concussive episode.

(Internal citations omitted.)

104.   The Zurich Protocol again emphasized the necessity of concussion education. "As the ability to treat or reduce the effects of concussive injury after the event is minimal, education of athletes, colleagues and the general public is a mainstay of progress in this field. Athletes, referees, administrators, parents, coaches, and healthcare providers must be educated regarding the detection of concussion, its clinical features, assessment techniques and principles of safe return to play."

105.   Finally, the Zurich Protocol noted that there is no evidence that protective equipment, including helmets, will prevent concussion. "There is no good clinical evidence that currently available protective equipment will prevent concussion although mouthguards have a definite role in preventing dental and orofacial injury. Biomechanical studies have shown a reduction in impact forces to the brain with the use of head gear and helmets, but these findings have not been translated to show a reduction in concussion incidence."

### 6.   In 2009, Even the "NFL Adopts Stricter Statement on Return to Play Following Concussions."

106.   In 2009, the NFL's medical committee on concussions, in conjunction with team doctors, outside medical experts, and the NFL Players Association, adopted stricter standards of return-to-play decisions after concussions.[37]

---

[37] *See* Press Release, *NFL Adopts Stricter Statement on Return-to-Play Following Concussions* (Dec. 2, 2009), *available at* http://www.nflevolution.com/wordpress/wp-content/uploads/2012/08/nfl_adopts_stricter_statement_on_return-to-play_following_concussions-508.pdf; *see also* NCAA10044661-62.

107.   The 2009 standards provided that a player who suffers a concussion should not return to play or practice on the same day if he shows any signs or symptoms of a concussion. The statement mandates:

> Once removed for the duration of the practice or game, the player should not be considered for return-to-football activities until he is fully asymptomatic, both at rest and after exertion, has a normal neurological examination, normal neuropsychological testing, and has been cleared to return both by his team physician(s) and the independent neurological consultant. These independent consultants have been approved by both the NFL Medical Advisor and the Medical Director of the NFL Players Association.

> A critical element of managing concussions is candid reporting by players of their symptoms following an injury. Accordingly, players are to be encouraged to be candid with team medical staffs and fully disclose any signs or symptoms that may be associated with a concussion.

108.   The 2009 NFL standards stated that a player who suffers a concussion should not return to play or practice on the same day if any of the following symptoms are identified based on the initial medical evaluation of the player:

- Loss of consciousness;

- Confusion as evidenced by disorientation to person, time or place; inability to respond appropriately to questions; or inability to remember assignments or plays;

- Amnesia as evidenced by a gap in memory for events occurring just prior to the injury inability to learn and retain new information; or a gap in memory for events that occurred after the injury;

- Abnormal neurological examination, such as abnormal pupillary response, persistent dizziness or vertigo, or abnormal balance on sideline testing;

- New and persistent headache, particularly if accompanied by photosensitivity, nausea, vomiting or dizziness; and

- Any other persistent signs or symptoms of concussion.

### 7.   In 2011, the NFL Implemented a Standardized Concussion Assessment Protocol.

109.   In 2011, the NFL implemented standardized sideline concussion tests to be administered to injured athletes called the "NFL Sideline Concussion Assessment Protocol" and also a standardized baseline test.

110.   The sideline protocol was apparently a result of a survey of team medical staffs and input from the players union and mirrors many aspects of the 2008 Zurich SCAT2 protocol. Notably, the NFL protocol was developed by its Head, Neck and Spine Committee, and specifically the return-to-play subcommittee which is chaired by Dr. Margot Putukian, who also consults to the NCAA.[38]

111.   First, players must take a baseline test prior to the season. Once a player is injured, players must be evaluated with a standardized test "derived from the Standardized Concussion Assessment Tool 2 (SCAT2) and represents a standardized method of evaluating NFL players for concussion consistent with the reasonable, objective practice of the healthcare profession." The protocol states that "If ANY significant abnormality is found, a conservative, 'safety first' approach should be adopted. An athlete suspected of sustaining a concussion is a 'No Go' and does not return to play in the same game or practice." Moreover, the comparison is being done real-time in the NFL using iPad apps.[39]

---

[38] *NFL Launches New Guidelines for Assessing Concussions*, USA TODAY (Mar. 30, 2011), *available at* http://usatoday30.usatoday.com/sports/football/nfl/2011-03-29-concussions-protocol_N.htm.

[39] Judy Battista, *NFL Will Expand Concussion Efforts During Games*, N.Y. TIMES (Feb. 26, 2013), *available at* http://www.nytimes.com/2013/02/27/sports/football/nfl-will-use-ipads-to-expand-in-game-concussion-testing.html?ref=judybattista&_r=0.

112.   The NFL explained: "The hope is that being able to compare the results of a baseline test and post-injury test side by side in real time will speed diagnosis and help doctors and trainers recognize when a player should be removed from a game. The league also plans to have independent neurological consultants on the sideline during each game to assist the team physician in diagnosing and treating players."[40]

**8.   American College of Sports Medicine's Concussion (Mild Traumatic Brain Injury) and the Team Physician: A Consensus Statement – 2011 Update.**

113.   The 2011 Update by the American College of Sports Medicine revised recommendations regarding mild traumatic brain injury from the 2006 edition.[41] The 2011 Update provided:

- No same day return-to play (RTP).

- Neurological examination emphasizing cognitive function and balance.

- Role and limitations of neuropsychological (NP) testing.

- Utility of standardized baseline and post injury assessments.

- Importance of preseason planning.

- Acknowledged importance of cognitive rest.

- Acknowledged emerging technologies and their role in concussion research.

- Recognition of long-term complications of concussion.

- Legislation and governing body regulations for concussion.

---

[40] *Id.*

[41] American College of Sports Medicine, *Concussion (Mild Traumatic Brain Injury) and the Team Physician: A Consensus Statement - 2011 Update*, MED. SCI. SPORTS & EXERCISE 2412, 2415 (2011).

114.   In addition, the 2011 Update provided:

It is *essential* the team physician understand:

- Before resuming exercise, the athlete must be asymptomatic or returned to baseline symptoms at rest and has no symptoms with cognitive effort.

  o   Amnesia surrounding the event may be permanent.

- An athlete should no longer be taking medications that may mask or modify concussion symptoms.

- The athlete's clinical neurological examination (cognitive, cranial nerve, and balance testing) have returned to baseline before resuming exercise.

- If performed, NP testing returns to at-least baseline before resuming contact/collision activities.

- Progressive aerobic and resistance exercise challenge tests should be utilized before full RTP.

  o   This process may take days, weeks, or months.

  o   Recurrence of symptoms and/or signs warrants additional rest and monitoring.

- Certain risk factors may affect RTP decision making.

- Additional factors may affect RTP decision making:

  o   Risk-taking behaviors

  o   Type of sport

It is *desirable* the team physician:

- Coordinate a team to implement sport-specific progressive aerobic and resistance exercise challenge tests before full RTP.

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 40 -

- • Facilitate academic accommodations for symptomatic student athletes.

- • Discuss status of athlete with parents/guardians, caregivers, certified athletic trainers, coaches, school officials, and others within disclosure regulations.

(Internal citations omitted) (emphasis in original).

115.   The ACSM also published a 2012 Update.[42] Regarding "Establishing a Return to Play Process," the 2012 Update states:

Establishing a process for returning an athlete to play is the essential first step in deciding when an injured or ill athlete may safely return to practice or competition. This process should include evaluation of the athlete's health status, participation risk, and extrinsic factors. The final RTP decision is made by the team physician.

It is essential the team physician:

- • Understand the RTP process should be established during the off season.

- • Coordinate a chain of command regarding decisions to return an injured or ill athlete to practice or competition.

- • Evaluate the athlete's health status.

  - o Medical factors including history, symptoms, signs, and additional tests.

  - o Psychological factors, including readiness and coping mechanisms.

  - o Functional testing to evaluate readiness to RTP.

  - o Nature of the illness/injury including mechanism of injury, natural history, and known risks of participating after illness/injury.

---

[42] American College of Sports Medicine, *The Team Physician and the Return-to-Play Decision: A Consensus Statement – 2012 Update*, MED. SCI. SPORTS & EXERCISE 2446, 2447 (2012).

- Evaluate the athlete's participation risk.

  o Demands of the athlete's sport, including the position and competitive level of play.

  o Role of taping, bracing, or orthoses to protect the athlete.

  o Role of medical interventions that allow an athlete to play (e.g., analgesics/injections, inhalers, and intravenous fluids).

  o RTP may affect other athletes (e.g., bracing, casting, and disease transmission).

- Understand extrinsic factors that may modify the acceptable level of risk (risk/gain ratio) for the individual athlete (e.g., pressure from parents, team and/or coaches, conflicts of interest and other ethical considerations, fear of litigation, point in athlete's season, or career).

- Communicate the RTP process to players, families, certified athletic trainers, coaches, administrators, and other health care providers.

- Confirm a system for medical documentation is in place.

- Establish protocols within disclosure regulations for the release of information regarding an athlete's ability to return to practice or competition after an injury or illness.

- Understand certain sports have governing body rules and regulations regarding participation that affect the RTP decision (e.g., no knee brace in rugby and skin infection in wrestling).

- Understand federal, state, and local regulations and legislation related to returning an injured or ill athlete to practice or competition.

It is desirable the team physician:

- Work with the athletic care network to educate athletes, parents, and coaches about the RTP process.

- Prepare a letter of understanding between the team physician and the administration that defines the authority, responsibilities, and RTP decisions.

(Internal citations omitted.)

### 9.    2013 American Academy of Neurology Update.

116.    On March 18, 2013, the American Academy of Neurology ("AAN") replaced its 1997 practice parameter regarding sports concussion with the *Summary of Evidence-Based Guideline Update: Evaluation and Management of Concussion in Sports* ("AAN Update").[43]

117.    The AAN Update recommended the following diagnostic tools as useful in identifying those with concussion: Post-Concussion Symptom Scale or Graded Symptom Checklist; Standardized Assessment of Concussion; neuropsychological testing; Balance Error Scoring System; Sensory Organization Test; and these diagnostic measures used in combination.[44] With respect to neuropsychological testing, the AAN stated that such testing:

> generally require[s] a neuropsychologist for accurate interpretation, although [it] may be administered by a non-neuropsychologist. It is likely that neuropsychological testing of memory performance, reaction time, and speed of cognitive processing, regardless of whether administered by paper-and-pencil or computerized method, is useful in identifying the presence of concussion.[45]

---

[43] American Academy of Neurology, *Summary of Evidence-Based Guideline Update: Evaluation and Management of Concussion in Sports* (2013), *available at* http://neurology.org/content/early/2013/03/15WNL.0b013e31828d57dd.

[44] *Id.* at 3.

[45] *Id.* (citations omitted).

The AAN further stated that the above diagnostic tools may be used to identify athletes with "chronic neurobehavioral impairments."[46]

118.   The AAN also provided three sets of recommendations, regarding: (1) preparticipation counseling; (2) the assessment, diagnosis, and management of suspected concussion; and (3) the management of diagnosed concussion (including acute management, RTP, and retirement).[47]

119.   First, with respect to preparticipation counseling, the AAN recommended that "school-based professionals be educated by experienced LHCPs [licensed healthcare providers] designated by their organization/institution to understand the risks of experiencing a concussion so that they may provide accurate information to parents and athletes."[48]

120.   Second, with respect to the management of diagnosed concussion, the AAN Update addressed RTP and the risk of recurrent concussion, and provided:

1.   In order to diminish the risk of recurrent injury, individuals supervising athletes should prohibit an athlete with concussion from returning to play/practice (contact-risk activity) until an LHCP has judged that the concussion has resolved.

2.   In order to diminish the risk of recurrent injury, individuals supervising athletes should prohibit an athlete with concussion from returning to play/practice (contact-risk activity) until the athlete is asymptomatic off medication.[49]

121.   The AAN also recommended "cognitive restructuring counseling" consisting of "education, reassurance, and reattribution of symptoms," which has been

---

[46] *Id.*

[47] *Id.* at 4.

[48] *Id.*

[49] *Id.* at 5.

shown to decrease the proportion of individuals with mTBI who develop chronic postconcussion syndrome.[50]

122.   Finally, the AAN stated that LHCPs "should counsel athletes with a history of multiple concussions and subjective persistent neurobehavioral impairment about the risk factors for developing permanent or lasting neurobehavioral or cognitive impairments."[51]

**10.   2013 Zurich II Protocol.**

123.   The 4th International Conference on Concussion in Sport was held in Zurich in November 2012, resulting in an update of the Vienna, Prague, and Zurich Protocols ("Zurich II").[52] Zurich II provided only modest updates to the prior consensus guidelines.

124.   With respect to pre-participation concussion management, Zurich II stated:[53]

> Recognising the importance of a concussion history, and appreciating the fact that many athletes will not recognise all the concussions they may have suffered in the past, a detailed concussion history is of value. Such a history may preidentify athletes who fit into a high-risk category and provides an opportunity for the healthcare provider to educate the athlete in regard to the significance of concussive injury. A structured concussion history should include specific questions as to previous symptoms of a concussion and length of recovery; not just the perceived number of past concussions. It is also worth noting that dependence on the recall of concussive injuries by teammates or coaches has been demonstrated to be unreliable.

---

[50] *Id.*

[51] *Id.* at 6.

[52] P. McCrory, et al., *Consensus statement on concussion in sport: the 4th International Conference on Concussion in Sport held in Zurich, November 2012*, 47 BRIT. J. SPORTS MED. 250 (2013), *available at* http://bjsm.bmj.com/content/47/5/250.full.pdf+html.  ("Zurich II Protocol").

[53] *Id.*

The clinical history should also include information about all previous head, face or cervical spine injuries as these may also have clinical relevance. It is worth emphasising that in the setting of maxillofacial and cervical spine injuries, coexistent concussive injuries may be missed unless specifically assessed. Questions pertaining to disproportionate impact versus symptom severity matching may alert the clinician to a progressively increasing vulnerability to injury. As part of the clinical history, it is advised that details regarding protective equipment employed at the time of injury be sought, both for recent and remote injuries.

There is an additional and often unrecognised benefit of the preparticipation physical examination insofar as the evaluation allows for an educative opportunity with the player concerned as well as consideration of modification of playing behaviour if required.

125.    Zurich II also emphasized the necessity of concussion education before a concussion has occurred, stating:[54]

As the ability to treat or reduce the effects of concussive injury after the event is minimal, education of athletes, colleagues and the general public is a mainstay of progress in this field. Athletes, referees, administrators, parents, coaches and healthcare providers must be educated regarding the detection of concussion, its clinical features, assessment techniques and principles of safe return to play.

126.    In regards to "Same day RTP" after a concussion, Zurich II again reinforced:[55]

It was unanimously agreed that no RTP on the day of concussive injury should occur. There are data demonstrating that at the collegiate and high school levels, athletes allowed to RTP on the same day may demonstrate NP deficits postinjury that may not be evident on the

---

[54] *Id.* at 5.

[55] *Id.* at 3.

CLASS ACTION COMPLAINT
Case No.:
010481-11 753991 V1

- 46 -

sidelines and are more likely to have delayed onset of symptoms.

127. With respect to return to play, Zurich II stated: "The cornerstone of concussion management is physical and cognitive rest until symptoms resolve and then a graded programme of exertion prior to medical clearance and return to play."[56] Zurich II further stated:[57]

> Return to play protocol following a concussion follows a stepwise process … With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. Generally, each step should take 24 h so that an athlete would take approximately one week to proceed through the full rehabilitation protocol once they are asymptomatic at rest and with provocative exercise. If any postconcussion symptoms occur while in the stepwise programme, then the patient should drop back to the previous asymptomatic level and try to progress again after a further 24 h period of rest has passed.

128. Zurich II included the following chart:[58]

Graduated Return-to-Play Protocol:

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 1. No activity | Symptom limited physical and cognitive rest | Recovery |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum permitted heart rate<br>No resistance training | Increase HR |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |

---

[56] *Id.*

[57] *Id.*

[58] *Id.* at 4.

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 4. Non-contact training drills | Progression to more complex training drills, eg, passing drills in football and ice hockey<br>May start progressive resistance training | Exercise, coordination and cognitive load |
| 5. Full-contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

129.   Zurich II explained that a single return-to-play paradigm should be used for all athletes and that formal neuropsychological testing should be used in high risks sports regardless of age or level of competition, explaining:[59]

> All athletes regardless of level of participation should be managed using the same treatment and return to play paradigm. The available resources and expertise in concussion evaluation are of more importance in determining management than a separation between elite and non-elite athlete management. Although formal NP testing may be beyond the resources of many sports of individuals, it is recommended that, in all organised high-risk sports, consideration be given to having this cognitive evaluation, regardless of the age or level of performance.

130.   Zurich II also re-emphasized the importance of neuropsychological testing but noted that it should not be used as a stand-alone tool or form the sole basis of management decisions but rather as an aid to the clinical decision making process. In addition, Zurich II recommended that "all athletes should have a clinical neurological assessment (including assessment of their cognitive function) as part of their overall management," and that NP testing should ideally be performed by trained

---

[59] *Id.* at 5.

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

neuropsychologists who are "in the best position to interpret NP tests by virtue of their background and training…."[60] Zurich II recommended that all high-risk sports, regardless of the age or level of performance, have formal baseline neuropsychological screening.[61]

131.   Zurich II also suggests that changes in the rules and rule enforcement are critical:

> Consideration of rule changes to reduce the head injury incidence or severity may be appropriate where a clear-cut mechanism is implicated in a particular sport. An example of this is in football (soccer) where research studies demonstrated that upper limb to head contact in heading contests accounted for approximately 50% of concussions. As noted earlier, rule changes may also be needed in some sports to allow an effective off-field medical assessment to occur without compromising the athlete's welfare, affecting the flow of the game or unduly penalising the player's team. It is important to note that rule enforcement may be a critical aspect of modifying injury risk in these settings, and referees play an important role in this regard.[62]

132.   In regards to sideline assessments, Zurich II requires "sufficient time for assessment … in some sports, this may require rule change to allow an appropriate off-field medical assessment to occur without affecting the flow of the game or unduly penalizing the injured player's team."[63]

133.   Finally, Zurich II states specific recommendations regarding child and adolescent athletes:

> The evaluation and management recommendations contained herein can be applied to children and adolescents down to the age of 13 years. Below that age, children report concussion symptoms different from adults and would

---

[60] *Id.* at 7-8.

[61] *Id.* at 5.

[62] *Id.* at 5-6.

[63] *Id.* at 2.

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 49 -

require age-appropriate symptom checklists as a component of assessment. An additional consideration in assessing the child or adolescent athlete with a concussion is that the clinical evaluation by the healthcare professional may need to include both patient and parent input, and possibly teacher and school input when appropriate. A child SCAT3 has been developed to assess concussion (see appendix) for individuals aged 5–12 years.

\*\*\*

It was agreed by the panel that no return to sport or activity should occur before the child/adolescent athlete has managed to return to school successfully. In addition, the concept of 'cognitive rest' was highlighted with special reference to a child's need to limit exertion with activities of daily living that may exacerbate symptoms. School attendance and activities may also need to be modified to avoid provocation of symptoms. Children should not be returned to sport until clinically completely symptom-free, which may require a longer time frame than for adults.

Because of the different physiological response and longer recovery after concussion and specific risks (eg, diffuse cerebral swelling) related to head impact during childhood and adolescence, a more conservative RTP approach is recommended. ***It is appropriate to extend the amount of time of asymptomatic rest and/or the length of the graded exertion in children and adolescents***. It is not appropriate for a child or adolescent athlete with concussion to RTP on the same day as the injury, regardless of the level of athletic performance. Concussion modifiers apply even more to this population than adults and may mandate more cautious RTP advice.[64]

134. The documents set forth above constitute the consensus best practices in the proper assessment and management of concussion for all physician, sub-specialty,

---

[64] *Id.* at 5 (emphasis added).

and allied health professionals, including athletic trainers and those responsible for the safety, well-being and treatment of athletes.

**C.    Reported Concussion Injuries and Incidence of Concussion in Water Polo**

135.   USA Water Polo's former medical director and team physician for USA Water Polo, Dr. Larry Drum, has described concussions as the "king of water polo injuries" and "the most important acute injury to care for."[65] According to Dr. Drum, concussions often occur from "a fast moving ball, usually off the cage and into the back of the goalie's head, or hand inadvertently hits the head of another player…."[66]

136.   H.C. is just one example of athletes that suffer concussions playing water polo and are returned to play symptomatic or are returned to play before they have recovered fully from their concussion. Some additional examples follow, and their stories are typical of the concussion problem in water polo and highlight the importance of USA Water Polo's failure to adopt or enforce consensus best practices guidelines including: i) recognizing possible concussions during the game; (ii) specific return to play guidelines including a specific graded stepwise return to play protocol indicating that a day is needed between return to play steps and that typically a week of asymptomatic time is needed to resolve symptoms prior to returning to play and that "it is appropriate to extend the amount of time of asymptomatic rest and/or the length of the graded exertion in children and adolescents"[67]; (iii) a prohibition on returning to play in the same game after sustaining a concussion; (iv) requiring formal baseline and/or post-injury neurocognitive testing of players; (v) requiring that players' concussions be managed and cleared by physicians or medical personnel with specific expertise in concussion management, diagnosis and treatment; (vi) adopting consensus best practices for management of children and adolescents with

---

[65] http://www.fina.org/H2O/index.php?option=com_content&view=article&id=2609:water-polo-doctor-on-deck&Itemid=974 (last accessed Jan. 15, 2015).

[66] *Id.*

[67] Zurich II Protocol, at 5.

concussions; and (vii) providing concussion education to athletes, those working with athletes, and the general public.

### 1.    Canadian Women's Water Polo Team's "Concussion Epidemic"

137.   Leading up to the 2012 Olympic Games in London, the Canadian women's water polo team suffered a "concussion epidemic" in which eight members of the 20-member squad suffered concussions at various times leading up to the Olympics.[68] The backup goalie for the Canadian women's water polo team had to retire because of repeated concussions.[69]

138.   The situation of one particular player, Carmen Camille Eggens, illustrates the difficult situation that players find themselves in and highlights the importance of proper care in identifying and treating concussions. One of Eggens' teammates stated in the lead up to the 2012 Olympics: "She got hit last week. She's had a couple of concussions already. She tried to tough it out for a few days: 'It's not a big deal. Maybe, I'm being a bit sensitive … But then now because she didn't take the rest right away she's been out for a week and she said normally her concussions in the past she only had to take a few days off."[70]

139.   During the "concussion epidemic" of the Canadian women's team, many members of the team feared the future consequences of repeated head trauma. For example, one member of the team noted: "All these girls have great ambitions, some want to become doctors," she said. "If they're not smart right now, years of their lives can be negatively affected."[71]

140.   While the Canadian women's team players were evaluated and diagnosed with concussions, many other water polo players and teams simply ignore

---

[68] Concussion Epidemic Hits Women's Water Polo Team Before Olympic Qualifier, available at: http://www.thestar.com/sports/olympics/2012/04/02/concussion_epidemic_hits_womens_water_polo_team_before_olympic_qualifier.html ( last accessed Jan. 15, 2015).

[69] *Id.*

[70] *Id.*

[71] *Id.*

concussions, do not pay attention to them, or choose to play through them. For example, during in a tournament in Australia, a women's U.S. Water Polo national team player took a hard shot directly in the face and was clearly "out of it" after the play. Despite this injury, the player was allowed to practice the following morning and played in a game that night despite it being "impossible" to onlookers that she was not concussed.[72]

### 2. Karoline "Kari" Krumpholz

141.   Karoline "Kari" Krumpholz "was destined for water polo greatness."[73] Her father was a three-time All American selection in men's water polo and her brother won an Olympic silver medal with the U.S. water polo team. As a sophomore at Foothill High School in Orange County, California, Krumpholz and her water polo team won the 2007 California Southern Section Division I Championship and she ultimately accepted a scholarship at UCLA.

142.   During a UCLA practice, Krumpholz was defending one of the strongest girls on the team when she was hit between the eyes by her teammate's elbow. She thought her nose was broken and a trainer made her skip practice the rest of the day.

143.   However, the next day she "went to class and … knew something was wrong" because she "couldn't focus" and "felt out of [her] body." That day a doctor diagnosed her with a concussion and five months later, between daily visits to physicians, Krumpholz was still experiencing symptoms. Although Krumpholz thinks this was the first concussion she suffered, doctors told her that it was a possibility that she had undiagnosed concussions in the past.

144.   Krumpholz was unsure whether she would return to play water polo once her symptoms subsided. In her own words, "[I]t would be scary for me to play again

---

[72] *Id.*

[73] *Concussions Take a Terrible Toll on America's Young Athletes*, available at: http://www.laweekly.com/news/concussions-take-a-terrible-toll-on-americas-young-athletes-2171689 (last accessed Jan. 15, 2015).

because my brain is really important to me and I have plans for graduate school…. Once I am cleared, I'm going to have to really examine if I'm willing to take the risk."[74]

**D.     USA Water Polo Has Failed to Provide Adequate Concussion Management**

**1.     USA Water Polo Has Knowledge of Consensus Best Practices.**

145.   USA Water Polo's website states: "A concussion is a type of traumatic brain injury (TBI), caused by a bump, blow, or jolt to the head that can change the way your brain normally works. Concussions can also occur from a blow to the body that causes the head to move rapidly back and forth. Even a "ding," "getting your bell rung," or what seems to be mild bump or blow to the head can be serious. Concussions can occur in any sport or recreation activity. So, all coaches, parents, and athletes need to learn concussion signs and symptoms and what to do if a concussion occurs."[75]

146.   USA Water Polo's website also provides links to "free tools for youth and high school sports coaches, parents, athletes, and health care professionals that provide important information on preventing, recognizing, and responding to a concussion" produced by the CDC.[76]

147.   USA Water Polo's former medical director and team physician for USA Water Polo has described concussions as "king of water polo injuries" and "the most important acute injury to care for."[77] In doing so, he acknowledged that any symptoms should be "treated seriously" and the Consensus Guidelines promulgated by the International Conferences on Concussion in Sport should be followed.[78]

148.   However, USA Water Polo does not actually follow or require its members to follow, any concussion-management procedures at USA Water Polo

---

[74] *Id.*

[75] http://www.usawaterpolo.org/resources/ethics-safety.html (last accessed January 16, 2015).

[76] *Id.*

[77] http://www.fina.org/H2O/index.php?option=com_content&view=article&id=2609:water-polo-doctor-on-deck&Itemid=974 (last accessed Jan. 15, 2015).

[78] *Id.*

events or tournaments. USA Water Polo also does not require proper concussion-management procedures in its rules, articulate these steps in an official policy, or enforce these steps.

### 2.   USA Water Polo Has Failed to Adopt *Any* Consensus Guidelines Promulgated by the International Conferences on Concussion in Sport.

149.   USA Water has neither endorsed nor adopted any of the internationally accepted guidelines set forth in the Vienna, Prague, Zurich I or Zurich II Protocols including, but not limited to: (i) specific return-to-play guidelines including a specific graded stepwise return-to-play protocol indicating that a day is needed between return-to-play steps that typically a week of asymptomatic time is needed to resolve symptoms prior to returning to play and that "it is appropriate to extend the amount of time of asymptomatic rest and/or the length of the graded exertion in children and adolescents"[79];(ii) a prohibition on returning to play in the same game after sustaining a concussion; (iii) requiring formal baseline and/or post-injury neurocognitive testing of players; (iv) requiring that players' concussions be managed and cleared by physicians by medical personnel with specific expertise in concussion management, diagnosis and treatment; (v) adopting consensus best practices for management of children and adolescents with concussions; and (vi) providing concussion education to athletes, those working with athletes, and the general public.

150.   Notably, USA Water Polo's Official Bylaws,[80] Official Playing Rules,[81] and Policies and Procedures[82] do not mention concussions, concussion protocols, or concussion-related playing rules.

---

[79] Zurich II Protocol at 5.

[80] http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWPByLaws.pdf.

[81] http://www.usawaterpolo.org/resources/rules-ethics.html.

[82] http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWPZonePolicies2013.pdf.

151.   Rather, USA Water Polo's website merely provides links to concussion informational materials. There is no evidence that USA Water Polo has implemented or enforces concussion guidelines.

152.   USA Water Polo also does not require that coaches[83] or referees[84] receive training or education in concussion management or recognition in contravention of best practices. Rather, coaches only must have current CPR and First Aid certification on file with USA Water Polo to obtain coaching certification.[85]

153.   USA Water Polo provides links to CDC "fact sheets" for athletes, coaches, and parents which contain an action plan requiring removal of an athlete from play after a concussion, ensuring that the athlete is evaluated by a health care professional, informing the athlete's parents or guardians, and keeping the athlete out of play the day of the injury until they get medical clearance.[86] However, USA Water Polo does not actually follow or require any of these steps in its rules, articulate these steps in an official policy, or enforce these steps.

154.   Accordingly, USA Water Polo's failure to require, implement, or enforce *any* consensus best practices is a clear breach of its duty and commitment to provide "a healthy and safe environment for all…participants."[87]

155.   Zurich II explained that a single treatment and return-to-play paradigm should be used for all athletes and that formal neuropsychological testing should be used in high-risk sports regardless of age or level of competition, explaining:[88]

> All athletes regardless of level of participation, should be managed using the same treatment and RTP paradigm. The available resources and expertise in concussion evaluation

---

[83] http://www.usawaterpolo.org/resources/coach-screenings.html.

[84] http://www.usawaterpolo.org/resources/ref-screenings.html.

[85] http://www.usawaterpolo.org/resources/coach-screenings.html.

[86] http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/Coaches_Fact_Sheet-Youth_concu.pdf.

[87] http://www.usawaterpolo.org/resources/safe-sport.html.

[88] *Id.* at 5.

are of more importance in determining management than a separation between elite and non-elite athlete management. Although formal NP testing may be beyond the resources of many sports or individuals, it is recommended that, in all organised high-risk sports, consideration be given to having this cognitive evaluation, regardless of the age or level of performance.

156.   USA Water Polo has failed to implement or enforce the following best practices of concussion management as established by the International Conferences on Concussion in Sport:

- A rule that a player may not return to play on the same day of a concussion;

- A mandatory 24 hour stepwise return-to-play guideline which accounts for the fact that a day is needed between return-to-play steps and that typically a week of asymptomatic time is needed to resolve symptoms relating to a concussion prior to return to play;

- Formal baseline testing regardless of the age or level of performance of the players and neuropsychological testing to evaluate injury;

- Require that a player with a concussion or a suspected concussion be evaluated, managed, and cleared by medical personnel with specific expertise in concussion diagnosis, treatment, and management; and

- Rule changes to account for proper concussion management.

157.   USA Water Polo has also failed to implement or enforce the following best practices of concussion management for child and adolescent athletes as established by the International Conferences on Concussion in Sport which:

- Require a different concussion symptom checklist for children below the age of 13;

- Require parental notification and that concussion treatment and evaluation involve parental input;

- Require utilization of the SCAT3 sideline concussion assessment tool specifically designed for children aged 5-12;

- Require that a child should not return to play before the child has returned to school successfully; and

- Require a more conservative return to play approach for children.

158.   USA Water Polo's website makes no mention of the special considerations in concussion management for child and adolescent athletes particularly that children should not be returned to play until completely symptom-free, which may require a longer time frame than for adults and a more conservative return to play approach for children is recommended.

      **a.**    **USA Water Polo Fails to Require a Stepwise Return-to-Play Protocol Which Prohibits Same Day Return to Play.**

159.   Consensus was reached in 2002 – and reinforced with each subsequent International Consensus Statement – that athletes suffering concussion symptoms should never be returned to play in the same game. In addition, consensus was also reached in 2002 that coaches, players, trainers, and physicians should follow a systematic return-to-play policy that includes systematic and graded return to exertion following injury, systematic reevaluation of symptoms following each exertional state, and a collective understanding that the patient is completely asymptomatic at rest, asymptomatic with exertion, and has intact neurocognitive performance prior to final clearance. The best practice consensus guideline has continually been reinforced since the Vienna Protocol.

160.   USA Water Polo has failed to implement or enforce the consensus return-to-play protocols for non-national team players as set forth in the 2002 Vienna Protocol – and updated with the Prague, Zurich, and Zurich II Protocols. For example,

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 58 -

the Vienna Protocol recommended specific return-to-play guidelines that continue to be followed today:

> When a player shows ANY symptoms or signs of a concussion:
>
> (1)    The player should not be allowed to return to play in the current game or practice.
>
> (2)    The player should not be left alone; and regular monitoring for deterioration is essential.
>
> (3)    The player should be medically evaluated after the injury.
>
> Return to play must follow a medically supervised stepwise process. A player should never return to play while symptomatic. 'When in doubt, sit them out!'

161.    The Vienna Protocol also recommended a return to play stepwise process as follows:

> It was the consensus of the CISG that a structured and supervised concussion rehabilitation protocol is conducive to optimal injury recovery and safe and successful return to play. The rehabilitation principles were common to all identified programmes and are outlined below. Important principles state that the athlete be completely asymptomatic and have normal neurological and cognitive evaluations before the start of the rehabilitation programme. Therefore, the more prolonged the symptom duration, the longer the athlete will have sat out. The athlete will then proceed stepwise with gradual incremental increases in exercise duration and intensity, and pause or backtrack with any recurrence of concussive symptoms. It is appreciated that, although each step may take a minimum of one day, depending on the duration of symptoms, proceeding through each step may take longer in individual circumstances.

162.    The Vienna Protocol also provides that return to play after a concussion follows a stepwise process:

(1)    No activity, complete rest. Once asymptomatic, proceed to level.

(2)    Light aerobic exercise such as walking or stationary cycling.

(3)    Sport specific training – for example, skating in hockey, running in soccer.

(4)    Non-contact training drills.

(5)    Full contact training after medical clearance.

(6)    Game play.

With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. If any symptoms occur after concussion, the patient should drop back to the previous asymptomatic level and try to progress again after 24 hours.

163.    The necessity of a stepwise return-to-play protocol has been reinforced as recently as 2013. Zurich II stated:[89]

Return to play protocol following a concussion follows a stepwise process … With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. Generally, each step should take 24 h so that an athlete would take approximately one week to proceed through the full rehabilitation protocol once they are asymptomatic at rest and with provocative exercise. If any postconcussion symptoms occur while in the stepwise programme, then the patient should drop back to the previous asymptomatic level and try to progress again after a further 24 h period of rest has passed.

---

[89] Zurich II Protocol, at 4.

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 60 -

164.   Zurich II included the following chart:[90]

Graduated Return-to-Play Protocol:

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 1. No activity | Symptom limited physical and cognitive rest | Recovery |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum permitted heart rate No resistance training | Increase HR |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |
| 4. Non-contact training drills | Progression to more complex training drills, eg, passing drills in football and ice hockey May start progressive resistance training | Exercise, coordination and cognitive load |
| 5. Full-contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

165.   USA Water Polo does not currently require that players sustaining a concussion or experiencing concussion symptoms be removed and unable to return to the game or practice. USA Water Polo's failure to implement or enforce a rule requiring that players suffering concussion symptoms should never be returned to play in the same game also is against best practices.

166.   Similarly, USA Water Polo does not currently require or enforce, and since 2002 has never required or enforced, the use of a return-to-play protocol

---

[90] *Id.*

"regardless of level of participation" in contravention of consensus best practice guidelines.

**b.  USA Water Polo Fails to Require Formal Baseline and/or Post-Injury Neurocognitive Testing of Players.**

167.  The International Consensus Statements provide that neuropsychological testing is one of the "cornerstones" of appropriate concussion management and contributes significantly to both understanding the injury and management of the individual.

168.  For example, the Vienna Protocol provided that neuropsychological testing "has shown to be of value and continues to contribute significant information in concussion evaluation …. It has been shown that cognitive recovery may precede or follow resolution of clinical symptoms, suggesting that the assessment of cognitive function should be an important component in any return to play protocol."

169.  The importance of neuropsychological testing has been reinforced with each subsequent International Consensus Statement. For example, the Zurich II Protocol recommends that "all athletes should have a clinical neurological assessment (including assessment of their cognitive function) as part of their overall management," and that all high-risk sports, regardless of the age or level of performance, have formal baseline neuropsychological screening.[91]

170.  USA Water Polo does not require formal baseline testing or the use of neuropsychological testing to assess injury "regardless of the age or level of performance." Further, USA Water Polo fails to mention that in the absence of neuropsychological testing, a more conservative return to play approach may be appropriate.

171.  USA Water Polo's failure to require formal baseline testing and to utilize neuropsychological testing for all players "regardless of the age or level of performance" is in contravention of consensus best practices. Without a formal

---

[91] *Id.*

baseline, it is very difficult for a physician to determine when a patient has recovered. And returning a player to play before they are fully recovered negligently puts them at risk for permanent brain injury.

**c.      USA Water Polo Fails to Require that Players' Concussions Be Managed Onsite by Medical Personnel with Specific Expertise in Concussion Diagnosis, Treatment, and Management.**

172.    The Zurich II Protocol provides the following in regards to medical evaluation of when a player shows any feature of a concussion:[92]

> On-field or sideline evaluation of acute concussion

> When a player shows ANY features of a concussion:

> A.    The player should be evaluated by a physician or other licensed healthcare provider onsite using standard emergency management principles and particular attention should be given to excluding a cervical spine injury.

> B.    The appropriate disposition of the player must be determined by the treating healthcare provider in a timely manner. If no healthcare provider is available, the player should be safely removed from practice or play and urgent referral to a physician arranged.

> C.    Once the first aid issues are addressed, an assessment of the concussive injury should be made using the SCAT3 or other sideline assessment tools.

> D.    The player should not be left alone following the injury and serial monitoring for deterioration is essential over the initial few hours following injury.

> E.    A player with diagnosed concussion should not be allowed to RTP on the day of injury.

173.    USA Water Polo does not require or enforce a rule requiring that a player be evaluated by a physician on the sideline and before returning to play.

---

[92] *Id.* at 3.

CLASS ACTION COMPLAINT
Case No.:
010481-11  753991 V1

- 63 -

174.   Further, USA Water Polo does not require that a physician or other licensed healthcare provider administer a sideline test/evaluation.

175.   USA Water Polo's failure to implement a policy requiring administration of a standardized sideline evaluation tool such as the SCAT3 to evaluate all players is in contravention of best practices, including the Zurich II Protocol, which requires that a "player should be evaluated by a physician or other licensed healthcare provider onsite.…"

176.   USA Water Polo's failure to require physician involvement and that players with concussion symptoms be seen and cleared by medical personnel who are experienced in concussion is in contravention of best practices.

177.   USA Water Polo knew that its failure to adopt best practices for concussion management would have the effect of the events and teams playing under the USA Water Polo rules not enforcing best concussion-management practices.

### d.   USA Water Polo Fails to Adopt Consensus Best Practices for Management of Children and Adolescents with Concussion.

178.   USA Water Polo has also failed to adopt best practices relating to concussion management of child and adolescent individuals despite the fact that the organization only has players aged 5-19.

179.   For example, the Zurich II Protocol states that "the evaluation and management recommendations herein can be applied to children and adolescents down to the age of 13 years … below that age, children report concussion symptoms different from adults and would require age-appropriate symptom checklists as a component of assessment."[93]

180.   Accordingly, the Zurich II Protocol recommends the usage and implementation of a specially designed SCAT3 sideline concussion assessment tool for individuals aged 5-12.[94]

---

[93] Zurich II Protocol, at 5.

[94] *Id.*

181.   USA Water Polo's failure to account for symptoms specific to children is against best practices.

182.   The Zurich II Protocol also states[95]:

> An additional consideration in assessing the child or adolescent athlete with a concussion is that the clinical evaluation by the healthcare professional may need to include both patient and parent input, and possible teacher and school input when appropriate…

> It was agreed by the panel that no return to sport or activity should occur before the child/adolescent athlete has managed to return to school successfully. In addition, the concept of 'cognitive rest' was highlighted with special reference to a child's need to limit exertion with activities of daily living that may exacerbate symptoms. School attendance and activities may also need to be modified to avoid provocation of symptoms. Children should not be returned to sport until clinically completely symptom-free, which may require a longer time frame than for adults.

183.   USA Water Polo does not require that a child or adolescent players' parents be notified and does not indicate or require that a child should not return to play before the child has returned to school successfully or recommend or require parental involvement in the treatment and evaluation of the child.

184.   USA Water Polo's failure to implement or require these consensus best practices for concussion management of children and adolescents is in contravention of best practices.

**E.   USA Water Polo Has Failed to Adopt Proper Rules Allowing For Play to Be Stopped to Substitute An Injured Player**

185.   USA Water Polo has failed to adopt rules that specially address the issues of brain injuries and/or the risk of brain injury by failing to modify or adopt the playing rules to allow for stoppage of play to substitute an injured player.

---

[95] *Id.*

186.   USA Water Polo rules state that: "[A] player shall only be allowed to leave the water, or sit or stand on the steps or side of the pool during play in the case of accident, injury, illness or with the permission of a referee. A player who has left the water legitimately may re-enter from the re-entry area nearest his own goal line at an appropriate stoppage, with the permission of a referee."[96]

187.   Accordingly, USA Water Polo rules do not require a stoppage of play for head injuries. Rather, a referee, at his or her discretion, *may* suspend the game for not more than three minutes if accident, injury, or illness, other than bleeding occurs.[97]

188.   USA Water Polo's rule prohibiting a stoppage in play is in contravention of the consensus best practices for concussion management. Zurich II requires:[98]

> Sufficient time for assessment and adequate facilities should
> be provided for the appropriate medical assessment both on
> and off the field for injured athletes. In some sports, this may
> require rule change to allow an appropriate off-field medical
> assessment to occur without affecting the flow of the game
> or unduly penalizing the injured players' team. The final
> determination regarding concussion diagnosis and/or fitness
> to play is a medical decision based on clinical judgment.

189.   If USA Water Polo truly intended to protect youth players, it would modify its rules to stop play and allow injured athletes to be substituted during a game. In addition, three minutes is an insufficient amount of time to evaluate a player for a concussion and whether play is stopped is at the ultimate discretion of the referee who is not trained in the recognition, diagnoses, or treatment of concussions in contravention of best practices for concussion management.

190.   Referees and coaches are also unable to prohibit a previously concussed player from returning to play too soon after following post-concussive protocols.

---

[96] USAWP Playing Rules, Rule 25.1 available at: http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWP_FINA_09_13.pdf (last accessed Jan. 15, 2015).

[97] *Id.*, Rule 25.3.

[98] Zurich II Protocol, at 2.

Within USA Water Polo, there are no provisions which prohibit a player from returning to play after a concussion until a medical provider has certified that the previously concussed player should return to training, practice, or game play.

## V.   CLASS ACTION ALLEGATIONS

191.   Plaintiff brings this action, individually and as a class action, pursuant to the provisions of Rules 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All current or former water polo players who from 2013 to the present competed for a team governed by USA Water Polo or participated in an event managed or governed by USA Water Polo.

Excluded from the Class are all persons who make a timely election to be excluded from the Class; and the judge to whom this case is assigned and any immediate family members thereof.

192.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

193.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all members of the Class is impracticable. On information and belief, there are thousands of water polo players who have been exposed to an increased risk of injury or have been damaged by defendant's wrongful conduct as alleged herein. The precise number of members of the Class and their addresses is presently unknown to Plaintiff, but may be ascertained including from books and records of USA Water Polo. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

194. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Class, including, without limitation:

      a.    whether Defendant engaged in the conduct as alleged herein;

      b.    whether Defendant owed a duty to Plaintiff and the Class;

      c.    whether that duty has been breached;

      d.    whether Defendant failed to adopt or enforce concussion-management and return-to-play guidelines in conformance with consensus best practices;

      e.    whether Plaintiff and members of the Class are at increased risk of injury as a result of Defendant's breach; and

      f.    whether Plaintiff and the Class are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

195. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all members of the Class were comparably injured through the uniform misconduct described above.

196. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class she seeks to represent; she has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

197. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below.

198. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The costs of medical monitoring to be incurred by Plaintiff and members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.  CLAIMS ALLEGED

### COUNT I
### NEGLIGENCE
### (On Behalf of the Class)

199. Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

200. At all relevant times, Defendant had a duty toward Plaintiff and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players.

201. Defendant acted carelessly and negligently in their positions as the regulatory body for water polo and water polo players, including Plaintiff and the

Class. In addition, Defendant knew or should have known that their actions or inaction in light of the rate and extent of concussions reported and made known to Defendant would cause harm to players in both the short- and long-term.

202.    Defendant knew that they had the power to direct and influence how its members treat concussion-management issues.

203.    Defendant had a duty to enact and enforce playing rules that properly protect players.

204.    Defendant was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiff and the Class, both generally and in the following particular respects as set forth above and summarized below:

a.   Failing to educate players and their parents concerning symptoms that may indicate a concussion has occurred;

b.   Failing to warn of the risk of unreasonable harm resulting from repeated concussions, the accumulation of subconcussive hits, and heading;

c.   Failing to disclose the risks of long-term complications from repeated concussions and return to play;

d.   Failing to disclose the role of repeated concussions or accumulation of subconcussive hits in causing chronic life-long cognitive decline;

e.   Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and accumulation of subconcussive hits, and a return-to-play policy to minimize long-term chronic cognitive problems;

f.   Concealing and misrepresenting pertinent facts that players and parents needed to be aware of to make determinations of the safety of return to play;

g.    Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions; and

h.    Other acts of negligence or carelessness that may materialize during the pendency of this action.

205.   The Plaintiff individually and the Class members play water polo and are at risk due to Defendant's breaches.

206.   As a result of the foregoing, Plaintiff and the Class have an improper risk of injury caused by the misconduct of Defendant.

207.   The Plaintiff and the Class are entitled to injunctive relief requiring Defendant, among other things, to adopt corrective measures regarding: the implementation of system-wide "return to play" guidelines for athletes who have sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and failing to implement substitution rules for medical evaluation purposes. Plaintiff is also entitled to the remedy of medical monitoring.

208.   Moreover, Plaintiff has no adequate remedy at law in that monetary damages cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Instead, Plaintiff is in need of medical monitoring as a remedy for Defendant's negligence where permitted under state law.

**COUNT II**
**BREACH OF VOLUNTARY UNDERTAKING**
**(On Behalf of the Class)**

209.   Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

210.   At all relevant times, Defendant voluntarily assumed a duty toward Plaintiff and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players.

211. Defendant acted carelessly and negligently in fulfilling their assumed duties as the regulatory body for water polo and water polo players, including Plaintiff and the Class. In addition, Defendant knew or should have known that their actions or inaction in light of the rate and extent of concussions reported and made known to Defendant would cause harm to players in both the short- and long-term.

212. Defendant had a voluntary duty to enact and enforce playing rules that properly protect players.

213. Defendant was careless and negligent by breaching it's assumed and voluntary duty of due care for the benefit of the Plaintiff and the Class, both generally and in the following particular respects as set forth above and summarized below:

    a. Failing to educate players and their parents concerning symptoms that may indicate a concussion has occurred;

    b. Failing to warn of the risk of unreasonable harm resulting from repeated concussions, the accumulation of subconcussive hits, and heading;

    c. Failing to disclose the risks of long-term complications from repeated concussions and return to play;

    d. Failing to disclose the role of repeated concussions or accumulation of subconcussive hits in causing chronic life-long cognitive decline;

    e. Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and accumulation of subconcussive hits, and a return-to-play policy to minimize long-term chronic cognitive problems;

    f. Concealing and misrepresenting pertinent facts that players and parents needed to be aware of to make determinations of the safety of return to play;

g.   Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions; and

h.   Other acts of negligence or carelessness that may materialize during the pendency of this action.

214.   Plaintiff individually and the Class members play water polo and are at risk due to Defendant's breaches.

215.   As a result of the foregoing, the Plaintiff and the Class have an improper risk of injury caused by the misconduct of the Defendant.

216.   The Plaintiff and the Class are entitled to injunctive relief requiring Defendant, among other things, to adopt corrective measures regarding: the implementation of system-wide "return-to-play" guidelines for athletes who have sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and failing to implement substitution Rules for medical evaluation purposes. Plaintiff is also entitled to the remedy of medical monitoring.

217.   Moreover, Plaintiff has no adequate remedy at law in that monetary damages cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Instead, Plaintiff is in need of medical monitoring as a remedy for Defendant's negligence where permitted under state law.

## COUNT III
## MEDICAL MONITORING
### (On Behalf of the Class)

218.   Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein. Plaintiff brings this Count III under the law of the state in which she resides and assert claims on behalf of the Medical Monitoring Class under the laws of the states in which class members reside.

219.   The Medical Monitoring Class has been exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of long-term injury and the illnesses as described above.

220.   The members of the Medical Monitoring Class have not yet fully manifested the long-term physical and mental effects of Defendant's misconduct, and require specialized testing that is not generally given or available to the public at large for the early detection of the long-term effects of concussions and sub-concussions.

221.   Medical monitoring is reasonably necessary according to contemporary scientific principles within the medical community that specialize in close head injuries and their connection to memory loss, early onset dementia, CTE and Alzheimer-like syndromes.

222.   By monitoring and testing former (and current) athletes who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long-term injuries, disease, and losses as described above will be significantly reduced.

223.   Accordingly, Defendant should be required to establish a medical monitoring program that includes, among other things:

  a. Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current, and future athletes, as frequently and appropriately as necessary;

  b. Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring; and

  c. Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the athlete is subjected to an increased risk of harm.

224.   Plaintiff and the Medical Monitoring Class have no adequate remedy at law in that monetary damages cannot compensate them for the risk of long-term

physical and economic losses due to concussions and sub-concussive injuries. Without a Court-approved medical monitoring program as described herein, or established by the Court, Plaintiff and the Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability.

**COUNT IV**

**GROSS NEGLIGENCE**
**(On Behalf of Minor H.C.)**

225.   Plaintiff, on behalf of minor H.C., individually and separately brings Count IV on her own behalf, and adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

226.   At all relevant times, USA Water Polo had a duty toward H.C. to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players.

227.   USA Water Polo acted carelessly and negligently in its position as the regulatory body for water polo in the United States and its athletes, including H.C. USA Water Polo knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to USA Water Polo would cause harm to players in both the short- and long- term.

228.   USA Water Polo was careless, negligent, and reckless by breaching the duty of due care it assumed for the benefit of H.C., both generally and in the following respects:

      (i)     failing to implement or require the implementation of concussion-management policies that met consensus best practices;

      (ii)    failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii) failing to require that athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv) failing to require that athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the athlete for deterioration;

(v) leaving discretion of return to play for a athlete that had suffered a concussion or displayed concussion symptoms to an individual team's coach or referee without any training or specific expertise in concussion diagnosis, treatment, and management;

(vi) failing to provide or require that medical personnel be present at USA Water Polo events and/or tournaments;

(vii) failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(viii) failing to provide appropriate medical care or coverage for costs for medical care for athletes who suffered concussions or displayed concussion symptoms; and

(ix) other acts of negligence, recklessness, or carelessness that may materialize during the pendency of this action.

229.   USA Water Polo's failure to enforce *any* of the consensus best practices for concussion management, which were established in approximately 2002, demonstrates a want of even scat care and an extreme departure from the ordinary standard of conduct.

230. Defendant's gross negligence resulted in severe injuries to H.C. who has individually experienced, and may in the future suffer, from an assortment of problems associated with the harm and injuries described above, including, but not limited to, post-concussion syndrome and Chronic Traumatic Encephalopathy, as well as such symptoms as headaches, dizziness, loss of memory, depression, anxiety, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, loss of the pleasures of life, early-onset dementia, and Parkonsonism, among other things.

231. As a result of the foregoing, H.C. has suffered damages and will in the future suffer damages caused by the gross negligence of the Defendant. Accordingly, Plaintiff, on behalf of minor H.C. seeks an individual award of compensatory damages, punitive damages, pain and suffering, and any other relief to which they are entitled under the law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests judgment as follows:

A. Certification of the proposed Class pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B. Designation of Plaintiff as representative of the proposed Class and designation of Plaintiff's counsel as Class counsel;

C. Injunctive relief;

E. The establishment of a medical monitoring program;

F. An award to the Plaintiff and the Class of costs, and attorneys' fees; and

G. An award to the Plaintiff and Class for such other and further relief as the Court deems just and proper.

1

**JURY DEMAND**

2

      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

3

jury of all claims in this Complaint so triable.

4

5

DATED:  February 3, 2015

6

                              By: s/ Elaine T. Byszewski
                              Elaine T. Byszewski (SBN 222304)

7

                              *elaine@hbsslaw.com*
                              HAGENS BERMAN SOBOL SHAPIRO LLP

8

                              301 N. Lake Ave., Suite 203
                              Pasadena, CA  91101

9

                              Telephone: (213) 330-7150
                              Facsimile: (213) 330-7152

10

11

                              Steve W. Berman (*pro hac* pending)

12

                              *steve@hbsslaw.com*
                              HAGENS BERMAN SOBOL SHAPIRO LLP

13

                              1918 Eighth Avenue, Suite 3300
                              Seattle, WA 98101

14

                              Telephone: 206-623-7292
                              Facsimile: 206-623-0594

15

16

                              Elizabeth A. Fegan *(pro hac* pending)

17

                              *beth@hbsslaw.com*
                              Thomas E. Ahlering *(pro hac* pending)

18

                              *toma@hbsslaw.com*
                              HAGENS BERMAN SOBOL SHAPIRO LLP

19

                              1144 W. Lake Street, Suite 400
                              Oak Park, IL 60301

20

                              Telephone: (708) 628-4949
                              Facsimile: (708) 628-4950

21

22

                              *Attorneys for Plaintiff Alice Mayall, as parent*

23

                              *and guardian of minor H.C., on behalf of H.C.*
                              *and all others similarly situated.*

24

25

26

27

28