STEVE W. BERMAN (*pro hac vice*)
steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

ELAINE T. BYSZEWSKI (SBN 222304)
elaine@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

ALICE MAYALL, as parent and guardian of minor H.C., on behalf of H.C. and all others similarly situated,

Plaintiff,

v.

USA WATER POLO, INC.

Defendant.

No. 8:15-cv-00171-AG-RNB

**FIRST AMENDED CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 8

A. Plaintiff .......... 8

B. Defendant .......... 12

IV. FACTUAL BACKGROUND .......... 14

A. A Primer on Concussions .......... 14

1. Introduction. .......... 14

2. Occurrence. .......... 15

3. Second Impact Syndrome. .......... 16

4. Post-Concussion Syndrome. .......... 18

5. Chronic Traumatic Encephalopathy. .......... 19

6. Why Water Polo Players – Particularly Youth Players – Are Vulnerable. .......... 21

7. On the Sidelines. .......... 22

B. Consensus Best Practices for the Treatment of Concussion .......... 23

C. Reported Concussion Injuries and Incidence of Concussion in Water Polo .......... 30

1. Canadian Women's Water Polo Team's "Concussion Epidemic." .......... 31

2. Karoline "Kari" Krumpholz. .......... 32

D. USA Water Polo Has Failed to Provide Adequate Concussion Management .......... 33

1. USA Water Polo Has Knowledge of Consensus Best Practices. .......... 33

2. USA Water Polo Has Failed to Adopt *Any* Consensus Guidelines Promulgated by the International Conferences on Concussion in Sport. .......... 34

E. USA Water Polo Has Failed to Adopt Proper Rules Allowing For Play to Be Stopped to Substitute An Injured Player .......... 38

V. CLASS ACTION ALLEGATIONS ........ 39

VI. CLAIMS ALLEGED ........ 42

COUNT I NEGLIGENCE (On Behalf of Minor H.C. and the Class) ........ 42

COUNT II BREACH OF VOLUNTARY UNDERTAKING (On Behalf Minor H.C. and the Class) ........ 45

COUNT III GROSS NEGLIGENCE (On Behalf of Minor H.C.) ........ 49

REQUEST FOR RELIEF ........ 51

JURY DEMAND ........ 52

Plaintiff Alice Mayall ("Ms. Mayall"), as parent of minor H.C. ("H.C."),[1] on behalf of H.C. and all others similarly situated, brings this class action complaint against Defendant USA Water Polo, Inc. ("USA Water Polo"), and complains and alleges upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I. INTRODUCTION

1. ***King of water polo injuries.*** *A concussion, however, is the most important acute injury to care for. A fast moving ball, usually off the cage and into the back of the goalie's head, or a hand that inadvertently hits the head of another player is usually the cause. Identifying and treating a concussion can be difficult since symptoms tend to be subjective and are hard to objectively measure. Even an astute physician watching a competition carefully can miss a blow to a team member's head. Any reports of dizziness, headache, confusion, sleepiness and lack of concentration should be treated seriously. Guidelines from the Second International Symposium on Concussion in Sport (Prague 2004) can help assist the physician in the decision making process for return to play after concussion.*

Dr. Larry Drum, Medical Director and Team Physician for USA Water Polo, July 1, 2007

2. USA Water Polo is the governing body for the sport of water polo in the United States and regulates every aspect of water polo, including rules regarding player safety and health. Using this authority, USA Water Polo requires all players and participants to follow the policies, rules, and regulations it has enacted. Accordingly, USA Water Polo is the authority on the issue of player safety and has a duty to provide

[1] As required by Federal Rule of Civil Procedure 5.2, minors are referred to herein only by their initials.

players with rules, information, and best practices that protect them as much as possible from short-term and long-term health risks.

3.     USA Water Polo has the power to enact and enforce policies and rules that would prevent or minimize injuries over and above those inherent in the sport of water polo without altering the nature of the game in any respect.

4.     Sports and medical organizations across the country have implemented rules and best practices for concussion management. For example, the American Medical Association (AMA), responding to rising concern about concussions in youth sports, recently adopted policies intended to lower the risk of concussions and called for prompt diagnosis and medical care.[2] The AMA recommended that young athletes suspected of having a concussion be removed immediately from the game and permitted to return only with a doctor's written approval.[3] AMA board member Dr. Jack Resneck Jr. stated: "By raising awareness of the serious risks associated with concussions and ensuring that the appropriate guidelines are in place, we can reduce the number of young athletes who may return to a game too soon, which can put their health at further risk."[4]

5.     This case arises from the failure of USA Water Polo to take such reasonable steps to recognize, manage and appropriately treat head injuries and concussions. It is not about preventing an initial concussion. USA Water Polo's failure to implement even a scant amount of concussion management care for its participants represents an extreme departure from the ordinary standard of care, increases the risks of injury beyond those inherent in the sport, and puts athletes at risk of exacerbation of symptoms, post-concussion syndrome, Second Impact Syndrome, and long-term cognitive degeneration such as Chronic Traumatic Encephalopathy (CTE).

---

[2] Steve Ginsburg, *American Medical Association Adopts Youth Sports Concussion Policy*, REUTERS, June 9, 2015, available at http://www.reuters.com/article/2015/06/09/us-usa-concussions-idUSKBN0OP2DA20150609.

[3] *Id.*

[4] *Id.*

6. For many families, water polo and other aquatic sports are seen as terrific alternatives to football and other sports with high concussion rates. However, concussions can, and do, occur in water polo.

7. Water polo is a rough and physical game, tracing its origins to an aquatic form of rugby, and is extremely demanding on both the body and mind. Water polo is the only true "contact" aquatic sport and is a mixture of swimming, throwing and martial arts. As a result, water polo is extremely taxing on the body because it demands all out bursts of energy. In addition, players compete in close proximity to one another, engage in physical contact, and can throw the ball at velocities reaching 60-70 km/h. As a result, head and facial injuries are common either through direct contact or contact with the ball.[5]

8. The direct contact of the players and high velocity with which the ball travels often carries sufficient force to fracture or cause severe facial or head injuries.[6] For example, common situations in which head injuries may occur include when a player is hit with an elbow or hit in the head by a direct shot with the ball.[7]

9. When head injuries such as concussions do occur in water polo, there are special considerations at play because the game is played while the players are treading water. Even for minor injuries, the correct precautions must be taken. As noted in a recent study: "[W]ater polo is unique because the physician or the coach must rely on other players to bring the injured athletes to the pool side for evaluation."[8]

---

[5] Miljenko Franić, et al., *Injuries in Water Polo*, THE NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2080536/ (last accessed July 7, 2015).

[6] *Id.*

[7] *Water Polo, Care of the Young Athlete Patient Education Handouts*, AMERICAN ACADEMY OF PEDIATRICS, available at http://www.pomonapeds.com/linked/water_polo.pdf (last accessed July 7, 2015).

[8] Miljenko Franić, et al., *Injuries in Water Polo.*

10.     Concussions have significant ramifications for young athletes. For example, 11% of children who suffer a concussion still have symptoms three months later.[9] Persistent post-concussion symptoms can be devastating. According to the Ontario Neurotrauma Foundation, persistent symptoms disrupt daily living and participation in school and activities.[10] Children/adolescents may:

- Miss weeks or even months out of the school year, affecting marks and risking their promotion to the next grade;

- Have attention and memory deficits, making schoolwork a challenge and requiring special accommodations to maintain required academic levels;

- Become clumsy and accident prone, where once they were strong athletes; and

- Become socially withdrawn to cope with headaches and mood changes, on top of the social isolation caused by resigning from athletic teams.

11.     There is substantial evidence that young people may be more susceptible to damage resulting from repetitive concussive and sub-concussive brain trauma. Studies in boxing, hockey, and football reveal that the earlier one is exposed to brain trauma, the greater their risk of long-term problems.

- A study of boxers found that for those with less education, psychomotor speed scores declined significantly with increasing years of fighting.[11]

- A study of college football players found a significant relationship between the number of years played and a

[9] K.M. Barlow, et al., *Epidemiology of Postconcussion Syndrome in Pediatric Mild Traumatic Brain Injury*. PEDIATRICS, Aug. 2010;126(2):e374-81.

[10] Roger Zemek, et al., *Guidelines for Diagnosing and Managing Pediatric Concussion*, First Edition, ONTARIO NEUROTRAUMA FOUNDATION, June 25, 2014.

[11] S.J. Banks, et al., *The Protective Effect of Education on Cognition in Professional Fighters*, ARCHIVES OF CLINICAL NEUROPSYCHOLOGY, Feb. 2014, 29(1):54-9.

smaller hippocampus, an area of the brain essential for creating new memories.[12]

- In younger children, the long-term effects of brain trauma can become apparent years after injury, as normal developmental milestones are disrupted.[13]

12.   Younger players are typically not provided professional medical supervision, either during practices or at matches. About half of all high schools have access to an athletic trainer, but very few have an athletic trainer present on the sidelines or on call to help identify concussions during play.

- A national study of over 100 high schools showed that schools with athletic trainers may identify up to 8 times as many concussions.[14]

- A study of ice hockey teams found that by placing a doctor in the stands to look for concussions, they were able to identify 7 times more concussions than with an athletic trainer alone.[15]

13.   As the national governing body for water polo in the United States, USA Water Polo enforces the playing rules adopted by the Federation Internationale de Natation (FINA) which oversees international competition in five aquatic sports: swimming, diving, synchronized swimming, water polo, and open water swimming. FINA enacts the rules which are then adopted and enforced by USA Water Polo.

---

[12] Rashmi Singh, et al., *Relationship Of Collegiate Football Experience And Concussion With Hippocampal Volume And Cognitive Outcomes*, JAMA, May 14, 2014, 311(18):1883-88.

[13] Daniel Daneshvar, et al., *Long-Term Consequences: Effects On Normal Development Profile After Concussion*, PHYSICAL MEDICINE AND REHABILITATION CLINICS OF NORTH AMERICA, Nov. 2011, 22(4):683-700.

[14] Cynthia LaBella, et al., *A Comparative Analysis Of Injury Rates And Patterns Among Girls' Soccer And Basketball Players At Schools With And Without Athletic Trainers From 2006/07-2008/09*, AMERICAN ACADEMY OF PEDIATRICS, Oct. 22, 2012.

[15] P.S. Echlin, et al., *A Prospective Study Of Concussion Education In 2 Junior Ice Hockey Teams: Implications For Sports Concussion Education*, NEUROSURG. FOCUS, Nov. 2010, 29(5):E6.

14.    USA Water Polo has the power to enact, enforce, or modify[16] these rules that would properly protect participants from exacerbating concussion symptoms, as well as properly protect participants who suffer concussions from returning to play until they have progressed through a widely accepted stepwise, graded exertional return to play protocol and are symptom free for at least 24 hours.

15.    USA Water Polo has a duty to protect its players and states on its website that it "is committed to creating a healthy and safe environment for all of our participants."[17] USA Water Polo requests that each athlete, coach, and referee read and agree to a Code of Conduct upon joining or renewing their membership with USA Water Polo. While the "Code of Conduct" contains a provision prohibiting athletes, coaches, and referees from "encouraging an athlete to return to play pre-maturely following a serious injury (e.g., a concussion) and without the clearance of a medical professional," USA Water Polo does not have any rules or policies regarding concussions, including mandatory best practices for concussion management such as mandatory baseline testing, strictly enforced return to play rules, and proper medical evaluation and clearance before returning to play. The lack of rules and policies increases the risk to athletes above and beyond those inherent in the sport.

16.    Since at least 2004, if not sooner, there has been an international consensus on how to diagnose and treat concussed players. Best practices for concussion management include baseline testing, strictly enforced return to play rules, and proper medical evaluation.

17.    Despite USA Water Polo's pronouncements to the contrary, it has not taken appropriate actions in regards to protecting the safety of players at any level and

---

[16] *See e.g.*, *New Rules and Interpretations*, available at http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2013-14/misc_non_event/2013NewRulesPOE.pdf (stating that some FINA playing rules "may be modified…" by USA Water Polo) (last accessed July 7, 2015).

[17] http://www.usawaterpolo.org/resources/safe-sport.html (last accessed Feb. 3, 2015).

has engaged in a pattern of negligence, gross negligence, and inaction with respect to concussions and concussion-related maladies suffered by players.

18.     USA Water Polo reasonably should be obligated to take these steps in order to minimize the risks that occur following a concussion, which can be accomplished without altering the nature of the sport in any respect.

19.     Plaintiff, on behalf of minor H.C. and a proposed class of all current or former water polo players who, from 2013 to the present, competed for a team governed by USA Water Polo, seeks injunctive relief requiring (1) the enactment and enforcement of proper concussion-management practices and return to play guidelines; and (2) proper substitution rules that allow for medical evaluation. Plaintiff further seeks equitable relief in the form of medical monitoring for the purpose of diagnosis of long-term injury and disease resulting from concussions as a result of USA Water Polo's negligence.

20.     Plaintiff, on behalf of minor H.C, individually has suffered damages and will in the future suffer damages caused by the negligence and gross negligence of the Defendant. Minor H.C. has suffered and continues to suffer from an assortment of problems associated with injuries, including, but not limited to, post-concussion syndrome, as well as such symptoms as headaches, loss of memory, academic impairment, excessive sleepiness, anxiety, cognitive dysfunction, limitations in physical activities, social isolation, and loss of the pleasures of life, among other things. As a result, Plaintiff, on behalf of minor H.C., seeks an individual award of compensatory damages, punitive damages, pain and suffering, and any other relief to which she is entitled.

## II.     JURISDICTION AND VENUE

21.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, Plaintiff's claims and the claims of the other members of the Class

exceed $5,000,000, exclusive of interest and costs, and there are numerous class members who are citizens of states other than Defendant's state of citizenship.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391(c) as Defendant is deemed to reside in this judicial district because it is subject to personal jurisdiction here, a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction, and Defendant conducts substantial business in this jurisdiction.

23.     Defendant is subject to personal jurisdiction in this District. Defendant is incorporated and based in California and thus has the requisite minimum contacts with California so as to be subject to both types of personal jurisdiction – general jurisdiction and specific jurisdiction. Defendant's actions and omissions have caused harm in California to California residents, including minors, and will continue to do so unless enjoined, thus establishing specific personal jurisdiction. Moreover, Defendant has had substantial, continuous, and systematic other contacts within California, thus establishing general jurisdiction.

## III.   PARTIES

### A.   Plaintiff

24.     Plaintiff Alice Mayall ("Ms. Mayall"), as parent of minor H.C. ("H.C."), is suing Defendant on behalf of H.C. and the Class. Ms. Mayall and H.C. are residents of Livermore, California. H.C. was born in 1998 and is currently 16 years old.

25.     H.C. has played water polo for the LARPD Lazers Water Polo Club, "a USA Water Polo team, governed by US Water Polo, which encourages high standards of play and good sportsmanship."[18] The LARPD Lazers is one of approximately 500 USA Water Polo member clubs and must abide by the rules and policies of USA

---

[18] *LARPD LAZERS Water Polo*, available at http://lazerswaterpolo.weebly.com/ (last accessed July 7, 2015).

Water Polo. The LARPD Lazers, like USA Water Polo, has not instituted any rules with respect to concussion management, or return to play guidelines.

26.     Before beginning to play for the Lazers, H.C. was a healthy, high-achieving, straight-A honors student and multi-sport athlete. In addition to water polo, H.C. also played soccer.

27.     Prior to playing for the Lazers, H.C. was not administered a baseline test nor did H.C. or Ms. Mayall received any information from the Lazers or USA Water Polo on how to recognize or report head injuries. H.C. and Ms. Mayall did not receive any information from the Lazers or USA Water Polo concerning techniques or preventative measures to avoid head injuries.

28.     H.C. began playing for the Lazers in December 2013. From February 14-16, 2014, H.C. attended the annual "WinterFest" tournament, organized and managed by USA Water Polo at Los Alamitos Joint Forces Training Base in Los Alamitos, California, and played five games over the course of three consecutive days.[19] The tournament hosted both boys and girls teams and age groups ranging from 10 to 18 years old.[20] Despite the susceptibility of youth athletes to concussions, USA Water Polo did not provide any athletic trainers or medical personnel for the tournament, or require that any athletic trainers or medical personnel be present at the tournament.

29.     On February 15, 2014, while playing goalie in a tournament for the Lazers, H.C. was hit hard in the face by a shot, which led to a concussion. The game was not stopped by the referee or the coach. Rather, H.C. swam to the side of the goal and spoke with her coach while her team was on offense. H.C.'s coach (lacking any concussion management training, qualifications, and education from USA Water Polo) asked her a couple of questions. Dazed and unaware of the severity of her injury, H.C.

---

[19] *WinterFest '14 Water Polo Tournament*, available at https://webpoint.usawaterpolo.com/wp15/Events2/ViewEvt.wp?EventID=7989 (last accessed July 7, 2015).

[20] *Id.*

told her coach that she wanted to return to play, despite suffering a concussion. She was not taken out of the game. No one from the team or USA Water Polo provided her with any treatment, nor was any athletic trainer or medical personnel present to provide treatment.

30.     During subsequent tournament games played on February 15, 2014, H.C. took additional hits to the head, exacerbating the initial injury. Again, the hits were observed by H.C.'s coach and the referee, the game was not stopped, and she was not evaluated by the team, nor was any medical personnel present to provide treatment. No sideline assessment was performed, nor was H.C. removed from the games.

31.     H.C. returned home from the tournament on February 16, 2014. On February 17, H.C. started to experience headaches, sleepiness and fatigue. As a result, H.C. was unable to attend school.

32.     For approximately two weeks following the tournament, H.C.'s symptoms continued, including: excessive sleeping, dizziness, inability to tolerate movement, extreme sensitivity to light, headaches, decreased appetite, nausea, and inability to do any school work.

33.     Concerned with H.C.'s symptoms and their failure to resolve, Ms. Mayall took H.C. to the doctor and H.C. was diagnosed with post-concussion syndrome on March 4, 2014. H.C.'s symptoms persisted in the following weeks, including continued fatigue, excessive sleeping, headaches, decreased cognitive function, and an inability to focus.

34.     On March 12, 2014, H.C.'s doctor recommended that she consult with a neurologist due to her persisting post-concussion symptoms. Following a consultation with a neurologist, H.C. again received confirmation that her symptoms were completely consistent with concussion. As a result of her persisting symptoms, H.C. continued to miss school, activities, and other social functions while continuing to struggle with symptoms relating to her injury.

35.     H.C. never returned to school. Rather, in April, H.C. started on a home-and-hospital instructional program through the school district which continued through the end of the school year in June. Although previously an excellent student, H.C.'s productivity in completing academic work at home was greatly diminished. H.C's neuropsychologist in August noted that H.C. was sleeping excessively, experiencing persistent headaches, demonstrated a deficit in her ability to hold information in her mind or complete tasks, and was functioning in a low-average range in memory and controlled attention.

36.     Approximately a year after her injury, H.C. continues to experience daily headaches, sleeps excessively, and takes strong medication to combat her symptoms. H.C. has finally returned to school but has only completed a single academic course. She is currently on a reduced school day and takes three classes instead of the typical five – only two of which consist of traditional academic course work.

37.     During her time as a water polo player, USA Water Polo did not enforce or enact any policies, regulations, or rules requiring that teams educate coaches or athletes on what symptoms may be signs of a concussion. Because H.C. did not "black out" and was not "knocked out," she did not recognize her injury as a concussion. H.C. did not learn that concussions could occur without a "blackout" or "knockout experience" until she saw a doctor.

38.     Specifically with respect to H.C., *inter alia*, USA Water Polo failed to implement system-wide concussion recognition and return to play guidelines for athletes who have sustained concussions, which increased the risks of playing water polo over and above those inherent in the sport. As a result, H.C. was returned to play while still recovering from prior concussion injuries. USA Water Polo failed to adequately educate and adopt rules requiring the education of coaches, staff, and athletes about the symptoms and long-term consequences of concussions if not properly treated, as well as the proper treatment protocol for head injuries. Moreover,

USA Water Polo failed to implement system-wide guidelines for screening and detecting head injuries that would have detected the concussions H.C. received and thus prevented her from playing until she had fully recovered.

39.    As a result of her injuries, H.C. has had to take time off from school, has suffered from a reduced academic performance and an inability to participate in social functions, and has incurred out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which H.C. has been diagnosed.

40.    H.C. is also at increased risk of latent brain injuries caused by repeated head impacts or the accumulation of subconcussive hits, particularly as a minor, and therefore is in need of medical monitoring. Further, on behalf of her minor daughter and the Class, Ms. Mayall seeks class-wide injunctive or equitable relief in the form of changes to USA Water Polo rules and practices with respect to concussion management and return to play guidelines in order to meet consensus best practices, as detailed below.

**B.    Defendant**

41.    USA Water Polo is the "national governing body for the sport of water polo in the United States."[21] As such, USA Water Polo shall:

> [B]e autonomous in the governance of the sport of water polo by independently determining and controlling all matters central to such governance, by not delegating any of that determination or control, and by being free from outside restraint.[22]

42.    USA Water Polo describes itself as:

> [A] non-profit organization recognized by the United States Olympic Committee (USOC) and the Federation Internationale de Natation (FINA) as the National Governing Body for the

---

[21] *See Bylaws of USA Water Polo, Inc.*, Section 4.1, Nov. 25, 2014, available at http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWPByLaws.pdf (last accessed July 7, 2015).

[22] *Id.* at Section 4.1(b).

> sport of Water Polo in the United States. USA Water Polo oversees our Olympic water polo program, including senior, junior, youth and cadet national teams, as well as 20 different championship events annually, including the Junior Olympics, the US Open of Water Polo, and the Masters National Championships. With nearly 40,000 members, USA Water Polo is also the sanctioning authority for more than 500 Member Clubs and more than 400 tournaments conducted nationwide each year. USA Water Polo has a rich tradition of success at every level including World Championship, World Cup, World League and Pan Am Gold Medals, and most recently, Olympic Gold for our women's program. USA Water Polo is committed to the development and promotion of the sport throughout the US and to providing the best possible experience for all participants. It fosters grass-roots expansion of the sport, providing a national system of affiliated clubs and leagues, certified coaches and officials, educational materials, and background screenings, as well as developing programmatic materials and undertaking initiatives to generate greater awareness of the sport.[23]

43. USA Water Polo's "Statement of Ethics Value" establishes a duty owed to players, members, and the public:

> Public trust in the performance of USA Water Polo, Inc. (USAWP) is the bedrock of our legitimacy. Donors, volunteers support our organization because they believe in our mission and they trust us to carry it forward, to be a faithful steward of our resources and to uphold rigorous and exemplary standards of conduct.
>
> USAWP is committed to earning this trust every day and in every possible way, including a willingness to go beyond legal requirements where appropriate to embrace the spirit of the law as well. It is up to everyone in our organization to carry out our mission with integrity, honesty, fairness, transparency, and a strong sense of respect for our membership and our public.[24]

---

[23] http://www.usawaterpolo.org/mission/mission-overview.html (last accessed July 7, 2015).

[24] http://www.usawaterpolo.org/resources/ethics-statement.html (last accessed July 7, 2015).

44. All USA Water Polo members are bound by the provisions of the USA Water Polo bylaws, rules of conduct, and any other membership requirements that the Board of Directors thinks are necessary and appropriate.

45. USA Water Polo has its principal place of business in Huntington Beach, California, and is located at 2124 Main Street, Suite 240, Huntington Beach, CA 92648.

46. USA Water Polo is subject to specific and general personal jurisdiction in this District. As described herein, USA Water Polo exerts tremendous influence over all aspects of water polo, heavily regulates water polo, and organizes and manages tournaments and events tournaments in the United States at all levels. USA Water Polo has sought and received permission from the California Secretary of State ("S.O.S.") to do business in California, and the S.O.S.'s website shows that USA Water Polo has been authorized to conduct business in California since at least as early as 1996.

47. USA Water Polo holds its Board of Directors meetings in California and consistently stages and promotes water polo events such as tournaments and events throughout California and this District.

48. USA Water Polo, through its acts and omissions as set forth herein, has damaged Plaintiff and Class members.

## IV. FACTUAL BACKGROUND

### A. A Primer on Concussions

#### 1. Introduction.

49. The word concussion derives from the Latin *concutere* for "to shake violently." Concussions are just that – a shaking of the brain inside the skull that changes the alertness of the injured person. That change can be relatively mild ("She was slightly dazed.") or profound ("She was unconscious."). Both situations fall

within the definition of concussion. Concussions are often classified as a form of mild traumatic brain injury.

50. According to the Centers for Disease Control and Prevention, almost four million sports- and recreation-related concussions are recognized every year, with many times that number occurring but going unrecognized.[25,26] For young people aged 15 to 24 years, sports are the second leading cause of traumatic brain injury, only behind motor vehicle crashes. According to research by the NEW YORK TIMES, at least 50 youth football players (high school or younger) from 20 different states have died or sustained serious head injuries on the field since 1997.[27] One study estimates that the likelihood of an athlete in a contact sport experiencing a recognized concussion is as high as 20 percent each season.[28]

**2. Occurrence.**

51. Concussions happen to all types of athletes – young and old, boys and girls, and in every conceivable sport. Concussions in sports occur when an athlete is slammed and makes sudden and forceful contact. That contact can be with the ground, court, or pool deck. It also can be with a batted ball, a thrown ball, a kicked ball, a goalpost (football), the boards (hockey), the scorer's table (basketball), and of course another player.

52. Concussions can and frequently do occur without any contact with the head. Rather, the player's body receives a jolt that causes his shoulders and head to change speed or direction violently. This motion results in a "whiplash effect." Inside

---

[25] http://www.cdc.gov (homepage on the internet) Concussion in Sports. Centers for Disease Control and Prevention. Atlanta GA; Concussion in Sports 2013 (updated July 22, 2013). Available from http://www.cdc.goviconcussion/sports/ (last accessed February 28, 2014).

[26] J.A. Langlois, et al., *The Epidemiology And Impact Of Traumatic Brain Injury; A Brief Overview*, 21 J. HEAD TRAUMA REHABIL., 375-78 (Sept.-Oct. 2006).

[27] Alan Schwarz, *Silence on Concussions Raises Risks of Injury*, NEW YORK TIMES, Sept. 15, 2007.

[28] S.G. Gerberich, et al., *Concussion Incidences And Severity In Secondary School Varsity Football Players*, 73(12) AM. J. PUBLIC HEALTH 1370-75 (Dec. 1983).

the skull, the brain shifts in the cerebrospinal fluid and bangs against the inside of the skull. Even falling from five or six feet and landing upright, if unexpected and therefore jarring, can send a shock through the spine and shake the head with a force that may cause a concussion. Concussions that are the most damaging to the brain tend to be the ones that involve a direct blow to the head, however.

53. With a blow to the front of the head, the brain pushes forward until it crashes into the skull, reverses, and bumps against the back of the skull. This action produces an initial *coup*, then a *contrecoup* injury.

**3. Second Impact Syndrome.**

54. Second Impact Syndrome (SIS) occurs when an athlete who sustains a head injury – often a concussion or worse injury, such as a cerebral contusion – sustains a second head injury before symptoms associated with the first have cleared.

55. Typically, the athlete suffers post-concussion symptoms after the first head injury. These may include headache, labyrinthine dysfunction, visual, motor, or sensory changes or mental difficulty, especially the thought and memory process. Before these symptoms resolve, which may take days or weeks, the athlete returns to competition and receives a second blow to the head.

56. The second blow may be remarkably minor, perhaps only involving a blow to the chest that jerks the athlete's head and indirectly imparts accelerative forces to the brain. Affected athletes may appear stunned but usually do not lose consciousness and often complete the play. They usually remain on their feet for 15 seconds to one minute or so but seem dazed. Often, affected athletes remain on the playing field or walk off under their own power.

57. What happens in the next fifteen seconds to several minutes sets this syndrome apart from a concussion. Usually within seconds to minutes of the second impact, the athlete – conscious yet stunned – quite precipitously collapses to the

ground, semicomatose with rapidly dilating pupils, loss of eye movement, and evidence of respiratory failure.

58. The pathophysiology of SIS is thought to involve a loss of autoregulation of the brain's blood supply. This loss of autoregulation leads to vascular engorgement within the cranium, which, in turn, markedly increases intracranial pressure and leads to herniation either of the medial surface (uncus) of the temporal lobe or lobes below the tentorium of the cerebellar tonsils through the foramen magnum (Fig. 1). Animal research has shown that vascular engorgement of the brain after a mild head injury is difficult, if not impossible, to control. The usual time from second impact to brainstem failure is rapid, taking two to five minutes. Once brain herniation and brainstem compromise occur, ocular involvement and respiratory failure precipitously ensue. Demise occurs far more rapidly than usually seen with an epidural hematoma. MR imaging and CT scan are the neuroimaging studies most likely to demonstrate the SIS. Although MR imaging is the more sensitive to traumatic brain injuries, especially true edema, the CT scan is usually adequate to show bleeding or midline shifts of the brain requiring neurosurgical intervention.

**Figure 1**

**Figure** · In second impact syndrome, vascular engorgement within the cranium increases intracranial pressure, leading to herniation of the uncus of the temporal lobe *(arrows)* below the tentorium in this frontal section *(A)*, or to herniation of the cerebellar tonsils *(arrows)* through the foramen magnum in this midsagittal section *(B)*. These changes compromise the brain stem, and coma and respiratory failure rapidly develop. The shaded areas of the brain stem represent the areas of compression.

59. While second impact syndrome typically does not occur with intracranial bleeding, a number of cases of second impact syndrome have been reported where acute hemisphere swelling has occurred in association with a thin subdural hematoma in athletes receiving the second injury while still symptomatic from the first.

**4. Post-Concussion Syndrome.**

60. When post-concussion symptoms persist beyond a month, most refer to this condition as post-concussion syndrome (PCS). PCS symptoms can include headaches, fatigue, memory problems, feeling in a fog, depression, impulsivity, and other physical, cognitive, mood, and behavioral problems. There may be treatments that can alleviate some or all of these symptoms and in almost all cases they resolve eventually.

61.    PCS can be thought of as a very severe concussion and its presence should be recorded in the medical record. Persistent PCS beyond a year is felt by some to be a contraindication to ever return to a collision sport.

**5.    Chronic Traumatic Encephalopathy.**

62.    Repetitive mild traumatic brain injury can trigger the development of chronic traumatic encephalopathy (CTE), a progressive neuro-degeneration characterized by the widespread deposition of hyperphosphorylated tau (p-tau) as neurofibrillary tangles. CTE was originally reported in 1928 by Harrison Martland, a New Jersey pathologist who described the clinical aspects of a progressive neurological deterioration (*i.e.*, "punch-drunk") that occurred after repetitive brain trauma in boxers. Although originally termed "dementia pugilistica," the recognition that activities other than boxing were associated with its development led to the preferred use of terms such as progressive traumatic encephalopathy and later, CTE.

63.    CTE may manifest in cognitive, mood, behavioral, and motor disorders and is clinically associated with symptoms of irritability, impulsivity, aggression, depression, short-term memory loss and heightened suicidality.

64.    Often there can be a delay of years or even decades between the end of the repetitive head impacts (*i.e.*, the end of playing the contact sport) and the beginning of the symptoms. CTE often presents with recent memory loss and other cognitive impairments similar to those experienced by people with Alzheimer's disease. People with CTE can also have changes in behavior (*e.g.*, impulsivity, rage, aggression, having a short fuse) and mood (*e.g.*, depression, hopelessness, feeling suicidal). Less commonly there can be movement disorders such as Parkinsonism (*e.g.*, tremor, difficulty walking or speaking, stiffness). Some people with CTE may first have behavior or mood problems. Others may first have cognitive difficulties, with the changes in mood and behavior emerging later.

65.     With advancing disease, more severe neurological changes develop that include dementia, gait and speech abnormalities and Parkinsonism. In late stages, CTE may be clinically mistaken for Alzheimer's disease or frontotemporal dementia. A subset of cases with CTE is associated with motor neuron disease (MND) that could be diagnosed clinically as Amyotrophic Lateral Sclerosis (ALS) or "Lou Gehrig's Disease."

66.     The neuropathological changes of CTE are distinctive and easily distinguished from other tauopathies, including Alzheimer's disease and frontotemporal dementia. With CTE there is atrophy of the cerebral cortex, medial temporal lobe, diencephalon and mammillary bodies with enlarged ventricles; cavum septum pellucidum, often with fenestrations; extensive p-tau-immunoreactive neurofibrillary tangles and astrocytic tangles in the frontal and temporal cortices, particularly around small cerebral vessels and at the depths of cerebral sulci; extensive p-tau-immunoreactive neurofibrillary tangles in limbic regions, diencephalon and brainstem nuclei; extensive degeneration of axons and white matter fibre bundles; TAR DNA-binding protein 43 (TDP-43) immunoreactive intraneuronal and intraglial inclusions occur in most cases with absent or minimal amyloid-B peptide deposits.

67.     In 2008, the Center for the Study of Traumatic Encephalopathy (CSTE) at Boston University School of Medicine established the CSTE brain bank at the Bedford VA Hospital under the direction of Dr. Ann McKee to analyse the brain and spinal cords after death of athletes, military veterans and civilians who experienced repetitive mild traumatic brain injury. Through this effort, the brains and spinal cords of 85 donors were examined for evidence of CTE, as well as for all other neurodegenerative diseases, including Alzheimer's disease, frontotemporal lobar degeneration (FTLD), Parkinson's disease, Lewy body disease and multiple system atrophy.

68.     CTE was found in 68 of 85 cases, including 64 athletes, 21 military veterans, and one individual who indulged in self-injurious, head-banging behavior.

Of the athletes, 49 were football players, 34 were former professional football players, nine had played only college football, and six had played only high school football. At this time the incidence and prevalence of CTE is not known. Neither are the genetic and environmental factors that may predispose one suffering multiple repetitive mild traumatic brain trauma to develop CTE.

**6. Why Water Polo Players – Particularly Youth Players – Are Vulnerable.**

69. Considerable research supports the proposition that a child's brain takes longer to recover from concussion or the accumulation of subconcussive hits than an adult's brain. Most of these studies deal with high school athletes, limiting the conclusions we can draw about younger kids. Yet what is known points to children being at risk for significant post-traumatic issues.

70. Not surprisingly, the comparison of the two major age groups centers on key developmental differences between adults and children. Several of these differences need emphasizing, all bearing directly on the brain's response to trauma.

71. The first aspect concerns *myelin*, the insulating cover of axons that make up the fiber tracts in the brain. Think of a copper wire inside the wall of a house and of the plastic rubber coating around the wire. The coating insulates, protects, and strengthens that wire. The fiber tracts in adult brains have a coating of myelin that acts in the same way, protecting the fibers from injury or insult. If sufficiently severe, brain trauma still can occur, of course, but myelination helps protect from minimal trauma. Children's brains have less myelin, so the neuronal pathways are more easily damaged.

72. A second consideration is that of *relative head size.* A child's brain and head are disproportionately large compared to the rest of the body, especially through the first five to eight years of life. This anatomical relationship continues through about the age of 14, by which time a child's skull has grown to be about 90 percent as large as an adult-size skull. While this fact seems trivial, it is important to a discussion

of concussions and concussion risk. The disproportionately larger head size and weight, coupled with a child's weaker neck, mean that the child can't brace for a hit the way that an adult does. Rotational forces are greater for a child, proportional to the severity of the hit. The hit itself may not generate the same force because of the speed of the collision and the weights of the (junior) players involved, but what is transferred to the head may be as great or greater. It is all about neck strength.

73. A third consideration is the effect of *cumulative trauma* through a person's life. Total brain trauma is the worry regarding child athletes. If one starts accumulating injuries early in life, chances are that there will be more through one's life experience. No one knows precisely what the effects of that long-term repetitive trauma might be. No head trauma is good head trauma. If knocking around the brain can be avoided, then avoid it.

**7. On the Sidelines.**

74. On the sidelines, the job of the physician or athletic trainer is to decide whether or not a player can continue in the game. The coach shares that responsibility, but is often saddled with other responsibilities that make it difficult for the coach to make a suitable evaluation. If he or she has any concerns about a particular player, the athlete should be pulled from the game. For the experienced doctor, the evaluation is a matter of looking into the eyes of the player and asking a series of questions. In this situation, the examiner is looking for clues that the individual knows what's going on around them; inappropriate answers to simple questions raise concerns.

75. Questions that may be used include the following: What was the play you were injured on? What was the color of the jerseys of the opposing team? (This question is asked without letting the player turn around to look.) What quarter is it? What's the score? These questions reveal whether or not the athlete is alert as to what was happening at the time of the injury. Of course, there is always the simplest

question of all: Do you remember what happened? Followed by: Tell me what you recall.

76. If they pass this initial assessment, the examiner moves on to other cognitive tests. One is to give them six digits which they are first asked to repeat, then prompted to repeat them backwards. A simple balance test: can the player stand firm with their feet together, in heel-to-toe tandem position, and on one foot, eyes open and then closed; with hands on hips, eyes open and then closed?

77. The age of the athlete is important to take into account in performing this assessment. While not a big difference exists in evaluating an adult and a young athlete, say down to nine or ten years old, this is not the case with very young children. More explanation is necessary and more care with language is needed with younger children. Both the examiner and child being examined must be clear about the meaning of the words. For example, a young child probably won't know about being "dinged" and would be confused by a term such as "feeling in a fog" since both terms are slang terms used for head trauma. Some will know "dazed" and some won't. The key is to communicate on a level that is understood by the athlete, whatever the age.

**B. Consensus Best Practices for the Treatment of Concussion**

78. As of 2002, consensus had been reached in the medical and scientific community for the cornerstones of the management and treatment of concussions.

79. The "Summary and Agreement Statement of the First International Conference on Concussion and Sport, Vienna 2001" ("International Consensus Statement" or "Vienna Protocol") was published in early 2002 simultaneously in the *Clinical Journal of Sports Medicine*, *Physician and Sports Medicine* and *British Journal of Sports Medicine*.[29] The expert group who compiled the International Consensus Statement, known as the "Concussion in Sport Group," was comprised of a panel of world experts and was organized by the International Ice Hockey Federation,

[29] M. Aubry, et al., *Summary and Agreement Statement of the First International Conference on Concussion in Sport, Vienna 2001*, 36 BRIT. J. SPORTS MED. 6 (Feb. 2002) ("Vienna Protocol").

the Federation Internationale de Football Association Medical Assessment and Research Center (FIFA), and the International Olympic Committee Medical Commission (IOC). The International Consensus Statement was intended to be, and was accepted as, "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions." It was also intended to "be widely applicable to sport related concussion" and "developed for use by doctors, therapists, health professionals, coaches, and other peopled involved in the care of injured athletes, whether at the recreational, elite, or professional level." The Concussion in Sport Group subsequently met in Prague (2004),[30] Zurich (2008),[31] and Zurich (2012), and published updated Consensus Statements.

80. The 4th International Conference on Concussion in Sport was held in Zurich in November 2012, resulting in an update of the Vienna, Prague, and Zurich Protocols ("Zurich II").[32] Zurich II represents the current consensus best practices for concussion management.

81. With respect to pre-participation concussion management, Zurich II stated: [33]

> Recognising the importance of a concussion history, and appreciating the fact that many athletes will not recognise all the concussions they may have suffered in the past, a detailed concussion history is of value. Such a history may pre-identify athletes who fit into a high-risk category and provides an opportunity for the healthcare provider to

---

[30] P. McCrory, et al., *Summary and Agreement Statement of the 2nd International Conference in Concussion in Sport, Prague 2004*, 39 (4) BRIT. J. SPORTS MED, 196 (Apr. 2005) ("Prague Protocol").

[31] P. McCrory, et al., *Consensus Statement on Concussion in Sport: The 3rd International Conference on Concussion in Sport held in Zurich, November 2008*, 43 BRIT. J. SPORTS MED., i76, i78 (2009) ("Zurich Protocol").

[32] Paul McCrory, et al., *Consensus Statement on Concussion in Sport: The 4th International Conference on Concussion in Sport held in Zurich, November 2012*, 47 BRIT. J. SPORTS MED. 250, p.4, (2013), available at http://bjsm.bmj.com/content/47/5/250.full.pdf+html (last accessed July 7, 2015) ("Zurich II Protocol").

[33] *Id.*

> educate the athlete in regard to the significance of concussive injury. A structured concussion history should include specific questions as to previous symptoms of a concussion and length of recovery; not just the perceived number of past concussions. It is also worth noting that dependence on the recall of concussive injuries by teammates or coaches has been demonstrated to be unreliable.
>
> The clinical history should also include information about all previous head, face or cervical spine injuries as these may also have clinical relevance. It is worth emphasising that in the setting of maxillofacial and cervical spine injuries, coexistent concussive injuries may be missed unless specifically assessed. Questions pertaining to disproportionate impact versus symptom severity matching may alert the clinician to a progressively increasing vulnerability to injury. As part of the clinical history, it is advised that details regarding protective equipment employed at the time of injury be sought, both for recent and remote injuries.
>
> There is an additional and often unrecognised benefit of the preparticipation physical examination insofar as the evaluation allows for an educative opportunity with the player concerned as well as consideration of modification of playing behaviour if required.

82. Zurich II also emphasized the necessity of concussion education before a concussion has occurred, stating:[34]

> As the ability to treat or reduce the effects of concussive injury after the event is minimal, education of athletes, colleagues and the general public is a mainstay of progress in this field. Athletes, referees, administrators, parents, coaches and healthcare providers must be educated regarding the detection of concussion, its clinical features, assessment techniques and principles of safe return to play.

---

[34] *Id.* at 5.

83.    In regards to same-day return-to-play ("RTP") after a concussion, Zurich II reinforced:[35]

> It was unanimously agreed that no RTP on the day of concussive injury should occur. There are data demonstrating that at the collegiate and high school levels, athletes allowed to RTP on the same day may demonstrate NP [neuropsychological] deficits postinjury that may not be evident on the sidelines and are more likely to have delayed onset of symptoms.

84.    With respect to when an athlete should be allowed to return to play after a concussion, Zurich II provided: "The cornerstone of concussion management is physical and cognitive rest until symptoms resolve and then a graded programme of exertion prior to medical clearance and RTP."[36] Zurich II further stated:[37]

> RTP protocol following a concussion follows a stepwise process … With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. Generally, each step should take 24 h so that an athlete would take approximately one week to proceed through the full rehabilitation protocol once they are asymptomatic at rest and with provocative exercise. If any postconcussion symptoms occur while in the stepwise programme, then the patient should drop back to the previous asymptomatic level and try to progress again after a further 24 h period of rest has passed.

85.    Zurich II included the following chart:[38]

**Graduated Return to Play Protocol**

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 1. No activity | Symptom limited physical | Recovery |

---

[35] *Id.* at 3.

[36] *Id.* at 3.

[37] *Id.* at 4.

[38] *Id.* at 4.

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| | and cognitive rest | |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum permitted heart rate<br>No resistance training | Increase HR |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |
| 4. Non-contact training drills | Progression to more complex training drills, eg, passing drills in football and ice hockey<br>May start progressive resistance training | Exercise, coordination and cognitive load |
| 5. Full-contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

86. Zurich II explained that a single return to play paradigm should be used for all athletes and that formal neuropsychological testing should be used in high risk sports regardless of age or level of competition:[39]

> All athletes regardless of level of participation should be managed using the same treatment and return to play paradigm. The available resources and expertise in concussion evaluation are of more importance in determining management than a separation between elite and non-elite athlete management. Although formal NP testing may be beyond the resources of many sports of individuals, it is recommended that, in all organised high-risk sports, consideration be given to having this cognitive evaluation, regardless of the age or level of performance.

[39] *Id.* at 5.

87.     Zurich II also re-emphasized the importance of neuropsychological testing but noted that it should not be used as a stand-alone tool or form the sole basis of management decisions but rather as an aid to the clinical decision making process. In addition, Zurich II recommended that "all athletes should have a clinical neurological assessment (including assessment of their cognitive function) as part of their overall management," and that NP testing should ideally be performed by trained neuropsychologists who are "in the best position to interpret NP tests by virtue of their background and training…."[40] Zurich II recommended that all high-risk sports, regardless of the age or level of performance, have formal baseline neuropsychological screening.[41]

88.     Zurich II also suggests that changes in the rules and rule enforcement are critical:

> Consideration of rule changes to reduce the head injury incidence or severity may be appropriate where a clear-cut mechanism is implicated in a particular sport. An example of this is in football (soccer) where research studies demonstrated that upper limb to head contact in heading contests accounted for approximately 50% of concussions. As noted earlier, rule changes may also be needed in some sports to allow an effective off-field medical assessment to occur without compromising the athlete's welfare, affecting the flow of the game or unduly penalising the player's team. It is important to note that rule enforcement may be a critical aspect of modifying injury risk in these settings, and referees play an important role in this regard.[42]

89.     In regards to sideline assessments, Zurich II requires "sufficient time for assessment … in some sports, this may require rule change to allow an appropriate

---

[40] *Id.* at 3.

[41] *Id.* at 5.

[42] *Id.* at 5-6.

off-field medical assessment to occur without affecting the flow of the game or unduly penalizing the injured player's team."[43]

90. Finally, Zurich II states specific recommendations regarding child and adolescent athletes:

> The evaluation and management recommendations contained herein can be applied to children and adolescents down to the age of 13 years. Below that age, children report concussion symptoms different from adults and would require age-appropriate symptom checklists as a component of assessment. An additional consideration in assessing the child or adolescent athlete with a concussion is that the clinical evaluation by the healthcare professional may need to include both patient and parent input, and possibly teacher and school input when appropriate. A child SCAT3 has been developed to assess concussion (see appendix) for individuals aged 5–12 years.
>
> ***
>
> It was agreed by the panel that no return to sport or activity should occur before the child/adolescent athlete has managed to return to school successfully. In addition, the concept of 'cognitive rest' was highlighted with special reference to a child's need to limit exertion with activities of daily living that may exacerbate symptoms. School attendance and activities may also need to be modified to avoid provocation of symptoms. Children should not be returned to sport until clinically completely symptom-free, which may require a longer time frame than for adults.
>
> Because of the different physiological response and longer recovery after concussion and specific risks (eg, diffuse cerebral swelling) related to head impact during childhood and adolescence, a more conservative RTP approach is recommended. ***It is appropriate to extend the amount of time of asymptomatic rest and/or the length of the graded exertion in children and adolescents***. It is not appropriate for a child or adolescent athlete with concussion to RTP on

[43] *Id.* at 2.

> the same day as the injury, regardless of the level of athletic performance. Concussion modifiers apply even more to this population than adults and may mandate more cautious RTP advice.[44]

91. The Zurich II Protocol constitutes the consensus best practices in the proper assessment and management of concussion for all physician, sub-specialty, and allied health professionals, including athletic trainers and those responsible for the safety, well-being and treatment of athletes.

**C. Reported Concussion Injuries and Incidence of Concussion in Water Polo**

92. USA Water Polo's former medical director and team physician for USA Water Polo, Dr. Larry Drum, has described concussions as the "king of water polo injuries" and "the most important acute injury to care for."[45] According to Dr. Drum, concussions often occur from "a fast moving ball, usually off the cage and into the back of the goalie's head, or a hand that inadvertently hits the head of another player…."[46]

93. H.C. is just one example of athletes that suffer concussions playing water polo and are returned to play symptomatic or are returned to play before they have recovered fully from their concussion. Some additional examples follow, and their stories are typical of the concussion problem in water polo and highlight the importance of USA Water Polo's failure to adopt or enforce consensus best practices guidelines including: i) recognizing possible concussions during the game; (ii) specific return to play guidelines including a specific graded stepwise return to play protocol indicating that a day is needed between return to play steps and that typically a week of asymptomatic time is needed to resolve symptoms prior to returning to play and

---

[44] *Id.* at 5 (emphasis added).

[45] Dr. Larry Drum, "Water Polo – Doctor on Deck," July 1, 2007, available at http://www.fina.org/H2O/index.php?option=com_content&view=article&id=2609:water-polo-doctor-on-deck&Itemid=974 (last accessed July 7, 2015).

[46] *Id.*

that "it is appropriate to extend the amount of time of asymptomatic rest and/or the length of the graded exertion in children and adolescents;"[47] (iii) a prohibition on returning to play in the same game after sustaining a concussion; (iv) requiring formal baseline and/or post-injury neurocognitive testing of players; (v) requiring that players' concussions be managed and cleared by physicians or medical personnel with specific expertise in concussion management, diagnosis and treatment; (vi) adopting consensus best practices for management of children and adolescents with concussions; and (vii) providing concussion education to athletes, those working with athletes, and the general public.

**1. Canadian Women's Water Polo Team's "Concussion Epidemic."**

94. Leading up to the 2012 Olympic Games in London, the Canadian women's water polo team suffered a "concussion epidemic" in which eight members of the 20-member squad suffered concussions at various times leading up to the Olympics.[48] The backup goalie for the Canadian women's water polo team had to retire because of repeated concussions.[49]

95. The situation of one particular player, Carmen Camille Eggens, illustrates the difficult situation that players find themselves in and highlights the importance of proper care in identifying and treating concussions. One of Eggens' teammates stated in the lead up to the 2012 Olympics: "She got hit last week. She's had a couple of concussions already. She tried to tough it out for a few days: 'It's not a big deal. Maybe, I'm being a bit sensitive … But then now because she didn't take the rest right

[47] Zurich II Protocol, at 5.

[48] Randy Starkman, *Concussion Epidemic Hits Women's Water Polo Team Before Olympic Qualifier*, Toronto Star, Apr. 2, 2012, available at http://www.thestar.com/sports/olympics/2012/04/02/concussion_epidemic_hits_womens_water_polo_team_before_olympic_qualifier.html (last accessed July 7, 2015).

[49] *Id.*

away she's been out for a week and she said normally her concussions in the past she only had to take a few days off."[50]

96. During the "concussion epidemic" of the Canadian women's team, many members of the team feared the future consequences of repeated head trauma. For example, one member of the team noted: "All these girls have great ambitions, some want to become doctors," she said. "If they're not smart right now, years of their lives can be negatively affected."[51]

97. While the Canadian women's team players were evaluated and diagnosed with concussions, many other water polo players and teams simply ignore concussions, do not pay attention to them, or choose to play through them. For example, during in a tournament in Australia, a women's U.S. Water Polo national team player took a hard shot directly in the face and was clearly "out of it" after the play. Despite this injury, the player was allowed to practice the following morning and played in a game that night despite it being "impossible" to onlookers that she was not concussed.[52]

**2. Karoline "Kari" Krumpholz.**

98. Karoline "Kari" Krumpholz "was destined for water polo greatness."[53] Her father was a three-time All American selection in men's water polo and her brother won an Olympic silver medal with the U.S. water polo team. As a sophomore at Foothill High School in Orange County, California, Krumpholz and her water polo team won the 2007 California Southern Section Division I Championship and she ultimately accepted a scholarship at UCLA.

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Steve Jansen & Gus Garcia-Roberts, *Concussions Take a Terrible Toll on America's Young Athletes*, L.A. Weekly, Aug. 18, 2010, available at http://www.laweekly.com/news/concussions-take-a-terrible-toll-on-americas-young-athletes-2171689 (last accessed July 7, 2015).

99. During a UCLA practice, Krumpholz was defending one of the strongest girls on the team when she was hit between the eyes by her teammate's elbow. She thought her nose was broken and a trainer made her skip practice the rest of the day.

100. However, the next day she "went to class and … knew something was wrong" because she "couldn't focus" and "felt out of [her] body." That day a doctor diagnosed her with a concussion and five months later, between daily visits to physicians, Krumpholz was still experiencing symptoms. Although Krumpholz thinks this was the first concussion she suffered, doctors told her that it was a possibility that she had undiagnosed concussions in the past.

101. Krumpholz was unsure whether she would return to play water polo once her symptoms subsided. In her own words, "[I]t would be scary for me to play again because my brain is really important to me and I have plans for graduate school…. Once I am cleared, I'm going to have to really examine if I'm willing to take the risk."[54]

**D. USA Water Polo Has Failed to Provide Adequate Concussion Management**

**1. USA Water Polo Has Knowledge of Consensus Best Practices.**

102. USA Water Polo's website states: "A concussion is a type of traumatic brain injury (TBI), caused by a bump, blow, or jolt to the head that can change the way your brain normally works. Concussions can also occur from a blow to the body that causes the head to move rapidly back and forth. Even a "ding," "getting your bell rung," or what seems to be mild bump or blow to the head can be serious. Concussions can occur in any sport or recreation activity. So, all coaches, parents, and athletes need to learn concussion signs and symptoms and what to do if a concussion occurs."[55]

103. USA Water Polo's website also provides links to "free tools for youth and high school sports coaches, parents, athletes, and health care professionals that provide

---

[54] *Id.*

[55] *Head Injuries*, available at http://www.usawaterpolo.org/resources/ethics-safety.html (last accessed July 7, 2015).

important information on preventing, recognizing, and responding to a concussion" produced by the CDC.[56]

104. USA Water Polo's former medical director and team physician for USA Water Polo has described concussions as "king of water polo injuries" and "the most important acute injury to care for."[57] In doing so, he acknowledged that any symptoms should be "treated seriously" and the Consensus Guidelines promulgated by the International Conferences on Concussion in Sport should be followed.[58]

105. However, USA Water Polo does not actually follow or require its members to follow, any concussion-management procedures at USA Water Polo events or tournaments. USA Water Polo also does not require proper concussion-management procedures in its rules, articulate these steps in an official policy, or enforce these steps.

**2. USA Water Polo Has Failed to Adopt *Any* Consensus Guidelines Promulgated by the International Conferences on Concussion in Sport.**

106. USA Water has neither endorsed nor adopted any of the internationally accepted guidelines set forth in the Zurich II Protocol including, but not limited to: (i) specific return to play guidelines including a specific graded stepwise return to play protocol indicating that a day is needed between return to play steps that typically a week of asymptomatic time is needed to resolve symptoms prior to returning to play and that "it is appropriate to extend the amount of time of asymptomatic rest and/or the length of the graded exertion in children and adolescents"[59];(ii) a prohibition on returning to play in the same game after sustaining a concussion; (iii) requiring formal baseline and/or post-injury neurocognitive testing of players; (iv) requiring that players' concussions be managed and cleared by physicians by medical personnel with

---

[56] *Id.*

[57] Dr. Larry Drum, *Doctor on Deck*.

[58] *Id.*

[59] Zurich II Protocol at 5.

specific expertise in concussion management, diagnosis and treatment; (v) adopting consensus best practices for management of children and adolescents with concussions; and (vi) providing concussion education to athletes, those working with athletes, and the general public.

107. Notably, USA Water Polo's Official Bylaws,[60] Official Playing Rules,[61]and Policies and Procedures[62] do not mention concussions, concussion protocols, or concussion-related playing rules.

108. Rather, USA Water Polo's website merely provides links to concussion informational materials. There is no evidence that USA Water Polo has implemented or enforces concussion guidelines.

109. USA Water Polo also does not require that coaches[63] or referees[64] receive training or education in concussion management or recognition in contravention of best practices. Rather, coaches only must have current CPR and First Aid certification on file with USA Water Polo to obtain coaching certification.[65]

110. USA Water Polo provides links to CDC "fact sheets" for athletes, coaches, and parents which contain an action plan requiring removal of an athlete from play after a concussion, ensuring that the athlete is evaluated by a health care professional, informing the athlete's parents or guardians, and keeping the athlete out

---

60 *Bylaws of USA Water Polo, Inc.*, Nov. 25, 2014, available at http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWPByLaws.pdf (last accessed July 7, 2015).

61 *USAWP Playing Rules*, available at http://www.usawaterpolo.org/resources/rules-ethics.html (last accessed July 7, 2015).

62 *Zone Policies and Procedures*, Oct. 19, 2014, available at http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWPZonePolicies2013.pdf (last accessed July 7, 2015).

63 *Coach Member Details*, available at http://www.usawaterpolo.org/resources/coach-screenings.html (last accessed July 7, 2015).

64 *Referee Member Details*, available at http://www.usawaterpolo.org/resources/ref-screenings.html (last accessed July 7, 2015).

65 *Coach Member Details*, available at http://www.usawaterpolo.org/resources/coach-screenings.html (last accessed July 7, 2015).

of play the day of the injury until they get medical clearance.[66] However, USA Water Polo does not actually follow or require any of these steps in its rules, articulate these steps in an official policy, or enforce these steps.

111.    Accordingly, USA Water Polo's failure to require, implement, or enforce *any* consensus best practices is a clear breach of its duty and commitment to provide "a healthy and safe environment for all…participants."[67]

112.    Zurich II explained that a single treatment and return to play paradigm should be used for all athletes and that formal neuropsychological testing should be used in high-risk sports regardless of age or level of competition, explaining:[68]

> All athletes regardless of level of participation, should be managed using the same treatment and RTP paradigm. The available resources and expertise in concussion evaluation are of more importance in determining management than a separation between elite and non-elite athlete management. Although formal NP testing may be beyond the resources of many sports or individuals, it is recommended that, in all organised high-risk sports, consideration be given to having this cognitive evaluation, regardless of the age or level of performance.

113.    USA Water Polo has failed to implement or enforce the following best practices of concussion management as established by the International Conferences on Concussion in Sport:

- A rule that a player may not return to play on the same day of a concussion;

- A mandatory 24 hour stepwise return to play guideline which accounts for the fact that a day is needed between return to play steps and that typically a week

---

[66] *A Fact Sheet for Coaches*, available at http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/Coaches_Fact_Sheet-Youth_concu.pdf (last accessed July 7, 2015).

[67] *Safesport Education*, available at http://www.usawaterpolo.org/resources/safe-sport.html (last accessed July 7, 2015).

[68] *Zurich II Protocol*, at 5.

of asymptomatic time is needed to resolve symptoms relating to a concussion prior to return to play;

- Formal baseline testing regardless of the age or level of performance of the players and neuropsychological testing to evaluate injury;
- Require that a player with a concussion or a suspected concussion be evaluated, managed, and cleared by medical personnel with specific expertise in concussion diagnosis, treatment, and management; and
- Rule changes to account for proper concussion management.

114. USA Water Polo has also failed to implement or enforce the following best practices of concussion management for child and adolescent athletes as established by the International Conferences on Concussion in Sport which:

- Require a different concussion symptom checklist for children below the age of 13;
- Require parental notification and that concussion treatment and evaluation involve parental input;
- Require utilization of a sideline concussion assessment tool (e.g., SCAT3) specifically designed for children aged 5-12;
- Require that a child should not return to play before the child has returned to school successfully; and
- Require a more conservative return to play approach for children.

115. USA Water Polo's website makes no mention of the special considerations in concussion management for child and adolescent athletes particularly that children should not be returned to play until completely symptom-free, which may require a longer time frame than for adults and a more conservative return to play approach for children is recommended.

116.   The above steps reasonably can and should be taken by USA Water Polo and will not alter the nature of the sport.

**E.   USA Water Polo Has Failed to Adopt Proper Rules Allowing For Play to Be Stopped to Substitute An Injured Player**

117.   USA Water Polo has failed to adopt rules that specially address the issues of brain injuries and/or the risk of brain injury by failing to modify or adopt the playing rules to allow for stoppage of play to substitute an injured player.

118.   USA Water Polo rules state that: "[A] player shall only be allowed to leave the water, or sit or stand on the steps or side of the pool during play in the case of accident, injury, illness or with the permission of a referee. A player who has left the water legitimately may re-enter from the re-entry area nearest his own goal line at an appropriate stoppage, with the permission of a referee."[69]

119.   Accordingly, USA Water Polo rules do not require a stoppage of play for head injuries. Rather, a referee, at his or her discretion, *may* suspend the game for not more than three minutes if accident, injury, or illness, other than bleeding occurs.[70]

120.   USA Water Polo's rule prohibiting a stoppage in play is in contravention of the consensus best practices for concussion management. Zurich II requires:[71]

> Sufficient time for assessment and adequate facilities should be provided for the appropriate medical assessment both on and off the field for injured athletes. In some sports, this may require rule change to allow an appropriate off-field medical assessment to occur without affecting the flow of the game or unduly penalizing the injured players' team. The final determination regarding concussion diagnosis and/or fitness to play is a medical decision based on clinical judgment.

---

[69] USAWP Playing Rules, Rule 25.1 available at http://grfx.cstv.com/photos/schools/uswp/genrel/auto_pdf/2012-13/misc_non_event/USAWP_FINA_09_13.pdf (last accessed July 7, 2015).

[70] *Id.*, Rule 25.3.

[71] Zurich II Protocol, at 2.

121.   If USA Water Polo truly intended to protect youth players, it would modify its rules to stop play and allow injured athletes to be substituted during a game. In addition, three minutes is an insufficient amount of time to evaluate a player for a concussion and whether play is stopped is at the ultimate discretion of the referee who is not trained in the recognition, diagnoses, or treatment of concussions in contravention of best practices for concussion management.

122.   Referees and coaches are also unable to prohibit a previously concussed player from returning to play too soon after following post-concussive protocols. Within USA Water Polo, there are no provisions which prohibit a player from returning to play after a concussion until a medical provider has certified that the previously concussed player should return to training, practice, or game play.

123.   The modification of these rules reasonably can and should be taken by USA Water Polo and will not alter the nature of the sport.

## V.   CLASS ACTION ALLEGATIONS

124.   Plaintiff brings this action, individually and as a class action, pursuant to the provisions of Rules 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All current or former water polo players who from 2013 to the present competed for a team governed by USA Water Polo or participated in an event managed or governed by USA Water Polo.

Excluded from the Class are all persons who make a timely election to be excluded from the Class; and the judge to whom this case is assigned and any immediate family members thereof.

125.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

126.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all members of the Class is impracticable. On information and belief, there are thousands of water polo players who have been exposed to an increased risk of injury or have been damaged by defendant's wrongful conduct as alleged herein. The precise number of members of the Class and their addresses is presently unknown to Plaintiff, but may be ascertained including from books and records of USA Water Polo. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

127.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Class, including, without limitation:

      a.    Whether Defendant engaged in the conduct as alleged herein;

      b.    Whether Defendant owed a duty to Plaintiff and the Class;

      c.    Whether that duty has been breached;

      d.    Whether Defendant failed to adopt or enforce concussion-management and return to play guidelines in conformance with consensus best practices;

      e.    Whether Plaintiff and members of the Class are at increased risk of injury as a result of Defendant's breach; and

      f.    Whether Plaintiff and the Class are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

128.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all members of the Class were comparably injured through the uniform misconduct described above.

129.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class she seeks to represent; she has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

130.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below.

131.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The costs of medical monitoring to be incurred by Plaintiff and members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. CLAIMS ALLEGED

### COUNT I
### NEGLIGENCE
### (On Behalf of Minor H.C. and the Class)

132. Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

133. At all relevant times, Defendant had a duty toward Plaintiff and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players and to take reasonable steps to minimize these risks without altering the nature of the sport.

134. Defendant acted carelessly and negligently in their positions as the regulatory body for water polo and water polo players, including Plaintiff and the Class by increasing the risks of water polo, (including exacerbation of symptoms, post-concussion syndrome, Second Impact Syndrome and long-term cognitive degeneration such as CTE) over and above the risks inherent in the sport. In addition, Defendant knew or should have known that their actions or inaction in light of the rate and extent of concussions reported and made known to Defendant would cause harm to players in both the short- and long-term.

135. Defendant knew that they had the power to direct and influence how its members treat concussion-management issues.

136. Defendant had a duty to enact and enforce playing rules that properly protect players.

137. Defendant was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiff and the Class, both generally and in the following particular respects as set forth above and summarized below:

a. Failing to educate players and their parents concerning symptoms that may indicate a concussion has occurred;

b.   Failing to warn of the risk of unreasonable harm resulting from repeated concussions, and the accumulation of subconcussive hits;

c.   Failing to disclose the risks of long-term complications from repeated concussions and return to play;

d.   Failing to disclose the role of repeated concussions or accumulation of subconcussive hits in causing chronic life-long cognitive decline;

e.   Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and accumulation of subconcussive hits, and a return to play policy to minimize long-term chronic cognitive problems;

f.   Concealing and misrepresenting pertinent facts that players and parents needed to be aware of to make determinations of the safety of return to play;

g.   Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions, exacerbated symptoms, post-concussion syndrome, Second Impact Syndrome and long-term cognitive degeneration such as CTE; and

h.   Other acts of negligence or carelessness that may materialize during the pendency of this action.

138.   The Plaintiff individually and the Class members play water polo and are at risk due to Defendant's breaches.

139.   As a result of the foregoing, Plaintiff and the Class have an improper risk of injury caused by the misconduct of Defendant which goes above and beyond the risks inherent in water polo.

140.   The Plaintiff and the Class are entitled to injunctive relief requiring Defendant, among other things, to adopt corrective measures regarding: the implementation of system-wide "return to play" guidelines for athletes who have

sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and failing to implement substitution rules for medical evaluation purposes. Plaintiff is also entitled to the remedy of medical monitoring.

141.    Moreover, Plaintiff and the Class have no adequate remedy at law in that monetary alone damages cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Instead, Plaintiff and the Class are in need of medical monitoring as a remedy for Defendant's negligence where permitted under state law.

142.    The Class has been exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of long-term injury and the illnesses as described above.

143.    The members of the Medical Monitoring Class have not yet fully manifested the long-term physical and mental effects of Defendant's misconduct, and require specialized testing that is not generally given or available to the public at large for the early detection of the long-term effects of concussions and sub-concussions.

144.    Medical monitoring is reasonably necessary according to contemporary scientific principles within the medical community that specialize in close head injuries and their connection to memory loss, early onset dementia, CTE and Alzheimer-like syndromes.

145.    By monitoring and testing former (and current) athletes who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long-term injuries, disease, and losses as described above will be significantly reduced.

146.    Accordingly, Defendant should be required to establish a medical monitoring program that includes, among other things:

        a.    Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all

past, current, and future athletes, as frequently and appropriately as necessary;

b. Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring; and

c. Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the athlete is subjected to an increased risk of harm.

**COUNT II**
**BREACH OF VOLUNTARY UNDERTAKING**
**(On Behalf Minor H.C. and the Class)**

147. Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

148. At all relevant times, Defendant voluntarily assumed a duty toward Plaintiff and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players and to take reasonable steps to minimize these risks without altering the nature of the sport.

149. USA Water Polo has undertaken broad responsibility in setting and enforcing the rules of water polo.

150. USA Water Polo states on its website that it "is committed to creating a healthy and safe environment for all of our participants." USA Water Polo's website also contains concussion information and acknowledges that "all coaches, parents, and athletes need to learn concussion signs and symptoms and what to do if a concussion occurs." Further, USA Water Polo's website also provides links to "free tools for youth and high school sports coaches, parents, athletes, and health care professionals that provide important information on preventing, recognizing, and responding to a concussion," produced by the CDC.

151. USA Water Polo controls the enactment, enforcement and modification of its rules governing the health and safety of players.

152.   USA Water Polo requests that each athlete, coach, and referee read and agree to a Code of Conduct upon joining or renewing their membership with USA Water Polo. The Code of Conduct contains a provision prohibiting athletes, coaches, and referees from "encouraging an athlete to return to play pre-maturely following a serious injury (e.g., a concussion) and without the clearance of a medical professional."

153.   Plaintiff and the Class relied on Defendant's assertions that it would provide a healthy and safe environment to their detriment. Based on these assertions, Plaintiff and the Class rightfully assumed that USA Water Polo would take reasonable steps, within its power, to minimize the risks of concussions after they had been sustained.

154.   Defendant acted carelessly and negligently in fulfilling their assumed duties as the regulatory body for water polo and water polo players, including Plaintiff and the Class by increasing the risks of water polo, (including exacerbation of symptoms, long-term cognitive degeneration, Second Impact Syndrome, and death) over and above the risks inherent in the sport. In addition, Defendant knew or should have known that their actions or inaction in light of the rate and extent of concussions reported and made known to Defendant would cause harm to players in both the short- and long-term.

155.   Defendant had a voluntary duty to enact and enforce playing rules that properly protect players.

156.   Defendant was careless and negligent by breaching it's assumed and voluntary duty of due care for the benefit of the Plaintiff and the Class, both generally and in the following particular respects as set forth above and summarized below:

      a.    Failing to educate players and their parents concerning symptoms that may indicate a concussion has occurred;

b.  Failing to warn of the risk of unreasonable harm resulting from repeated concussions, and the accumulation of subconcussive hits;

c.  Failing to disclose the risks of long-term complications from repeated concussions and return to play;

d.  Failing to disclose the role of repeated concussions or accumulation of subconcussive hits in causing chronic life-long cognitive decline;

e.  Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and accumulation of subconcussive hits, and a return to play policy to minimize long-term chronic cognitive problems;

f.  Concealing and misrepresenting pertinent facts that players and parents needed to be aware of to make determinations of the safety of return to play;

g.  Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions, exacerbated symptoms, post-concussion syndrome, Second Impact Syndrome and long-term cognitive degeneration such as CTE; and

h.  Other acts of negligence or carelessness that may materialize during the pendency of this action.

157.  Plaintiff individually and the Class members play water polo and are at risk due to Defendant's breaches.

158.  As a result of the foregoing, the Plaintiff and the Class have an improper risk of injury caused by the misconduct of the Defendant which goes above and beyond the risks inherent in water polo.

159.  Plaintiff and the Class are entitled to injunctive relief requiring Defendant, among other things, to adopt corrective measures regarding: the implementation of system-wide "return to play" guidelines for athletes who have

sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and failing to implement substitution Rules for medical evaluation purposes. Plaintiff is also entitled to the remedy of medical monitoring.

160. Moreover, Plaintiff and the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Instead, Plaintiff and the Class are in need of medical monitoring as a remedy for Defendant's negligence where permitted under state law.

161. The Class has been exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of long-term injury and the illnesses as described above.

162. The members of the Medical Monitoring Class have not yet fully manifested the long-term physical and mental effects of Defendant's misconduct, and require specialized testing that is not generally given or available to the public at large for the early detection of the long-term effects of concussions and sub-concussions.

163. Medical monitoring is reasonably necessary according to contemporary scientific principles within the medical community that specialize in close head injuries and their connection to memory loss, early onset dementia, CTE and Alzheimer-like syndromes.

164. By monitoring and testing former (and current) athletes who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long-term injuries, disease, and losses as described above will be significantly reduced.

165. Accordingly, Defendant should be required to establish a medical monitoring program that includes, among other things:

a. Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all

past, current, and future athletes, as frequently and appropriately as necessary;

b. Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring; and

c. Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the athlete is subjected to an increased risk of harm.

**COUNT III**

**GROSS NEGLIGENCE**
**(On Behalf of Minor H.C.)**

166. Plaintiff, on behalf of minor H.C., individually and separately brings Count IV on her own behalf, and adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

167. At all relevant times, USA Water Polo had a duty toward H.C. to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players and to take reasonable steps to minimize these risks without altering the nature of the sport.

168. USA Water Polo acted carelessly and negligently in its position as the regulatory body for water polo in the United States and its athletes, including H.C. by increasing the risks of water polo, (including exacerbation of symptoms, long-term cognitive degeneration, Second Impact Syndrome, and death) over and above the risks inherent in the sport. USA Water Polo knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to USA Water Polo would cause harm to players in both the short- and long- term.

169. USA Water Polo was careless, negligent, and reckless by breaching the duty of due care it assumed for the benefit of H.C., both generally and in the following respects:

(i)  Failing to implement or require the implementation of concussion-management policies that met consensus best practices;

(ii)  Failing to implement or require the implementation of medically-supervised stepwise return to play criteria with express time requirements for the athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)  Failing to require that athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)  Failing to require that athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the athlete for deterioration;

(v)  Leaving discretion of return to play for an athlete that had suffered a concussion or displayed concussion symptoms to an individual team's coach or referee without any training or specific expertise in concussion diagnosis, treatment, and management;

(vi)  Failing to provide or require that medical personnel be present at USA Water Polo events and/or tournaments;

(vii)  Failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(viii)  Failing to provide appropriate medical care or coverage for costs for medical care for athletes who suffered concussions or displayed concussion symptoms; and

(ix) Other acts of negligence, recklessness, or carelessness that may materialize during the pendency of this action.

170. USA Water Polo's failure to enforce *any* of the consensus best practices for concussion management, which were established in approximately 2002, demonstrates a want of even scat care and an extreme departure from the ordinary standard of conduct.

171. Defendant's gross negligence resulted in severe injuries to H.C. who has individually experienced, and may in the future suffer, from an assortment of problems associated with the harm and injuries described above, including, but not limited to, post-concussion syndrome and Chronic Traumatic Encephalopathy, as well as such symptoms as headaches, dizziness, loss of memory, depression, anxiety, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, loss of the pleasures of life, early-onset dementia, and Parkinsonism, among other things.

172. As a result of the foregoing, H.C. has suffered damages and will in the future suffer damages caused by the gross negligence of the Defendant. Accordingly, Plaintiff, on behalf of minor H.C. seeks an individual award of compensatory damages, punitive damages, pain and suffering, and any other relief to which they are entitled under the law. Plaintiff also requests medical monitoring as a remedy.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests judgment as follows:

A. Certification of the proposed Class pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B. Designation of Plaintiff as representative of the proposed Class and designation of Plaintiff's counsel as Class counsel;

C. Injunctive relief;

E. The establishment of a medical monitoring program;

F. An award to the Plaintiff and the Class of costs, and attorneys' fees; and

G. An award to the Plaintiff and Class for such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

DATED: July 8, 2015

By: /s/ Steve W. Berman

Steve W. Berman (*pro hac vice)*
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth A. Fegan *(pro hac vice)*
*beth@hbsslaw.com*
Thomas E. Ahlering *(pro hac vice)*
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950

Elaine T. Byszewski (SBN 222304)
*elaine@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Ave., Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

*Attorneys for Plaintiff Alice Mayall, as parent and guardian of minor H.C., on behalf of H.C. and all others similarly situated.*