STEVE W. BERMAN (*pro hac vice*)
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

ELAINE T. BYSZEWSKI (SBN 222304)
*elaine@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiff Alice Mayall, as parent*
*and guardian of minor H.C., on behalf of H.C.*
*and all others similarly situated.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| ALICE MAYALL, as parent and guardian of minor H.C., on behalf of H.C. and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>USA WATER POLO, INC.,<br><br>Defendant. | No. 8:15-cv-00171-AG-RNB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT USA WATER POLO, INC.'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Date:    September 14, 2015<br>Time:    10:00 A.M.<br>Crtrm:  10D |

010481-11  800458 V1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     STATEMENT OF RELEVANT FACTS ........................................................ 3

    A.      Concussion Risks in Water Polo ........................................................... 3

    B.      Defendant's Duty ................................................................................... 4

    C.      Defendant's Breach ............................................................................... 5

    D.      Minor H.C.'s Injuries As a Result of Defendant's Breach .................... 6

III.    ARGUMENT .................................................................................................. 7

    A.      Plaintiff Has Standing to Seek Injunctive Relief. ................................. 7

    B.      Plaintiff States Valid Claims for Negligence and Breach of
          Voluntary Undertaking in Counts I and II of the Complaint ................ 10

          1.      USA Water Polo has a duty to Plaintiff and the Class to take
                reasonable steps to protect players from concussions and to
                adopt post-concussion protocols to limit the damage from
                concussions. ................................................................................ 11

                a.      Courts nationwide have recognized that sports
                      organizations owe a duty of care to athletes. .................... 11

                b.      Sports organizations owe a duty of care to protect
                      against occurrences which are reasonably expected. ........ 15

                c.      The primary assumption of risk doctrine does not
                      apply because USA Water Polo has a duty not to
                      increase the risks inherent in water polo. ......................... 16

          2.      USA Water Polo has voluntarily assumed the duty to
                Plaintiff and the Class to take reasonable steps to implement
                and enforce concussion management standards. ......................... 21

    C.      Plaintiff States a Viable Claim for Gross Negligence ......................... 23

IV.     CONCLUSION ............................................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*Armstrong v. David*,
5
   275 F.3d 849 (9th Cir. 2001) ...................................................................................... 8

6

*Avila v. Citrus Cmty. Coll. Dist.*,
7
   38 Cal. 4th 148 (2006) ........................................................................... 12, 13, 16

8

*Berman v. Knife River Corp.*,
9
   2012 WL 646068 (N.D. Cal. Feb. 28, 2012) ........................................................ 25

10

*Biakanja v. Irving*,
   49 Cal. 2d 647 (1958) .......................................................................................... 22

11

*Britz Fertilizers, Inc. v. Bayer Corp.*,
12
   2008 WL 341628 (E.D. Cal. Feb. 5, 2008) ......................................................... 23

13

*Calhoon v. Lewis*,
14
   81 Cal. App. 4th 108 (2000) ................................................................................ 18

15

*Castro v. Chicago Park Dist.*,
16
   178 Ill. App. 3d 348, 353-54 (1988) .................................................................... 21

17

*City of Santa Barbara v. Superior Court*,
18
   41 Cal. 4th 747 (2007) .................................................................................. *passim*

19

*Dabish v. Infinitelabs, LLC*,
20
   2014 WL 4658754 (S.D. Cal. Sept. 17, 2014) ...................................................... 7

21

*Davidson v. University of N.C. at Chapel Hill*,
   543 S.E.2d 920 (N.C. Ct. App. 2001) ................................................................. 11

22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
23
   528 U.S. 167 (2000) ............................................................................................... 7

24

*Kahn v. East Side Union High Sch. Dist.*,
25
   31 Cal. 4th 990 (2003) ........................................................................................ 14

26

*Karas v. Strevell*,
27
   227 Ill. 2d 440, 465-66 (2008) ...................................................................... 13, 14

28

010461-11 730518 V1

*Godee v. Illinois Youth Soccer Ass'n*,
   327 Ill. App. 3d 695, 698 (2002) .......................................................................... 21

*Kleinknecht v. Gettysburg Coll.*,
   989 F.2d 1360 (3d Cir. 1993) ................................................................ 11, 12, 13

*Knight v. Jewett*,
   3 Cal. 4th 296 (1992) ...................................................................................... *passim*

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ............................................................................................... 9

*L.H. v. Schwarzenegger*,
   2007 U.S. Dist. LEXIS 18728 (E.D. Cal. Feb. 28, 2007) .................................... 8, 9

*Lewis v. Mammoth Mountain Ski Area*,
   2009 WL 426595 (E.D. Cal. Feb. 20, 2009) ..................................................... 24, 25

*Loosier v. Youth Baseball & Softball, Inc.*,
   142 Ill. App. 3d 313 (1986) ................................................................................ 22

*Mehr, et al. v. Federation Internationale de Football Association, et al.*,
   No. 14-cv-3879 (N.D. Cal.) ................................................................................ 9, 10

*Morgan v. Fuji Country USA, Inc.*,
   34 Cal. App. 4th 127, 134 (1995) ....................................................................... 17

*Onyshko v. National Collegiate Athletic Association*,
   No. 13-cv-01791 (W.D. Pa. May 28, 2014) .................................................... 11, 17

*Paz v. State of California*,
   22 Cal. 4th 550 (2000) ....................................................................................... 22

*Randall v. Mammoth Mountain Ski Area*,
   63 F. Supp. 2d 1251 (E.D. Cal. 1999) .................................................................. 2

*Saffro v. Elite Racing, Inc.*,
   98 Cal. App. 4th 173 (2002) ............................................................................... 17

*Sherry v. East Suburban Football League*,
   807 N.W.2d 859 (Mich. Ct. App. 2011) ............................................................. 13

*Stineman v. Fontbonne Coll.*,
   664 F.2d 1082 (8th Cir. 1981) ............................................................................ 11

-iii-

*Van Horn v. Watson*,
   45 Cal. 4th 322 (2008) ............................................................................ 22

*Wattenberger v. Cincinnati Reds, Inc.*,
   28 Cal. App. 4th 746 (1994) ............................................................. 18, 19

*Wolfe v. Strankman*,
   392 F.3d 358 (9th Cir. 2004) ...................................................................... 9

## OTHER AUTHORITIES

BAJI No. 4.45 ................................................................................................ 22

Fed. R. Civ. P. 12(g)(2) ....................................................................... 18, 20, 21

Restatement (Second) of Torts § 323 (1965) .............................................. 21

Restatement (Second) of Torts § 328B (1965) ........................................... 11

Restatement (Second) of Torts § 328C (1965) ........................................... 11

Restatement (Second) of Torts § 500 (1965) .............................................. 23

# I.     INTRODUCTION

> ***King of water polo injuries.***  *A concussion, however, is the most important acute injury to care for.  A fast moving ball, usually off the cage and into the back of the goalie's head, or a hand that inadvertently hits the head of another player is usually the cause.  Identifying and treating a concussion can be difficult since symptoms tend to be subjective and are hard to objectively measure.  Even an astute physician watching a competition carefully can miss a blow to a team member's head.  Any reports of dizziness, headache, confusion, sleepiness and lack of concentration should be treated seriously.  Guidelines from the Second International Symposium on Concussion in Sport (Prague 2004) can help assist the physician in the decision making process for return to play after concussion.*

> Dr. Larry Drum, Medical Director and Team Physician for USA Water Polo, July 1, 2007

Plaintiff's First Amended Class Action Complaint, July 8, 2015, ECF No. 38 ("Complaint"), ¶¶ 1, 92.[1]

Defendant USA Water Polo, Inc. ("USA Water Polo") is the governing body for the sport of water polo in the United States and regulates every aspect of water polo, including rules regarding player safety and health.  USA Water Polo can make changes that would protect water polo players throughout the United States without altering the nature of the game in any respect.  ¶¶ 18, 78-91, 106-116 (detailing steps USA Water Polo can take to meet its duty of care).  Despite USA Water Polo's admission that concussions in water polo are acute, common, and should be treated seriously in accordance with international consensus best practices, it has failed to adopt or enforce any standards for concussion management and return to play.  ¶ 17.  USA Water Polo's steadfast reluctance to join other sports organizations in adopting and enforcing the standard of care is negligent, and directly contradicts its alleged

---

[1] All citations to "¶" are to the First Amended Complaint unless otherwise noted.

"commit[ment] to creating a healthy and safe environment for all of our participants." ¶ 15.

USA Water Polo's Motion to Dismiss should be denied for several reasons. First, Plaintiff has standing to seek injunctive relief because she amply pleads both an "actual or imminent" injury as well as a threat of repetition. Moreover, Plaintiff has standing to seek medical monitoring relief and damages for her injuries. ¶¶ 141, 160, 172.

Second, Plaintiff states viable claims for negligence and voluntary undertaking. USA Water Polo has a duty to Plaintiff and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players without altering the nature of the sport. This Court must fashion the duty owed by Defendant by defining "the risks inherent in the sport not only by virtue of the nature of the sport itself, but also by reference to the steps [USA Water Polo] reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport." *Knight v. Jewett*, 3 Cal. 4th 296, 317 (1992). USA Water Polo also owes a duty to its participants "not to increase the risks…over and above those inherent in the sport." *Randall v. Mammoth Mountain Ski Area*, 63 F. Supp. 2d 1251, 1254 (E.D. Cal. 1999) (citing *Knight*, 3 Cal. 4th at 315-16). USA Water Polo has breached its duty by failing to enact and enforce basic protocols for the treatment of concussions and return to play guidelines, thus putting players at increased risk for persistent post-concussion syndrome and early-onset neurological diseases, such as Chronic Traumatic Encepholopathy ("CTE").

Third, Plaintiff pleads a viable individual claim for gross negligence on behalf of minor H.C. USA Water Polo's failure to enforce *any* concussion management standards, despite international consensus on concussion management in sport in 2002, demonstrates a want of even scant care and an extreme departure from the ordinary standard of conduct. As a result of her injuries and the lack of proper

-2-

protocols, minor H.C. has suffered, and continues to suffer, from persistent post-concussion syndrome, evidenced by headaches, memory loss, academic impairment, excessive sleepiness, anxiety, cognitive dysfunction, limitations in physical activities, and social isolation. *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747 (2007). Accordingly, USA Water Polo's Motion to Dismiss should be denied.

## II.    STATEMENT OF RELEVANT FACTS

This class action was brought on behalf of all "current or former water polo players who from 2013 to the present competed for a team governed by USA Water Polo or participated in an event managed or governed by USA Water Polo." ¶ 124. Plaintiff sets forth claims for negligence, breach of voluntary undertaking, and gross negligence. ¶¶ 132-172.

## A.    Concussion Risks in Water Polo

Concussions are traumatic brain injuries. ¶¶ 49-50. Common in water polo due to the physical nature of the game, concussions must be carefully managed because players are treading water when they occur. ¶¶ 6-9. Second Impact Syndrome may also occur when an athlete who has sustained a head injury – often a concussion or worse injury – sustains a second head injury before the symptoms associated with the first have cleared. ¶¶ 54-59. The athlete – conscious yet stunned – collapses to the ground with dilating pupils, loss of eye movement, and evidence of respiratory failure. Concussion symptoms can persist beyond a month, which is a condition called post-concussion syndrome. ¶¶ 60-61. Accordingly, USA Water Polo itself has described concussions as the "king of water polo injuries" and "the most important acute injury to care for." ¶ 1. *See also* ¶¶ 92-101 (examples).

Concussion symptoms "can be devastating," disrupting "daily living and participation in school and activities." ¶ 10. Symptoms can cause children to miss weeks or even months out of the school year, as well as attention and memory deficits, clumsiness, and social withdrawal due to headaches and mood changes. *Id*.

1   Moreover, there is "substantial evidence that young people may be more susceptible

2   to damage resulting from repetitive concussive and sub-concussive brain trauma," and

3   that they "are typically not provided professional medical supervision, either during

4   practices or at matches." ¶¶ 11, 12.

5   **B.   Defendant's Duty**

6       USA Water Polo is the "national governing body for the sport of water polo in

7   the United States," claiming it is "committed to creating a healthy and safe

8   environment for all of our participants." ¶¶ 13, 15, 41.  Using this authority, USA

9   Water Polo requires all players and participants to follow the policies, bylaws, rules of

10   conduct, and regulations it has enacted.  ¶ 2.  USA Water Polo has the power to enact,

11   enforce, or modify rules that would properly manage concussions and return to play

12   protocols to ensure players have progressed through a stepwise, graded exertional

13   return to play protocol and are symptom free for at least 24 hours.  ¶ 14.

14       USA Water Polo requests that each athlete, coach, and referee read and agree to

15   a Code of Conduct upon joining or renewing their membership with USA Water Polo.

16   The Code of Conduct contains a provision prohibiting athletes, coaches, and referees

17   from "encouraging an athlete to return to play pre-maturely following a serious injury

18   (e.g., a concussion) and without the clearance of a medical professional." ¶ 15.

19   However, USA Water Polo does not have any rules or guidelines for concussion

20   management or return to play.  *Id.*

21       In addition, USA Water Polo's "Statement of Ethics Value" establishes a duty

22   owed to players, members, and the public:

23           Public trust in the performance of USA Water Polo, Inc.
           (USAWP) is the bedrock of our legitimacy.  Donors, volunteers
24           support our organization because they believe in our mission
           and they trust us to carry it forward, to be a faithful steward of
25           our resources and to uphold rigorous and exemplary standards
           of conduct.

26
           USAWP is committed to earning this trust every day and in
27           every possible way, including a willingness to go beyond legal
           requirements where appropriate to embrace the spirit of the law
28           as well.  It is up to everyone in our organization to carry out our

010461-11 730518 V1

mission with integrity, honesty, fairness, transparency, and a strong sense of respect for our membership and our public.

¶ 43.

USA Water Polo's website states: "A concussion is a type of traumatic brain injury (TBI), caused by a bump, blow, or jolt to the head that can change the way your brain normally works.  Concussions can also occur from a blow to the body that causes the head to move rapidly back and forth.  Even a 'ding,' 'getting your bell rung,' or what seems to be [a] mild bump or blow to the head can be serious.  Concussions can occur in any sport or recreation activity.  So, all coaches, parents, and athletes need to learn concussion signs and symptoms and what to do if a concussion occurs." ¶ 102.  Further, USA Water Polo's website also provides links to "free tools for youth and high school sports coaches, parents, athletes, and health care professionals that provide important information on preventing, recognizing, and responding to a concussion," produced by the CDC.  ¶ 103.  Accordingly, USA Water Polo had a duty, and voluntarily assumed the duty, to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players and to take reasonable steps to minimize these risks without altering the nature of the sport.  ¶¶ 133, 148, 167.

## C.    Defendant's Breach

Despite its duty, USA Water Polo failed to implement the standard of care for the management of head injuries and concussions after their occurrence, including generally-accepted return-to-play guidelines.  ¶ 5.  USA Water Polo's failure to implement even a scant amount of concussion management care or enforce *any* of the consensus best practices for concussion management represents an extreme departure from the ordinary standard of care.  *Id.*  USA Water Polo has not taken appropriate actions in regard to protecting the safety of players at any level and has engaged in a pattern of gross negligence and inaction with respect to concussions and concussion-related maladies suffered by players.  ¶ 17.

The international consensus guidelines for the treatment of concussions were established – and have been ignored – by USA Water Polo since 2002.  ¶¶ 78-91, 102-123.  USA Water Polo has failed to adopt *any* consensus guidelines promulgated by the International Conferences on Concussion in Sport, which require a stepwise return to play protocol; formal pre-injury baseline and/or post-injury neurocognitive testing of players; management of concussions by medical personnel with specific expertise in concussion diagnosis, treatment, and management; adoption of consensus best practices for management of children and adolescents with concussion; and substitution rules for injured players.  ¶¶ 106-116.

In fact, USA Water Polo's Official Bylaws, Official Playing Rules, and Policies and Procedures do not mention concussions, concussion protocols, or concussion-related rules.  ¶ 107.  Accordingly, USA Water Polo has breached its duty of care and damaged Plaintiff and Class members.  ¶¶ 18-20, 48, 126, 141, 160, 172.

**D.  Minor H.C.'s Injuries As a Result of Defendant's Breach**

Plaintiff's daughter, minor H.C., played water polo for the LARPD Lazers water polo club, which is one of approximately 500 USA Water Polo member clubs that must abide by the rules and policies of USA Water Polo.  ¶ 25.  From February 14-16, 2014, H.C. attended the annual WinterFest tournament, organized and managed by USA Water Polo, in Los Alamitos, California.  ¶ 28.  Despite the susceptibility of young athletes to concussions, USA Water Polo did not provide any athletic trainers or medical personnel for the tournament.  *Id.*

During the tournament, H.C. was hit hard in the face by a shot, causing a concussion.  The game was not stopped.  She was not taken out of the game and did not receive any assessment or treatment.  ¶ 29.  During subsequent tournament games, H.C. took additional hits to the head, exacerbating the initial injury.  The hits were observed by H.C.'s coach and the referee, but the games were not stopped, and she did not receive any evaluation or treatment.  ¶ 30.

The failure to take H.C. out of the game after sustaining a concussion, provide her with any treatment, have any athletic trainer or medical personnel present to provide treatment, or stop the game to evaluate H.C., and allowing H.C. to return to play while she was still recovering from prior concussion injuries, was a breach of duty by USA Water Polo.

Subsequently diagnosed with post-concussion syndrome, H.C. experiences daily headaches, sleeps excessively, and takes medication to combat her symptoms. ¶¶ 33-36. H.C. has missed school, suffered academically and socially, and incurred out-of-pocket costs for ongoing medical treatment. ¶ 39. H.C. is at increased risk of latent brain injuries caused by repeated head impacts or the accumulation of subconcussive hits, particularly as a minor, and therefore is in need of medical monitoring. ¶ 40.

## III.   ARGUMENT

### A.   Plaintiff Has Standing to Seek Injunctive Relief.

The Complaint adequately alleges Plaintiff's standing to maintain claims against USA Water Polo. First, USA Water Polo does not dispute that Plaintiff has standing to seek medical monitoring relief. Br. at 6. Thus, on this basis alone, only a portion of Plaintiff's claims are subject to USA Water Polo's standing argument. *See*, *e.g.*, *Dabish v. Infinitelabs, LLC*, 2014 WL 4658754, at *6 (S.D. Cal. Sept. 17, 2014) (granting defendant's motion to dismiss plaintiff's claims on subject matter jurisdiction grounds only to the extent that the claims sought injunctive relief).

Second, Plaintiff has standing to pursue claims for injunctive relief. To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),*

-7-

*Inc.*, 528 U.S. 167, 180-81 (2000).  A plaintiff who seeks prospective injunctive relief "must also demonstrate 'that he is realistically threatened by a repetition of [the violation].'" *L.H. v. Schwarzenegger*, 2007 U.S. Dist. LEXIS 18728, at *15 (E.D. Cal. Feb. 28, 2007) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)).  A plaintiff may show that "harm is capable of realistic repetition when the harm is part of a 'pattern of officially sanctioned...behavior, violative of the plaintiffs' [ ] rights.'" *Id.* at *16 (quoting *LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir. 1985)).  "When a named plaintiff asserts injuries that have been inflicted upon a class of plaintiffs, [the court] may consider…the harm asserted by the class as a whole, to determine whether [there is] a credible threat that the named plaintiff's injury will recur." *Armstrong v. David*, 275 F.3d, 849, 861 (9th Cir. 2001) (citing *LaDuke*, 762 F.2d at 1326).

In *Armstrong,* the court explained:

> Where a court, through its specific factual findings, documents the threat of future harm to the plaintiff class and establishes that the named plaintiffs (or some subset thereof sufficient to confer standing on the class as a whole) are personally subject to that harm, the "possibility of recurring injury ceases to be speculative," and standing is appropriate.

*Armstrong,* 275 F.3d at 861 (internal citations omitted).

Plaintiff amply pleads both an "actual or imminent" injury as well as a threat of repetition.[2]  First, it is undeniable that H.C. has alleged an actual injury.  *See* Section II.D.  Second, the Complaint plainly alleges that H.C. plays water polo and is therefore "at risk due to Defendant's breaches."  ¶¶ 138, 157.  It is also a reasonable and plausible inference from the Complaint that Plaintiff, only 16 years old, will continue her participation in water polo.  One such plausible scenario would be in the event that USA Water Polo implements the internationally-accepted concussion policies and rules sought by this lawsuit.  Further, there is also standing based on the threat of future injury from USA Water Polo's systematic failure to implement even a scant

---

[2] USA Water Polo does not dispute that H.C.'s injury is "fairly traceable to the challenged action of the defendant."

amount of concussion management care for its participants.  As a result, "Plaintiff and the Class have an improper risk of injury…." ¶ 139.  Courts have found similar inferences reasonable for pleading purposes in considering whether a plaintiff is realistically threatened by future harm.  *See Schwarzenegger*, 2007 U.S. Dist. LEXIS 18728, at *17-18.  Finally, H.C.'s "prior injuries serve as evidence that the future threat is likely to actually occur."  *Id.* at *21-22 (citing *Lyons*, 461 U.S. at 102) (noting that past wrongs are evidence "bearing on whether there is a real and immediate threat of repeated injury"); *Kolender v. Lawson,* 461 U.S. 352, 357 n.3 (1983) (finding a "credible threat" of future injury in part based on plaintiff's past experiences with defendants' conduct).

USA Water Polo improperly requests that the Court draw speculative inferences not contained in the Complaint.  On a facial challenge for a lack of subject matter jurisdiction, all material allegations in the complaint must be assumed true, and the only question for the court is whether the claimed lack of federal jurisdiction appears from the face of the pleading itself.  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  Here, USA Water Polo requests that the Court infer that because of H.C.'s injuries, she is "incapable of participating in any sort of organized water polo competition" and therefore, it is "inconceivable that she would again voluntarily expose herself to the risks inherent in the sport of water polo."  Br. at 8-9.  This argument stands in direct contrast to the Complaint, which alleges that H.C. is currently playing (or will play) water polo in the future and therefore is at risk of injury caused by the misconduct of USA Water Polo.  ¶¶ 138-139.

Finally, the court's decision in *Mehr* regarding standing is clearly distinguishable.[3]  In *Mehr*, the court noted that in regards to prospective injunctive

---

[3] USA Water Polo also asks that the Court take judicial notice of a class action complaint and an order granting motions to dismiss in the case of *Mehr, et al. v. Federation Internationale de Football Association, et al.*, No. 14-cv-3879 (N.D. Cal.) ("*Mehr*"), but does not argue anywhere in its Motion to Dismiss that the purported documents should result in dismissal of Plaintiff's claims.  *See* Defendant's Request

-9-

relief, plaintiffs did not allege facts showing that they were injured or in "any imminent danger of injury." *Mehr* at 23. In fact, the court held that only one plaintiff was alleged to suffer an actual concussion and yet did not "allege[] any facts showing that [plaintiff] is in imminent danger of injury, as they assert the same vague and conclusory allegation with regard to [plaintiff] as with regard to the other six plaintiffs." *Id.* Further, the court held that even the one plaintiff alleged to have sustained a concussion pled no facts showing that any defendant was responsible for the concussion. *Mehr* at 24. This case differs significantly from *Mehr* as Plaintiff pleads specific facts regarding how USA Water Polo was responsible for H.C.'s injuries and how she is in danger of future injury. *See* Section II.C, II.D. Finally, the court held that "no plaintiff that does not claim to have suffered a concussion can seek to hold defendants liable for any alleged failure to implement plaintiffs' proposed concussion management protocols…." *Mehr* at 27-28. Here, Plaintiff alleges that H.C. suffered a concussion and was damaged by USA Water Polo's lack of protocols. *See* Sections II.C, II.D.

The logical import of USA Water Polo's invocation of *Mehr*, coupled with its argument that Plaintiff here is too injured to have standing, is that *no* plaintiff would ever have standing to seek redress for USA Water Polo's dangerous conduct. If the plaintiff is not injured enough (*Mehr*), there is no standing, and if the Plaintiff is "too injured" (here), there is also no standing. That cannot be the law.

**B.    Plaintiff States Valid Claims for Negligence and Breach of Voluntary Undertaking in Counts I and II of the Complaint**

Plaintiff alleges that USA Water Polo had a duty (Count I), and voluntarily assumed a duty (Count II), "to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players and to take reasonable steps to minimize these risks without altering the nature of the sport." ¶

for Judicial Notice in Support of Motion to Dismiss First Amended Class Action Complaint, Ex. 2.

133 (Count I), ¶ 148 (Count II).  This case is not about preventing an initial concussion but rather USA Water Polo's failure to implement concussion management policies and rules which are necessary to minimize or prevent an exacerbation of symptoms, post-concussion syndrome, Second Impact Syndrome, and long-term cognitive degeneration such as CTE.  ¶ 5.

> **1.     USA Water Polo has a duty to Plaintiff and the Class to take reasonable steps to protect players from concussions and to adopt post-concussion protocols to limit the damage from concussions.**

Whether a defendant owes a duty of care to a plaintiff is a question of law.  *See* Restatement (Second) of Torts § 328B (1965) (court determines whether facts give rise to any legal duty on part of defendant).  "[I]n any case in which different conclusions may be reached on the issue…whether the defendant has conformed to the standard of conduct required by the law" is a matter for the jury.  *Id*. § 328C.

> **a.     Courts nationwide have recognized that sports organizations owe a duty of care to athletes.**

Federal and state courts nationwide have confirmed that organizers of sporting events owe a duty of care to athletes in practices and games and must "take reasonable steps to guard against hazards which are generally foreseeable."  *See*, *e.g.*, *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1372 (3d Cir. 1993) (holding that a college owes a duty to student-athletes to have timely medical care available); *Stineman v. Fontbonne Coll.*,  664 F.2d 1082, 1086 (8th Cir. 1981); *Davidson v. University of N.C. at Chapel Hill*, 543 S.E.2d 920, 926-28 (N.C. Ct. App. 2001) (university owes a duty of care to members of school-sponsored intercollegiate team); *Onyshko v. National Collegiate Athletic Association*, No. 13-cv-01791, ECF No. 11 at 13 (W.D. Pa. May 28, 2014) (finding that the NCAA owed a duty of care to a former football player).

For example, in *Kleinknecht*, the Third Circuit held that a college owed a lacrosse player a duty of care because the player "was participating in a scheduled athletic practice for an intercollegiate team sponsored by the College under the supervision of College employees."  989 F.2d at 1367.  The Third Circuit explained:

-11-

> Although it is true that a defendant is not required to guard against every possible risk, he must take reasonable steps to guard against hazards which are generally foreseeable.  *Kimble v. Mackintosh Hemphill Co.,* 359 Pa. 461, 59 A.2d 68, 71 (1948).…  [T]he College did owe Drew a duty to take reasonable precautions against the risk of death while Drew was taking part in the College's intercollegiate lacrosse program.  Having determined that it is foreseeable that a member of the College's interscholastic lacrosse team could suffer a serious injury during an athletic event, it becomes evident that the College's failure to protect against such a risk is not reasonable.  The magnitude of the foreseeable harm--irreparable injury or death to one of its student athletes as a result of inadequate preventive emergency measures--is indisputable.

*Id*. at 1370.

The California Supreme Court also recognizes the existence of a duty owed by sporting organizations to athletes in *Avila v. Citrus Cmty. Coll. Dist.*, 38 Cal. 4th 148 (2006).  In *Avila*, the court found that a college, as a host school for an athletic competition, "is not a disinterested, uninvolved party vis-à-vis the athletes it invites to compete…." and that the competition "allows a school to…offer its students the benefits of athletic participation and…reap the economic and marketing benefits that derive from maintenance of a major sports program."  *Id*. at 162.  Therefore, the court held that these benefits "justify removing a host school from the broad class of those with no connection to a sporting contest and no duty to the participants" and that the host college owed a duty to players to "not increase the risks inherent in the sport."  *Id*. (noting that colleges and universities owe special duties to athletes and that in a duty analysis "a court need not ask what risks a particular plaintiff subjectively knew of and chose to encounter, but instead must evaluate the fundamental nature of the sport and the defendant's role in or relationship to that sport in order to determine whether the defendant owes a duty to protect a plaintiff from the particular risk of harm").  *Id*. at 161.

Like in *Kleinknecht* and *Avila*, water polo players participate in competitions and practices governed by USA Water Polo and under the supervision of USA Water

-12-

Polo employees.  USA Water Polo obtains a benefit from the athletes' participation in that players pay to play.  Therefore, USA Water Polo should not be removed "from the broad class of those with no connection to a sporting contest and no duty to the participants."  *Id.* at 162.  Further, like the risks of injury identified in *Avila* and *Kleinknecht*, the risks of concussion in water polo are foreseeable.  Just as in *Avila*, the Court should reject the argument that USA Water Polo is "little more than a passive provider of facilities," but instead is the key authority for the way in which players' health and safety is managed.  *Id.*

USA Water Polo's position as a governing organization does not immunize it from liability for ensuring that the appropriate follow-up occurs after a concussion, its "king of water polo injuries," occurs.  In *Karas v. Strevell*, the plaintiff alleged that certain hockey organizations failed to adequately enforce a rule against bodychecking from behind.  227 Ill. 2d 440, 465-66 (2008).  While the Illinois Supreme Court affirmed dismissal of a negligence count, it was only because plaintiff did "not allege that the organizational defendants completely failed to enforce the rule against bodychecking from behind."  *Id.* at 466.  Unlike in *Karas*, Plaintiff here alleges that USA Water Polo has *completely* failed to adopt or enforce *any* concussion management or return to play guidelines.  In doing so, Plaintiff "alleges conduct totally outside the range of ordinary activity involved with" the sport of water polo. *Id*.

Organizations "can expect to be sued for their carelessness, and holding… organizations to an ordinary negligence standard of care does not discourage vigorous participation in recreational activities."  *Sherry v. East Suburban Football League*, 807 N.W.2d 859, 862 (Mich. Ct. App. 2011).  Thus, this Court should not find, as a matter of law, that the rule-making organization for water polo in the United States does not owe any duty to its participant players.  *Id*. at 863.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        For example, in *Kahn v. East Side Union High Sch. Dist.*, the California

Supreme Court reversed the appellate court's decision finding that shallow-water

diving is a fundamental part of competitive swimming and an inherent risk of the

sport, precluding liability for those that oversaw the sport.  31 Cal. 4th 990 (2003).

The California Supreme Court held that a sports instructor can be liable for breach of a

duty of care to an athlete if "the instructor intentionally injures the student or engages

in conduct that is reckless…." *Id*. at 996.  The Court then explained that shallow-

water diving subjected a swimmer to safety risks:

> [T]he Red Cross teaching manual submitted by plaintiff
> acknowledged that the principal danger faced by persons
> learning to compete in swimming is the shallow-water dive.
> The risk presented is not simply that the swimmer might
> suffer bruises or even break an arm; the risk is that the
> student may sustain serious head and spinal cord injuries by
> striking the bottom of the pool.  Plaintiff presented evidence,
> both documentary and expert, that a settled progression of
> instruction in the dive is considered essential to a student's
> safety.

*Id*. at 1011-12.  The court held that the plaintiff had presented substantial evidence that

the instructor acted recklessly, precluding summary judgment for the instructor.  *See

also Karas*, 884 N.E.2d at 137 ("[W]hether the contact sports exception applies to a

nonparticipant defendant is a policy determination that rests on the circumstances of

the sport and its inherent risks, the relationship of the parties to the sport and to each

other, and whether imposing broader liability on the defendant 'would harm the sport

or cause it to be changed or abandoned.'") (quoting *Kahn*, 31 Cal. 4th at 1006).

        Similarly here, water polo players are at risk of serious injuries, and the

international consensus standards establish basic protocols for concussion

management and return to play.  Just as an instructor can be liable for failing to follow

standard safety measures, USA Water Polo can be held liable for failing to implement,

follow, or enforce standard concussion management protocols which would minimize

the risk of injury following a concussion, the exacerbation of symptoms, and the

potential of Second Impact Syndrome, post-concussion syndrome, and CTE.

-14-

### b.   Sports organizations owe a duty of care to protect against occurrences which are reasonably expected.

In *Knight*, the California Supreme Court explained that "the nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself. Additionally, the scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." 3 Cal. 4th at 317. The court explained that sports organizations should have a duty to protect against foreseeable risks, stating:

> Had the *Ratcliff* court utilized an implied consent analysis, the court would have looked only to the knowledge of the particular plaintiff (the spectator) to determine whether the risk of being hit by an accidentally thrown bat was an inherent risk of the sport of baseball assumed by the plaintiff, and would have treated the plaintiff's action against both defendants similarly with regard to such risk. The *Ratcliff* court did not analyze the case in that manner, however. Instead, the court implicitly recognized that two different potential duties were at issue--(1) the duty of the ballplayer to play the game without carelessly throwing his bat, and (2) the duty of the stadium owner to provide a reasonably safe stadium with regard to the relatively common (but particularly dangerous) hazard of a thrown bat. Because each defendant's liability rested on a separate duty, there was no inconsistency in the jury verdict absolving the batter of liability but imposing liability on the stadium owner for its failure to provide the patron "protection from flying bats, at least in the area where the greatest danger exists and where such an occurrence is reasonably to be expected." (*Ratcliff v. San Diego Baseball Club*, *supra*, 27 Cal.App.2d at p. 736.)

*Id.* Thus, as the organization that sets the rules by which the game of water polo is played, USA Water Polo has a duty to protect against foreseeable risks. *Id.* at 318.

Plaintiff adequately alleges that USA Water Polo has a duty to take reasonable steps to protect Plaintiff and the Class from concussions and to adopt post-concussion protocols to limit the damage from concussions. USA Water Polo's duty to take such steps arises from its role as the national governing body for the sport of Water Polo in the United States. ¶¶ 13, 41, 42. As the governing body, USA Water Polo has recklessly failed to follow or require its members to adopt *any* concussion

-15-

management procedures, including failing to: (1) mandate return to play protocols; (2) implement baseline testing at all levels "regardless of age or level of performance"; (3) require that players' concussions be managed onsite by medical personnel with specific expertise in concussion diagnosis, treatment, and management; and (4) follow best practices in managing concussions in children and adolescents.  ¶¶ 78-91, 102-116.  In addition, USA Water Polo has failed to adopt proper rules allowing for play to be stopped to substitute an injured player who has a concussion or suspected concussion.  ¶¶ 117-123.  Three minutes is an insufficient amount of time to evaluate a player and whether play is stopped is at the ultimate discretion of the referee, who is not trained in the recognition, diagnoses, or treatment of concussions.  ¶ 121.  Therefore, Defendant's motion should be denied.

### c.  The primary assumption of risk doctrine does not apply because USA Water Polo has a duty not to increase the risks inherent in water polo.

"Primary assumption of the risk arises when, as a matter of law and policy, a defendant owes no duty to protect a plaintiff from particular harms."  *Avila*, 38 Cal. 4th at 161.  In the sporting context, a sports organization has a duty "not to increase the risks inherent in sports participation."  *Id*. at 162.  Thus, primary assumption of the risk does not preclude liability just by virtue of an athlete's participation in sports – regardless of the athlete's subjective knowledge of potential risks.  Rather, the court must examine whether USA Water Polo increased the risk of harm from concussions through participation in water polo.  *Id*. at 161.  The answer is yes.

Here, Plaintiff is not alleging that USA Water Polo could prevent concussions.  ¶ 5.  However, once a player receives a concussion, USA Water Polo has a duty to properly manage the concussion and ensure that the player does not return to play before the athlete has fully recovered.  USA Water Polo's failure to implement or enforce *any* concussion management or return to play guidelines exacerbated H.C.'s symptoms and put other athletes at risk of exacerbation of symptoms, long-term

-16-

cognitive degeneration, Second Impact Syndrome, post-concussion syndrome, and CTE.

Numerous courts have followed the principles in *Knight* in holding sports organizations liable.  For example, directly on point is *Onyshko v. National Collegiate Athletic Association*, No. 13-cv-01791, ECF No. 11 at 13 (W.D. Pa. May 28, 2014).  In *Onyshko,* the NCAA argued that it owed plaintiff no duty because of the primary assumption of risk doctrine.  In dismissing this argument, the court noted: "[W]hile it is true that getting hit in the head is an inherent risk of football, Plaintiffs assert that the NCAA *increased* [plaintiff's] risk of long-term injury by failing to disclose crucial information as well as failing to have procedures in play with respect to returning to play after sustaining serious head injuries."  Plaintiff makes identical allegations here. *See*, *e.g.*, ¶¶ 137, 156.

In *Saffro v. Elite Racing, Inc.*, the court held that the trial court erred in applying the primary assumption of risk doctrine.  98 Cal. App. 4th 173 (2002).  The *Saffro* court held that "a race organizer that stages a marathon has a duty to organize and conduct a reasonably safe event…[including] the obligation to minimize the risks of dehydration and hyponatremia by providing adequate water and electrolyte fluids along the 26 mile course…."  98 Cal. App. 4th 173, 179.  Similarly, the court in *Morgan v. Fuji Country USA, Inc.* held that despite the fact that being stuck by an errant ball is an inherent risk in the sport of golf, the owner of a golf course owed a duty to golfers "to provide a reasonably safe golf course" which requires it to "minimize the risks without altering the nature of the sport."  34 Cal. App. 4th 127, 134 (1995).  Thus, the golf course owner was required to minimize the risks that players would be hit by golf balls and affirmatively provide protection for players. *Id.* at 137.  Here, USA Water Polo's failure to adopt basic concussion management measures to protect players once a concussion has occurred is a breach of duty that is not barred by the primary assumption of the risk doctrine.

010461-11 730518 V1

**(1)     USA Water Polo's Duty of Care Extends to Restricting Participation by an Injured Player**

Further, USA Water Polo's argument that the primary assumption of risk doctrine applies when the defendant's conduct only increased the severity of the injury (and not the risk of injury) misstates the law.[4,5]  For example, in *Wattenberger v. Cincinnati Reds, Inc.*, the court noted that "whether this general duty of care extends to restricting participation by an injured player to avoid aggravation of an injury is primarily a question of foreseeability."  28 Cal. App. 4th 746, 755 (1994).  The court held that a baseball team had a "duty to protect participants from aggravating an existing injury," including a pitcher who aggravated an arm injury in a tryout, and found the primary assumption of risk duty inapplicable:

> In addition to the foreseeability of harm, various policy considerations support imposition of a duty here…Imposition of a duty to protect participants from aggravating an existing injury would help to prevent future harm. At the same time, such a duty would not unduly burden either defendants or injured players. Neither is served by permitting a player to participate in a tryout where such participation is necessarily constricted by an injury. Finally, evidence was presented that the Reds were not only able to but did in fact maintain insurance for tryout injuries.

*Id.* at 756.

Harm to water polo players following a concussion is clearly foreseeable to USA Water Polo and the policy consideration at issue in *Wattenberger* is equally

---

[4] This argument, despite being available, was not made in USA Water Polo's initial motion to dismiss (Dkt. No. 15) and has therefore been waived under Fed. R. Civ. P. 12(g)(2), which states that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."

[5] USA Water Polo's sole support for this proposition is clearly inapplicable. *Calhoon v. Lewis*, 81 Cal. App. 4th 108 (2000).  In *Calhoon*, a teenager was injured skateboarding in the driveway of a neighbor by tripping over a concealed metal pipe in a planter in their driveway.  The court found that "the *Knight* exception permitting liability for one who has increased the risks beyond those inherent in the sport, 'was made in the context of [the court's] discussion of the duty owed by parties who have some *organized relationship with each other and to a sporting activity*….'" *Id.* (internal citation omitted) (emphasis in original).

-18-

1   applicable: "the imposition of a duty to protect participants from aggravating an

2   existing injury would help to prevent future harm."  *Id.*  USA Water Polo "reasonably

3   should be obligated to take" such steps.  *Knight*, 3 Cal. 4th at 317.

4        USA Water Polo also argues that its current rules regarding stoppage of play

5   and substitution are sufficient.  USA Water Polo's argument improperly speaks to the

6   merits of the case and nonetheless are directly contradicted by the Complaint, which

7   plainly alleges that USA Water Polo's playing rules are deficient for a variety of

8   reasons, including: (1) the rules do not *require* that play be stopped but rather

9   permissively allow for play to be stopped at the discretion of the referee; (2) the

10  referee making a determination as to whether to stop play is insufficient because the

11  referee lacks training in the recognition, diagnoses, or treatment of concussions; (3)

12  play may only be stopped for three minutes at the discretion of the referee, which is an

13  insufficient amount of time to evaluate a suspected concussion; (4) referees and

14  coaches are unable to prohibit a previously concussed player from returning too soon

15  because they lack proper training in the recognition, diagnoses, or treatment of

16  concussions; and (5) USA Water Polo does not prohibit a player from returning to

17  play after a concussion until a medical provider has certified that the concussed player

18  should return and to the extent that it requires medical clearance, delegates the

19  certification of medical clearance to coaches who lack proper training in the

20  recognition, diagnoses, or treatment of concussions.  ¶¶ 117-123.

21              **(2)   Changes to USA Water Polo's Rules and Policies Can**
22              **(and Should) Be Reasonably Taken and Will Not Chill**
                **Participation or Alter the Nature of the Sport.**

23       After acknowledging that its rules and policies are deficient, USA Water Polo

24  subsequently argues that the only alternative to its currently deficient rules and

25  policies "would be to require a stoppage in play every time there was an impact to the

26

27

28

-19-

1   head of a player and/or to extend the time during which play is stopped…to assess

2   such an impact."[6]

3        However, positive changes to USA Water Polo's rules and policies will not

4   alter the nature of the sport nor will it "chill vigorous participation." *Knight*, at 318.

5   First, any concern regarding chilling vigorous participation is absent here because the

6   concern is only present "if legal liability were to be imposed *on a participant* on the

7   basis of his or her ordinary conduct." *Id.* (emphasis added).  Second, numerous sports

8   leagues have implemented proper concussion rules and policies and yet, these sports

9   have not ceased to exist, nor have the changes altered the game in any way.  ¶ 3

10  ("Sports and medical organizations across the country have implemented rules and

11  best practices for concussion management.").  Such changes have been recognized by

12  the American Medical Association (AMA) as necessary to "ensure that the

13  appropriate guidelines are in place" to "reduce the number of youth athletes who may

14  return to a game too soon, which can put their health at further risk." *Id.*

15       The burden to implement these changes is considerably low in light of the

16  significant risks of exacerbation of symptoms, such as in the case of H.C.  A rule

17  requiring stoppage of play when H.C. sustained a blow to the head could have quickly

18  identified her injury, ensured that she received the proper attention, and ensured that

19  she was not returned to play too quickly.  Such a simple rule would go a long way in

20  ensuring the safety of water polo players.  USA Water Polo's unwillingness to make

21  such reasonable changes are unconvincing, especially in light of its "commit[ment] to

22  creating a healthy and safe environment for all of [our] participants."  ¶ 15.

23       Finally, USA Water Polo's argument that implementation of consensus best

24  practices for concussion management would require it to provide "medical

25  assessment, care, and treatment" which would "interfere with the relationship between

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[6] USA Water Polo's argument, despite being available, that imposition of a duty
27  would "chill vigorous participation" and "alter the fundamental nature of the activity"
was not raised in USA Water Polo's initial motion to dismiss.  Dkt. No. 15.
28  Therefore, this argument has also been waived under Fed. R. Civ. P. 12(g)(2).

the player and his or her own physician" is similarly misguided.[7]  The consensus best practices require no medical treatment by USA Water Polo and can be accomplished by simply amending its rules and policies – which it seems completely unwilling to do, despite the fact that athlete safety (including the safety of minors) is at stake.  For example, the following best practices can be implemented without providing medical care: implementing a rule that a player may not return to play on the same day of a concussion; requiring a mandatory 24 hour stepwise return to play guideline; requiring baseline testing; and requiring a player to be evaluated, managed, and cleared by a medical professional.

> **2.      USA Water Polo has voluntarily assumed the duty to Plaintiff and the Class to take reasonable steps to implement and enforce concussion management standards.**

Section 323 of the Restatement (Second) of Torts, provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject for liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>> (a)  his failure to exercise such care increases the risk of such harm, or
>> (b)  the harm is suffered because of the other's reliance upon the undertaking.

*See* Restatement (Second) of Torts § 323 (1965).

Courts have applied the Restatement to the duty owed by sports organizations to athletes and participants.  For example, in *Godee v. Illinois Youth Soccer Ass'n*, the court recognized that a youth soccer organization's undertaking "was limited to the administration of youth soccer games….  Therefore, any duty they owed was to the participants."  327 Ill. App. 3d 695, 698 (2002).  Similarly, in *Castro v. Chicago Park Dist.*, the court held that a defendant baseball league and its president had a duty to supervise and safeguard its participants.  178 Ill. App. 3d 348, 353-54 (1988).  The court stated that the defendant league's undertaking was the organization and

---

[7] USA Water Polo also waived this argument under Fed. R. Civ. P. 12(g)(2).

administration of the league and that therefore, "the League had a duty to supervise and safeguard its participants." *Id*.; *see also Loosier v. Youth Baseball & Softball, Inc.*, 142 Ill. App. 3d 313, 318 (1986) (holding that a defendant baseball league had a duty to supervise the activity of its baseball and softball games while the players were on the field actively participating in the sport and entrusted by their parents to their coaches).

The California Supreme Court has also recognized that "[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to a duty of acting carefully, if he acts at all." *Van Horn v. Watson*, 45 Cal. 4th 322, 333 (2008) (internal quotation marks and citations omitted). As that Court has also explained, "a person who undertakes to render services for another may be liable to third persons for physical harm resulting from a failure to act with reasonable care…*if* (a) the failure to exercise reasonable care increased the risk of harm, (b) the undertaking was to perform a duty the other person owed to the third persons, or (c) the harm was suffered because the other person or the third persons relied on the undertaking." *Paz v. State of California*, 22 Cal. 4th 550, 553 (2000). And a California jury instruction states that a "person who is under no duty to care for or render service to another but who voluntarily assumes such a duty, is liable to the other for injury caused by a failure to exercise ordinary or reasonable care in the performance of that assumed duty." Cal. BAJI No. 4.45.

USA Water Polo has undertaken broad responsibility in setting and enforcing the rules of water polo. *See*, *e.g.*, *Biakanja v. Irving*, 49 Cal. 2d 647, 649 (1958) (noting that liability has been imposed upon suppliers of goods and services that have undertaken a duty and negligently made or rendered those services which are "reasonably certain to place life and limb in peril") (citations omitted). USA Water Polo states on its website that it "is committed to creating a healthy and safe environment for all of our participants." ¶ 15. And USA Water Polo controls the

enactment, enforcement and modification of its rules governing the health and safety of players.  ¶ 151.  USA Water Polo thus assumed a duty toward Plaintiff and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players, and to take reasonable steps to minimize these risks without altering the nature of the sport.  ¶¶ 133, 148, 167.

USA Water Polo's actions have increased the risk of harm to them and members of the putative class by knowingly disregarding medical research and best practices regarding treatment of concussions and subconcussive hits.  Moreover, Plaintiff and the Class relied on USA Water Polo's assertions that it would provide a healthy and safe environment to their detriment.  ¶ 151.  Based on these assertions, Plaintiff and the Class rightfully assumed that USA Water Polo would take reasonable steps, within its power, to minimize the risks of concussions after they had been sustained.  ¶ 153.  Accordingly, Plaintiff has stated a valid claim for breach of voluntary undertaking.

## C.  Plaintiff States a Viable Claim for Gross Negligence

With respect to gross negligence, the Restatement of Torts (Second) states:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*See* Restatement (Second) of Torts § 500 (1965).

Similarly, the California Supreme Court has long defined gross negligence as either a "want of even scant care" or "an extreme departure from the ordinary standard of conduct."  *City of Santa Barbara*, 41 Cal. 4th at 754 (citations omitted); *see also Britz Fertilizers, Inc. v. Bayer Corp.*, 2008 WL 341628, at *13 (E.D. Cal. Feb. 5, 2008) ("Whether a party acted with gross negligence is a question of fact.") (citing *Cooper v. Kellogg,* 2 Cal.2d 504, 511, 42 P.2d 59 (1935) (stating "whether there has been such a lack of care as to constitute gross negligence is a question of fact for the

1  determination of the trial court or jury, even where there is no conflict in the evidence

2  if different conclusions upon the subject can rationally be drawn therefrom.")).

3  Whether a defendant's lack of care constitutes gross negligence is usually a triable

4  issue of fact.  *City of Santa Barbara*, 41 Cal. 4th at 767.

5          Here, Plaintiff alleges the following facts demonstrating an extreme departure

6  from the ordinary standard of conduct: as a result of USA Water Polo's complete

7  disregard of any semblance of concussion prevention or treatment, minor H.C. was not

8  taken out of the game after sustaining a concussion; was not provided with any

9  treatment by her team or USA Water Polo, nor was any athletic trainer or medical

10  personnel present to provide treatment; the games were not stopped to evaluate H.C.;

11  H.C. was not evaluated on the sideline; H.C. was returned to play while still

12  recovering from prior concussion injuries; and H.C. was not screened, which would

13  have detected the concussions she received and thus prevented her from playing until

14  she had fully recovered.  ¶¶ 24-40.  Instead, H.C. was at the mercy of her coach and

15  the referee – both of whom lacked any concussion management training,

16  qualifications, and education from USA Water Polo.  ¶ 30.  As of 2002, consensus had

17  been reached in the medical and scientific community for the cornerstones of the

18  management and treatment of concussions, and despite knowledge of these

19  cornerstones, USA Water Polo made a voluntary decision to not implement any

20  consensus guidelines.  ¶ 78.  As a result, H.C. struggles to this day – over a year after

21  her injuries – with damages she sustained as a result.  ¶¶ 32-36, 39-40, 171-72.

22          These facts are sufficient to state a claim for gross negligence that is "plausible

23  on its face," allowing at least a "reasonable inference" that USA Water Polo could be

24  liable.  *See, e.g.*, *Lewis v. Mammoth Mountain Ski Area*, 2009 WL 426595, at *14-15

25  (E.D. Cal. Feb. 20, 2009) (denying summary judgment where allegations that

26  defendant snowmobile guide ignored known risks could support a finding of reckless

27  disregard amounting to gross negligence).

28

-24-

The decision in *Lewis* is instructive.  *Id*.  In *Lewis*, the plaintiff alleged that she sustained injuries while participating in a guided snowmobile tour offered by defendant.  Denying summary judgment against plaintiff on her gross negligence claim, the court explained "there is evidence that could support a finding that [defendant employee] deliberately and without warning led the group over at least one terrain variation that caused [plaintiff] and other members of the group to go airborne in violation of MSA policy….  Going airborne is sufficiently riskful that [defendant] has a policy against the activity.  Deliberately ignoring and violating its own rule could support a finding of reckless disregard of known risks amounting to gross negligence."  *Lewis*, 2009 WL 426595, at *15; *see also Berman v. Knife River Corp*., 2012 WL 646068, at *6 (N.D. Cal. Feb. 28, 2012) (holding that plaintiff's allegations that defendant failed to mark a street, which caused him to crash his motorcycle and sustain injuries, was sufficient to state a claim for gross negligence at the Rule 12(b)(6) stage).

Here, USA Water Polo's failure to implement or enforce the international consensus standards represents "an extreme departure from the ordinary standard of conduct."  *City of Santa Barbara*, 41 Cal. 4th at 754 (citations omitted).  Describing concussions as the "king of water polo injuries" and "the most important acute injury to care for," USA Water Polo's medical director has admitted that the consensus guidelines should be followed.  ¶ 1.  Yet, incredibly, USA Water Polo does not actually follow or require its members to follow *any* concussion management procedures at USA Water Polo events or tournaments.  ¶ 105.

Accordingly, Defendant's motion should be denied.

## IV.   CONCLUSION

Plaintiff respectfully requests that the Court deny USA Water Polo's Motion to Dismiss.  If the Court dismisses the Complaint on any basis, Plaintiff respectfully requests leave to file an amended complaint to address any deficiencies.

-25-

1    DATED: August 24, 2015                  HAGENS BERMAN SOBOL SHAPIRO LLP

2

3                                            By:   /s/ Steve W. Berman
                                                  Steve W. Berman (*Pro Hac Vice*)
4                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                             1918 Eighth Avenue, Suite 3300
5                                            Seattle, WA 98101
                                             Telephone: (206) 623-7292
6                                            Facsimile: (206) 623-0594
                                             steve@hbsslaw.com
7

8                                            Elaine T. Byszewski (SBN 222304)
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
9                                            301 North Lake Avenue, Suite 203
                                             Pasadena, CA 91101
10                                           Telephone: (213) 330-7150
                                             Facsimile: (213) 330-7152
11                                           elaine@hbsslaw.com

12

13                                           Elizabeth A. Fegan (*Pro Hac Vice*)
                                             Thomas E. Ahlering (*Pro Hac Vice*)
14                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                             455 N. Cityfront Plaza Drive, Suite 2410
15                                           Chicago, IL 60611
                                             Telephone: (708) 628-4961
16                                           Facsimile: (708) 628-4950
                                             beth@hbsslaw.com
17                                           toma@hbsslaw.com

18

19                                           *Attorneys for Plaintiff Alice Mayall, as parent
                                             and guardian of minor H.C., on behalf of H.C.
20                                           and all others similarly situated.*

21

22

23

24

25

26

27

28

010461-11 730518 V1

1

**CERTIFICATE OF SERVICE**

2

      I hereby certify that on August 24, 2015, I electronically filed the foregoing

3

document using the CM/ECF system which will send notification of such filing to the

4

e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail

5

Notice List.

6

7

                             /s/ Steve W. Berman

8

                             STEVE W. BERMAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-27-