UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICE MAYALL, *as parent and guardian of minor H.C., on behalf of H.C. and all others similarly situated*,<br><br>          Plaintiff,<br><br>     v.<br><br>USA WATER POLO, INC.,<br><br>          Defendant. | CASE NO. SACV 15-0171 AG (KESx)<br><br>ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT |

From Ancient Greece and before to the twenty-first century, sports enrich our society. For spectators, sports bring people from all walks of life together in a coliseum or in front of a big-screen TV. For athletes, sports promote the lifelong values of team work, good health, athletic excellence, fair play, and robust competition. For young athletes, sports may be the ticket to college.

This case raises a significant question facing society about how best to maintain those values, while also ensuring the safety of athletes. Film writers, news pundits, and athletes themselves have recently raised similar questions in other contexts and for other sports. In this case, Plaintiff Alice Mayall raises the question for her minor daughter, H.C., who suffered head injuries while playing water polo under Defendant USA Water Polo's rules and policies. Plaintiff's First Amended Complaint

("FAC") challenges whether Defendant struck the proper balance between promoting vigorous competition and ensuring the safety of its competitors.

Defendant moves to dismiss and strike portions of the FAC. The Court GRANTS Defendant's Motion to Dismiss. Defendant's Motion to Strike portions of the FAC is therefore MOOT.

The Court's decision is by no means a panacea to the policy question lying beneath the action. Nor should the decision result in limiting efforts, voluntary or otherwise, to prevent concussions in water polo or other sports. Those safety efforts may be laudable and even necessary to adequately ensure the well being of athletes. But the facts alleged in this case do not present this federal District Court applying California common law with the opportunity to judicially require those safety efforts. The Court reaches this decision sensitive to the continued pain and suffering of H.C. and recognizing the conflicting interests of not discouraging athletes from going "faster, higher, stronger."

1.  **FACTUAL BACKGROUND**

The Court assumes facts alleged in the FAC as true for these Motions that attack standing and the sufficiency of the claims on the face of the allegations in the FAC. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014); *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). Plaintiff sues on behalf of her sixteen-year-old daughter, H.C., and others similarly situated, seeking compensatory and injunctive relief. Plaintiff's claims arise from a concussion H.C. suffered while playing water polo for a team governed by Defendant's rules and policies. On February 15, 2014, H.C. was playing in a water polo tournament when she suffered a concussion after a ball hit her in the face. Neither the referee nor the coach stopped the game. Her coach, who was not trained or educated in concussion management, allowed her to continue playing. No athletic trainer or medical professional was at the game. H.C. continued to play in other games that day and took additional hits to the head that aggravated her initial injury.

After the tournament, H.C. suffered physical symptoms, including headaches, excessive sleepiness, and dizziness. H.C. was eventually diagnosed with post-concussion syndrome. H.C. continues to experience physical symptoms and to struggle socially and academically. The thrust of Plaintiff's allegations is that Defendant's lack of policies regarding concussions aggravated H.C.'s initial injury.

**2.    STANDING**

A plaintiff must show the plaintiff has standing for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Defendant here doesn't challenge standing to seek simple monetary relief or medical monitoring for H.C. on the gross negligence claim. Instead, Defendant challenges standing to seek other injunctive relief for H.C. and the class. Specifically, Defendant challenges standing to seek injunctive relief requiring Defendant to (1) implement systemwide return-to-play guidelines for athletes who have sustained concussions, (2) implement systemwide guidelines to screen and detect head injuries, (3) implement substitution rules for medical evaluation purposes, and (4) provide medical monitoring for players' injuries.

Standing to bring these challenged claims requires that (1) H.C. suffers an "injury in fact" that is not "conjectural or hypothetical," (2) "a causal connection [exists] between the injury and conduct complained of," and (3) it is "likely" rather than "speculative" that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Court now reviews these three requirements.

**2.1    Injury in Fact**

Although H.C. has suffered a medical injury, Plaintiff has not sufficiently shown that H.C. suffers an "injury in fact" that supports standing under Article III. "Past exposure to illegal conduct does not

in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). Instead, plaintiffs "must demonstrate that they are realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (citations and alterations omitted). Plaintiffs must also show that the threatened injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

The FAC does not allege sufficient facts that H.C. is realistically threatened by a repetition of a violation. *Gest*, 443 F.3d at 1181. To start, if H.C. is not playing water polo for a team governed by Defendant's rules and policies, she is not exposed to the types of "continuing, present adverse effects" needed to have standing to bring claims against Defendant. *O'Shea*, 414 U.S. at 495.

Portions of the FAC raise that concern. For instance, the FAC alleges that "H.C. *has played* water polo for the LARPD Lazers Water Polo Club." But that allegation doesn't provide that H.C. is currently playing for a team governed by Defendant's rules and policies. Indeed, the single allegation in the FAC that Plaintiff currently plays water polo for any team is questionable. In her opposition, Plaintiff states that it is a plausible inference H.C. will continue to play water polo if Defendant implements Plaintiff's requested concussion policies. At the hearing for these Motions, Plaintiff's counsel confirmed that H.C. "wants to play again." Both statements suggest that H.C. is not currently playing the game, much less for a team governed by Defendant's rules and policies.

Nor has Plaintiff adequately shown that an injury is "certainly impending." *Clapper*, 133 S. Ct. at 1147. The bare assertion that Plaintiff has an "improper risk of injury caused by the misconduct of Defendant which goes above and beyond the risks inherent in water polo" is unsupported by any alleged facts.

4

Finally, Plaintiff's bare statistical assertions describing the heightened risk of concussions for young people are not enough to show that H.C. faces an imminent risk of harm. The Court must not base the likelihood of threatened harm to H.C. on "naked statistical assertion[s]," but instead must make an "individualized inquiry into whether there is a credible threat that [H.C.] will again suffer the harm that allegedly occurred" to her. *Nelsen v. King Cty.*, 895 F.2d 1248, 1251–52 (9th Cir. 1990). Plaintiff's allegations therefore don't persuade the Court that H.C. suffers the required "injury in fact" to have standing to seek injunctive relief other than for medical monitoring of H.C.

### 2.2 Causal Connection

Plaintiff has also inadequately shown that Defendant's conduct caused any increased risk of injury. As noted, Plaintiff hasn't alleged that H.C. is currently playing on a team governed by USA Water Polo's rules and policies. Any risk of injury is therefore not fairly traceable to Defendant.

Nor has Plaintiff adequately shown that Defendant increased the risk of head injuries "above and beyond the risks inherent in water polo." That vague, legal conclusion in the FAC is not enough to show that Defendant's failure to implement (1) return-to-play guidelines, (2) guidelines to screen and detect head injuries, or (3) substitution rules for medical evaluation purposes *increased* the risks of head injuries beyond those inherent in the game. Indeed, Plaintiff acknowledges that "head and facial injuries are common" in water polo. Plaintiff also alleges that Defendant failed to *minimize* the risks that arise after suffering a concussion. But, as discussed later in Section 3.1, a failure to minimize a risk doesn't equate to increasing that risk.

Plaintiff has thus not persuaded the Court that Defendant caused any injury in fact fairly traceable to Defendant to support standing to seek injunctive relief other than for medical monitoring of H.C.

**2.3 Redressability**

Even if Plaintiff satisfied the first two elements to confer standing, Plaintiff has not met her burden to show that a favorable ruling will redress any injury in fact fairly traceable to Defendant. The requested changes to Defendant's rules and policies are too vague and convoluted to assess whether they will reduce any risk of aggravating H.C.'s head injury. As Defendant notes, it is unclear what policies Plaintiff even seeks to implement through injunctive relief. Further, it is doubtful that certain requested remedies, like having on-site medical personnel trained in head injuries, will minimize the risk of suffering a head injury, much less increase that risk. This doubt stems in part from the allegation in the FAC that "[e]ven an astute physician watching a competition carefully can miss a blow to a team member's head." Thus, Plaintiff hasn't convinced the Court that she satisfies the third requirement to have standing. Plaintiff therefore does not have standing to seek the requested injunctive relief in the FAC. Once again, this result does not affect standing to seek medical monitoring for H.C.'s injuries.

Plaintiff states it "cannot be the law" that Plaintiff does not have standing because that may mean no plaintiff has standing to challenge Defendant's policies on concussions. But the Supreme Court has held that is indeed the law. As the Supreme Court has stated, "[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Clapper*, 133 S. Ct. at 1154 (citations omitted). In short, simply because someone in Plaintiff's position doesn't have standing is not a reason for this Court to manufacture a case or controversy.

**3. FAILURE TO STATE A CLAIM FOR RELIEF**

"The foregoing considerations [of standing] obviously shade into those determining whether the complaint states a sound basis for equitable relief." *O'Shea*, 414 U.S. at 499 (assessing whether the

plaintiff has a basis to seek relief as though the complaint presented an existing case or controversy). As such, the Court still considers whether Plaintiff states a claim for relief under Rule 12(b)(6) for her claims. To survive a Rule 12(b)(6) Motion, a complaint must contain "a short and plain statement of the claim" showing that it is "plausible" Plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**3.1     Negligence**

Plaintiff alleges that Defendant has a duty "to take reasonable steps to recognize, manage, and appropriately treat head injuries and concussions" and "to provide players with rules, information, and best practices that protect them as much as possible from short-term and long-term health risks." Defendant argues that Plaintiff's negligence claim should be dismissed because USA Water Polo owed no such legal duties to H.C. Defendant's argument is on sounder legal footing.

A claim for negligence requires alleging duty, breach of duty, causation, and damages. *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 463 (2003). Generally, persons owe duties to use due care to avoid injury to others. Cal. Civ. Code § 1714. "In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." *Knight v. Jewett*, 3 Cal. 4th 296, 315 (1992). Under the primary assumption of risk doctrine, "[d]efendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself." *Id.* at 315–16. But "defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." *Id.* at 316.

To determine whether a risk is inherent in the sport, courts rely on their common experience, case law, or other published materials. *Nalwa v. Cedar Fair, L.P.*, 55 Cal. 4th 1148, 1158 (2012). Specifically, courts look to (1) the nature of the sport, (2) the defendant's role in the sport or relationship to the plaintiff, and (3) whether imposing a duty would chill vigorous participation in the sport or alter its fundamental nature. *Knight*, 3 Cal. 4th at 317; *Ferrari v. Grand Canyon Dories*, 32 Cal. App. 4th 248, 253 (1995). "Conduct is not inherent in the sport if that conduct is totally outside the range of ordinary activity involved in the sport . . . [and] if the prohibition of that conduct would neither deter vigorous participation in the sport nor otherwise fundamentally alter the nature of the sport." *Moser v. Ratinoff*, 105 Cal. App. 4th 1211, 1222 (2003) (citation and internal quotation marks omitted). The California Supreme Court has reaffirmed that "operators, sponsors, and instructors" of physical recreational activities owe no duties to eliminate or minimize inherent risks of injury in a sport, but only owe duties not to increase the inherent risks of injury. *Nalwa*, 55 Cal. 4th at 1162; *see also Balthazor v. Little League Baseball, Inc.*, 62 Cal. App. 4th 47, 49 (1998) (finding that a baseball league had no duty to decrease the risks in the sport and thus owed no duty to protect a player from being hit by a pitch because that risk was inherent in the sport); *Connelly v. Mammoth Mt. Ski Area*, 39 Cal. App. 4th 8, 12 (1995) (finding that an alpine ski operator owed no legal duty to a skier because the operator did not increase the risk of colliding with a ski lift tower).

Plaintiff has not alleged sufficient facts to show that Defendant increased the risks of suffering head injuries beyond those inherent in water polo to create a legal duty of care to H.C. Plaintiff maintains that Defendant doesn't owe a duty to prevent concussions, but only a duty to "properly manage the concussion and ensure that the player does not return to play before the athlete is fully recovered." But that is a distinction without a difference, as Plaintiff also hasn't adequately alleged that Defendant increased the risk of aggravating a head injury after it happens.

Plaintiff's allegations support not only that concussions are common in water polo, but also that successive head injuries in a single game or tournament are common. For example, the FAC alleges

that "head and facial injuries are common either through direct contact or contact with the ball" and that "[c]oncussions can and frequently do occur without any contact with the head." It also alleges that "direct contact of the players and high velocity with which the ball travels often carries sufficient force to fracture or cause severe facial or head injuries." While acknowledging that the risk of suffering head injuries in water polo is significant, the FAC doesn't adequately allege that Defendant increased the risk of suffering or aggravating a head injury beyond those inherent in the sport. Her conclusory allegations, like the bare allegation that Defendant "increases the risk of injury beyond those inherent in the sport," are unpersuasive. Plaintiff's allegations that Defendant failed to *minimize* the risk of head injuries also doesn't support her allegation that Defendant *increased* those risks. Thus, the allegations in the FAC don't support that Defendant increased the risk of incurring or aggravating a head injury to extend a legal duty from Defendant to H.C. *See Paz v. California*, 22 Cal. 4th 550, 560 (2000) ("[A] failure to alleviate a risk cannot be regarded as tantamount to increasing that risk.").

Plaintiff's reliance on unpublished and out-of-state cases is unpersuasive. Also unpersuasive is her reliance on California cases. In *Wattenbarger v. Cincinnati Reds, Inc.*, 28 Cal. App. 4th 746, 755 (1994), the court held that an organizer of a baseball tryout owed a duty not to aggravate a baseball player's known injury. *Id.* The court imposed this duty because the player's "popped" shoulder made his injury obvious, rendering it foreseeable that he would aggravate his injury by returning to play. *Id.* But unlike a "popped" shoulder, concussions in water polo are not obvious injuries. As Plaintiff alleges, "[e]ven an astute physician watching a competition carefully can miss a blow to a team member's head." And in contrast to the *Wattenbarger* plaintiff, H.C. was not impliedly or explicitly encouraged to return to play. Instead, H.C. herself asked her coach to get back in the game. It was therefore far from foreseeable to H.C.'s coach that returning to play would aggravate a known injury.

9

Plaintiff's reliance on *Khan v. East Side Union High School District*, 31 Cal. 4th 990 (2003) is equally unpersuasive. In *Khan*, the California Supreme Court held that an instructor could be liable when the instructor intentionally or recklessly injured the student. *Id.* at 996. The Court isn't convinced that failing to stop a water polo game every time a player is hit in the head rises to the same level of recklessness as allowing beginners to dive in shallow water, as in *Khan. Id.* at 1101–12.

Nor do any allegations in the FAC support that Plaintiff's requested injunctive remedies would minimize the risks of injury without fundamentally altering the nature of the game. For instance, Plaintiff alleges that it is "best practice" to require sideline testing of players by medical personnel with special expertise in concussion management, diagnosis, and treatment. But requiring medical personnel to attend every game may be so costly that it deters participation in water polo altogether. Similarly, requiring coaches and referees to be trained in recognizing, diagnosing, and treating concussions may dry up the pool of volunteers and employees who make games possible. Plaintiff's version of the sport may leave only M.D.'s available to coach and referee a game. Nothing in the FAC dispels those concerns.

Plaintiff also requests that the game stop for more than three minutes each time a player is hit in the head to see if a player suffered a concussion. As Defendant recognizes, this may require the game to stop for an indefinite period each time a player is hit in the head. If players are hit in the head as often as Plaintiff alleges, the game may be constantly stalled for indefinite periods. Requiring constant interruptions to the game may fundamentally alter the nature of water polo, which is meant to demand continuous bursts of energy. As the FAC alleges, "water polo is extremely taxing on the body because it demands all out bursts of energy."

Plaintiff's negligence claim therefore fails because she has not sufficiently alleged that Defendant increased the risks of injury in water polo beyond those inherent in the sport to give rise to a legal duty of care to H.C.  Nor is there any allegation in the FAC that Plaintiff's proposed remedies

10

would not fundamentally alter the nature of the sport. Because Plaintiff has failed to adequately allege a legal duty to prevent or treat H.C.'s head injuries, the Court need not consider whether Plaintiff has properly alleged the remaining elements of her negligence claim. *See Friedman*, 107 Cal. App. 4th at 463 ("The existence of a duty is the threshold element of a negligence cause of action."). Accordingly, the Court GRANTS Defendant's Motion to Dismiss Plaintiff's negligence claim.

### 3.2  Voluntary Undertaking

Plaintiff's second claim alleges that Defendant "voluntarily assumed" a duty "to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players." California's so-called "Good Samaritan Rule" provides that "[a] defendant who enters upon an affirmative course of conduct affecting the interests of another is regarded as assuming a duty to act, and will be liable for negligent acts or omissions . . . because one who undertakes to do an act must do it with care." *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1156 (2013) (internal citation and alterations omitted). But "[t]he duty of a 'good Samaritan' is limited." *Baker v. City of Los Angeles*, 188 Cal. App. 3d 902, 907 (1986). The Good Samaritan Rule cannot "be expanded to draft all 'Samaritans' into an army obligated to the person aided." *Id.* "A defendant's undertaking will support the finding of a duty to another only if (a) the defendant's action increased the risk of harm to another, or (b) the other person reasonably relied upon the undertaking to his or her detriment." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 250 (2005). Defendants must have "specifically" undertaken to perform the task they are charged with having performed negligently. *Artiligo v. Corning*, 18 Cal. 4th 604, 614 (1998).

Like the Good Samaritan Parable, the doctrine of voluntary undertaking is not new. The limit that a person must have *specifically* undertaken to perform a task to be liable also has mature roots. *See, e.g.*, Joseph H. Beale, Jr., *Gratuitous Undertakings*, 5 Harv. L. Rev. 222, 223 (1891) (describing gratuitous undertakings and providing the following as an example: "A falls senseless in the street; B, a passing

physician, undertakes to cure him. B might have passed by and left A to his fate; but having undertaken the work, he is liable for any negligence, either of commission or of omission.").

Plaintiff has not adequately alleged facts showing that Defendant undertook a *specific* duty to prevent or manage players' head injuries. Plaintiff bases Defendant's purported voluntary undertaking on vague, sweeping allegations like "USA Water Polo has undertaken broad responsibility in setting and enforcing the rules of water polo," and "[Defendant has asserted] that it would provide a healthy and safe environment" to players. Those actions and statements don't support that Defendant undertook any *specific* task to prevent or care for head injuries. Plaintiff also points to statements and links on Defendant's website that discuss the importance of learning about concussion signs and symptoms. Neither passively providing information about concussions nor generally discussing the importance of concussion management shows that Defendant undertook a *specific*, affirmative step to protect H.C. from suffering a concussion or aggravating her injury.

At most, Defendant's efforts show that it voluntarily tried to minimize the inherent risks of injury in water polo. But "such voluntary efforts at minimizing risk do not demonstrate defendant bore a legal duty to do so." *Nalwa*, 55 Cal. 4th at 1163 (finding that a defendant's efforts to discourage head-on bumping of bumper cars did not give rise to a duty under a voluntary undertaking theory). Further support for Defendant's position is provided by the decision of the Northern District of California in *Mehr v. Federation Internationale de Football Ass'n*, 115 F. Supp. 3d 1035 (N.D. Cal. 2015). There, the court found that even greater steps — such as implementing a Concussion Management Program or adopting a Concussion Procedure and Protocol — did not show that the defendants undertook a specific duty to eliminate the risks of concussion inherent in soccer. *Id.* at 1065–67

Even setting aside Plaintiff's failure to allege a specific undertaking, Plaintiff fails to allege sufficient facts, apart from a bare legal assertion, to suggest that H.C. detrimentally relied on any action taken by Defendant. This alone would justify dismissing Plaintiff's claim.

12

Thus, Plaintiff's claim for voluntary undertaking fails because she has not alleged sufficient facts to show that Defendant specifically undertook a duty to prevent the risk that H.C. would suffer a concussion, or that H.C. detrimentally relied on Defendant's actions. The Court therefore GRANTS Defendant's Motion to Dismiss Plaintiff's voluntary undertaking claim.

### 3.3 Gross Negligence

Finally, Defendant moves to dismiss Plaintiff's gross negligence claim. "Gross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages." *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (2011). But "to set forth a claim for 'gross negligence' the plaintiff must allege extreme conduct on the part of the defendant." *Id.*

Plaintiff's gross negligence claim fails because, as described earlier, Plaintiff hasn't shown that Defendant owes a legal duty of care to H.C. And although Plaintiff asserts that Defendant acted in a manner that was an extreme departure from ordinary standards of conduct, Plaintiff has not alleged sufficient facts to support such a conclusory assertion. Indeed, Plaintiff has not shown that Defendant's policies depart from any industry standard of care, much less an extreme departure. Plaintiff has therefore failed to state a claim for gross negligence. Accordingly, the Court GRANTS Defendant's Motion to Dismiss Plaintiff's claim of gross negligence.

### 3.4 Leave to Amend

In dismissing the claims, the Court must also decide whether to grant leave to amend. "A district court may deny a plaintiff leave to amend if it determines that 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency,' . . . ." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (citation omitted) (quoting *Schreiber Distrib. Co. v. Serv-Well*

*Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986)). Under this standard, an additional chance to amend seems justified. Thus, the Court grants the Motion WITH LEAVE TO AMEND the claims.

4.  **DISPOSITION**

The Court GRANTS WITH LEAVE TO AMEND Defendant's Motion to Dismiss Plaintiff's FAC for failure to state a claim. Defendant's Motion to Strike portions of the FAC under Rule 12(f) is therefore MOOT. Plaintiff may file an amended complaint within 28 days of this Order.

IT IS SO ORDERED.

DATED: March 30, 2016

_____
Andrew J. Guilford
United States District Judge